# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

MOUNTAIN WEST HELICOPTERS, LLC,:
LONG-LINE LEASING, LLC, :
HELOG AG and HELI-AIR ZAGEL :
LUFTTRANSPORT AG, :
:
          Plaintiffs, :
:
vs. :
: CASE NO. 3:01-CV-1746 (AVC)
KAMAN AEROSPACE CORPORATION :
and JOHN DOES I THROUGH V, : September 10, 2004
:
Defendants. :

## DEFENDANT'S LOCAL RULE 56(A)(1) STATEMENT

1.      Plaintiffs Mountain West Helicopters, LLC and Long-Line Leasing, LLC (collectively "Mountain West") purchased a helicopter from Kaman in 1997 to use in logging operations (the "Mountain West helicopter"). (Exhibit A, Plaintiffs', Mountain West Helicopters, LLC and Long-Line Leasing, LLC, Response to Defendant's First Interrogatories, Requests for Production and Requests for Admission ("Mountain West Response") at 7, ¶ 1; Exhibit B, a true and correct copy of the Purchase Agreement for the Mountain West helicopter).

2.      Plaintiffs Helog AG and Heli-Air Zagel Lufttransport AG (collectively "Helog") purchased a helicopter from Kaman in 1997 to use in logging operations (the "Helog helicopter"). (Exhibit C, Plaintiffs', Helog AG and Heli-Air Zagel Lufttransport AG, Response to Defendant's First Interrogatories, Requests for Production and Requests for Admission ("Helog Response") at 7, ¶ 1; Exhibit D, a true and correct copy of the Purchase Agreement for the Helog helicopter).

3.    The purchase agreement under which Mountain West purchased the helicopter contained a warranty provision expressly excluding recovery of incidental and consequential economic damages.   (Exhibit A, Mountain West Response at 7, ¶ 1; Exhibit B, Purchase Agreement at 5).

4.    The purchase agreement under which Helog purchased the helicopter contained a warranty provision expressly excluding recovery of incidental and consequential economic damages. (Exhibit C, Helog Response and 7, ¶ 1; Exhibit D, Purchase Agreement at 5-6).

5.    In 1999, the free wheeling sprag clutch of the Helog helicopter was replaced and the warranty provisions applicable to the replacement clutch mirrored those contained in the helicopter purchase agreement.  (Exhibit C, Helog Response at 8, ¶ 2; Exhibit E, Affidavit of Wolfgang Zagel, sworn to March 22, 2002 at ¶ 10; Exhibit F is a true and correct copy of the relevant warranty provision of Kaman's 1999 parts catalogue).

6.    In 1999, the free wheeling sprag clutch of the Mountain West helicopter was replaced and the warranty provisions applicable to the replacement clutch mirrored those contained in the helicopter purchase agreement.  (Exhibit G, Affidavit of Bryan Burr, sworn to on January 31, 2002 at ¶ 9; Exhibit F).

7.    The Mountain West helicopter was involved in an accident in 1999, resulting in damage to the helicopter.  (Exhibit H, Complaint ¶¶ 19-20; Exhibit I Answer ¶¶ 19, 20).

8.    The Helog helicopter was involved in an accident in 1999, resulting in damage to the helicopter.  (Exhibit H, Complaint ¶¶ 26-28; Exhibit I, Answer ¶¶ 26-28).

9.    Helog's insurer reimbursed Helog $2,591,908 for the loss of the Helog helicopter. (Exhibit C, Helog Response at 4, ¶ 3).

2

10.    Mountain West's insurer paid $1,030,000 to repair the Mountain West helicopter. (Exhibit A, Mountain West Response at 5, ¶ 8).

11.    Plaintiffs' insurance carriers brought subrogation actions against Kaman to recover the insurance proceeds paid in connection with the accidents and these subrogation actions have been settled.    (Exhibit J, Kaman Aerospace Corporation's Objections and Responses to Plaintiffs' First Set of Interrogatories at ¶¶ 10-11).

12.    Plaintiffs seek to recover from Kaman the amounts they have already received from their insurers.  (Exhibit A, Mountain West Response at 7-8, ¶ 4; Exhibit C, Helog Response at 2, ¶ 1).

13.    In addition to its property damage claim, Mountain West claims the following damages:

    (a)    Lost profits and revenues for helicopter logging operations -- $30,000;

    (b)    Ongoing expenses in the form of excess salaried personnel unable to generate revenue in the absence of the helicopter -- $25,000;

    (c)    Loss of the benefit of pilot training expenses -- $40,000;

    (d)    Loss of the benefit of a portion of the annual premium paid to insure the helicopter -- $18,700;

    (e)    Increase in hull and liability insurance premiums -- $117,000,

    (f)    Interest expenses -- $207,500; and

    (g)    Loss of a "no claims bonus on renewal" for aviation hull insurance premium -- $40,000.    (Exhibit A, Mountain West Response at 2-4, ¶¶ 2, 3 & 5).

14.    In addition to its property damage claim, Helog claims the following damages:

    (a)    Lost profits and revenues for helicopter logging operations -- $250,000;

    (b)    Ongoing expenses in the form of excess salaried personnel unable to generate revenue in the absence of the helicopter -- $101,371;

3

(c)    Loss of the benefit of a portion of the annual premium paid to insure the helicopter -- $57,486;

(d)    Increase in hull and liability insurance premiums -- $893,424; and

(e)    The expense of replacing the helicopter at a less favorable currency exchange rate -- $2,992,752.00. (Exhibit C, Helog Response at 2-4, ¶¶ 2-3).

15.    Mountain West's property damage claim is the $125,000 insurance deductible paid toward the repair of the helicopter. (Exhibit A, Mountain West Response at 2-3, ¶¶ 2-3).

16.    Helog's property damage claim is between $400,000 and $600,000, representing Helog's assessment of the helicopter's fair market value at the time of the accident minus the amount Helog recovered from its insurer. (Exhibit C, Helog Response at 3-4, ¶ 3; 5-6, ¶ 7).

DEFENDANT
KAMAN AEROSPACE CORPORATION

By: _____
Shaun S. Sullivan (ct 04883)
Timothy A. Diemand (ct 18075)
Wiggin and Dana LLP
One CityPlace
Hartford, CT 06103-3402
ph. (860) 297-3700
fax (860) 525-9380
e-mail ssullivan@wiggin.com
        tdiemand@wiggin.com

4

## CERTIFICATION

This is to certify that a copy of the foregoing was mailed this 10th day of September, 2004, by first class mail, postage prepaid, to:

Robert S. Young, Esq.
Law Offices of Robert S. Young
800 McIntyre Building
68 South Main Street
Salt Lake City, UT 84101

Timothy A. Bishop, Esq.
Bishop & Jackson, LLC
80 Ferry Blvd., Suite 103
Stratford, CT 06615

_____
Timothy A. Diemand

\14658\2\483861.4

# EXHIBIT
# A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT, HARTFORD

| | |
|---|---|
| MOUNTAIN WEST HELICOPTERS, LLC, a Utah Limited Liability Company; LONG-LINE LEASING, LLC, a Utah Limited Liability Company; HELOG AG, a Foreign Corporation; and HELI-AIR ZAGEL LUFTTRANSPORT AG, a foreign corporation, <br><br> Plaintiffs, <br><br> v. <br><br> KAMAN AEROSPACE CORPORATION, a Delaware corporation and JOHN DOES I through V, <br><br> Defendants. | Case No. 301 CV 1746 (AVC) <br><br> August 6, 2004 |

### PLAINTIFFS', MOUNTAIN WEST HELICOPTERS, LLC AND LONG-LINE LEASING, LLC, RESPONSE TO DEFENDANT'S FIRST INTERROGATORIES, REQUESTS FOR PRODUCTION AND REQUESTS FOR ADMISSION

Plaintiffs, Mountain West Helicopters, LLC ("Mountain West") and Long-Line Leasing, LLC ("Long-Line"), hereinafter collectively referred to as "Plaintiffs," through counsel, submit this response to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admission dated June 30, 2004 ("First Discovery Requests"). Plaintiffs object to the "Definitions" section of Defendant's First Discovery Requests to the extent it seeks to impose duties and/or obligations upon Plaintiffs that exceed the duties and/or obligations imposed upon Plaintiffs by the Federal Rules of Civil Procedure and/or the Local Civil Rules of this court.

## I. RESPONSE TO INTERROGATORIES

1.    What is the total amount (in U.S. dollars) that Mountain West is claiming as damages in this case?

**Response:**    Mountain West and its related entities claim total damages of approximately $1,633,000.00, less any payment(s) made by Kaman and/or its liability insurance carrier to Mountain West and/or its aircraft hull insurance carrier as compensation, partial or otherwise, for losses suffered as a result of the November 4, 1999 crash of a Kaman Aerospace model K-1200 helicopter bearing serial number A94-0014 and Federal Aviation Administration ("FAA") registration number N164KA (the "Mountain West Helicopter").

2.    What is the amount of your damage claim (in U.S. dollars) attributable to each of the following categories of damages set forth in ¶ 30 of Plaintiffs' September 11, 2001 complaint?

   a.    Lost profits and revenues for helicopter logging operations;

   b.    Ongoing expenses in the form of excess salaried personnel unable to generate revenue in the absence of the helicopter;

   c.    Loss of the benefit of pilot training expenses;

   d.    Loss of the benefit of a portion of the annual premium paid to insure the helicopter;

   e.    Increase in hull and liability and/or workers' compensation insurance premiums;

   f.    The expense of the deductible for the portion of the insurance risk assumed by Mountain West;

   g.    Interest expenses incurred between the time of the accident and the settlement of your hull claim with your insurer; and

2

h.    The costs of investigating the accident.

**Response:**    In order of the subcategories listed above, Mountain West and its related entities claim damages of: a) approximately $30,000.00; b) approximately $25,000.00; c) approximately $40,000.00; d) approximately $18,700.00; e) approximately $117,000.00; f) $125,000.00; g) approximately $207,500.00; and h) no claim for damages.

3.    Describe how each of the dollar amounts listed in Interrogatory 2 was calculated.

**Response:**    For each of the subcategories identified in interrogatory no. 2 above, Mountain West and its related entities calculated their damages as follows: a) Bryan J. Burr ("Mr. Burr"), Mountain West's President, calculates lost profits of approximately $30,000.00, a calculation confirmed by Tom Woody whose company finished the logging contract Mountain West could not complete following the crash of the Mountain West Helicopter; b) Mr. Burr calculates approximately $25,000.00 paid to salaried personnel unable to generate revenue in the absence of the helicopter; c) Mr. Burr calculates approximately $40,000.00 spent to give two Mountain West pilots Kaman factory training, an amount that Kaman could confirm based upon the rates it then charged for such training; d) Mr. Burr calculates approximately $18,700.00 for loss of the benefit of a portion of the annual premium based upon the following formula – the annual premium divided by 365 days (to obtain a daily premium); the daily premium multiplied by the number of days the aircraft was unavailable due to the accident; e) Mr. Burr calculates the increase in hull and liability insurance premium (and claims no damages for an increase in workers' compensation insurance premium) at approximately $117,000.00 based upon a post-accident increase in premium from 4.85% to 6.85% of the aircraft hull value; f) Mr. Burr's aviation hull and liability policy set the deductible applicable to this accident at 5% of the aircraft hull value, but not to exceed $125,000.00; g) Mr. Burr

3

calculates the interest expenses his company incurred, between the time of the accident and the settlement of the insurance claim, at approximately $207,500.00 based upon a loan amortization schedule (the actual amount will be higher because loan payments were not made during the repair period) ; and h) nothing for costs associated with investigating the accident.

4.    Identify all documents supporting the each (sic) category of damages claimed by Mountain West.

**Response:**    Mr. Burr has maintained documents relevant to the claims his company asserts, arising out of the crash of the Mountain West Helicopter, in a binder, of approximately three to four inches in thickness, and a file. However, because Mr. Burr is currently moving both his home and office, he has only just recently located the binder, and delivered the same to counsel, while the file remains stored in a 53 foot trailer scheduled to be unloaded on or about August 25, 2004 as part of the move.

As contemplated by Rule 34 Fed.R.Civ.P. and subject to a prior review by counsel for purposes of determining any applicable privileges, Mr. Burr will permit inspection and related activities, with respect to these items, at a mutually agreed time and place.

5.    Are there any other categories of damages claimed by you in this action other than those identified in response to Interrogatories 2,3, and 4? If yes, for each additional category of damages, please: (a) describe the category and the dollar amount sought for the category of damages; (b) indicate the dollar amount sought for each category; (c) describe how the dollar amount was calculated; and (d) identify all documents supporting the damage claim.

**Response:**    In addition to the damages identified in response to Interrogatories 1, 2,3, and 4 above, Mountain West and its related entities in this action claim the loss of a "no-claims bonus on renewal" of 15% of the hull premium or approximately $40,000.00.

4

6.   If you contend that you acquired the replacement free-wheeling sprag clutch on terms different than those contained in the parts catalog referred to in paragraph 9 of the affidavit of Brian Burr, dated January 31, 2002, please identify all evidence, including documentation and testimony, supporting such a claim.

**Response:**   While Mountain West is generally aware of the warranty period applicable to new spare parts for the Mountain West Helicopter, as outlined in the Kaman parts catalog referred to in paragraph 9 of the affidavit of Bryan Burr, Mountain West is aware of no written agreements setting forth the terms under which it acquired the replacement free-wheeling sprag clutch assembly. Moreover, Mountain West has asked Kaman to produce any documents that Kaman believes set forth the terms under which it sold the sprag clutch assembly to Mountain West. Until Kaman responds to Mountain West's discovery requests, Mountain West cannot specify the terms and conditions under which it believes it purchased the sprag clutch assembly.

7.   Please identify all materials documenting the repairs done to the helicopter as a result of the accident.

**Response:**   See response to interrogatory number 4 above.

8.   Please indicate the amount received (in U.S. dollars) from Mountain West's insurer for this accident.

**Response:**   According to records Mr. Burr has maintained, Mountain West's aviation hull insurance carrier paid a total of approximately $1,030,000 to Mountain West and/or to Kaman Aerospace Corporation, in Mountain West's behalf, to repair the helicopter.

9.   (No Interrogatory no. 9 appears in defendant's discovery requests).

**Response:**   Not Applicable.

5

10.    Please identify every person who participated in the determination of any category of damages claimed by Mountain West.

**Response:**    Mr. Burr, with the assistance of counsel, determined the categories of damages claimed by Mountain West herein.

## II. RESPONSE TO REQUESTS FOR PRODUCTION

1.    All documents supporting the damage figure claimed in response to interrogatory 1.

**Response:**    See response to interrogatory number 4 above.

2.    All documents supporting the amount of each category of damages identified in interrogatory 2.

**Response:**    See response to interrogatory number 4 above.

3.    All documents supporting the damage claims made in response to interrogatory 3.

**Response:**    See response to interrogatory number 4 above.

4.    All documents identified in response to interrogatory 4.

**Response:**    See response to interrogatory number 4 above.

5.    All documents supporting each category of damages identified in interrogatory 5.

**Response:**    See response to interrogatory number 4 above.

6.    All documents identified in response to interrogatory 6.

**Response:**    See response to interrogatory number 4 above.

7.    All documents regarding repairs done on the helicopter as a result of the accident.

**Response:**    See response to interrogatory number 4 above.

6

8.    All documents related to any recovery by and/or amounts received by Mountain West from any source (including any insurer) related to this accident.

Response:    See response to interrogatory number 4 above.

### III. RESPONSE TO REQUESTS FOR ADMISSION

1.    The Mountain West Helicopter, a Kaman Aerospace model K–1200, A94–0014, was purchased by you under an Aircraft Sale Agreement dated May 20, 1997 ("Aircraft Sale Agreement"), a true and correct copy of which is attached hereto as exhibit A.

Response:    Other than the Aircraft Sale Agreement dated May 20, 1997, Mountain West is presently aware of no document under which it purchased the Mountain West Helicopter and, on that premise, admits request for admission number 1.

2.    A true and correct copy of the warranty provisions contained in Kaman's parts catalog that are referred to in paragraph 9 of the affidavit of Bryan Burr, sworn to on January 31, 2002 are attached hereto as exhibit B.

Response:    Mountain West cannot admit or deny request for admission number 2. Pages 14 and 15 of the 2004 Kaman Parts Catalog possessed by Mountain West do not contain warranty provisions.

3.    Aside from the warranty provisions of the aircraft sale agreement referenced in Request 1 and the parts catalog referenced in Request 2, Kaman did not provide Mountain West with any other warranties concerning the helicopter.

Response:    Deny.

4.    Mountain West received compensation from its insurance carrier for the repair of the Mountain West helicopter, and subrogated its claim to the insurer up to the amount paid by the insurer to Mountain West.

7

**Response:**    Mountain West admits it received compensation from its own aviation hull insurance carrier.  Mountain West objects to the second half of request for admission number 4, since it seeks the admission or denial of a question of law to be addressed in the upcoming cross-motions for summary judgment.  Notwithstanding the foregoing objection, Mountain West acknowledges the payment(s) by its hull insurance carrier gave rise to a right of subrogation, either by agreement or operation of law, in favor of the carrier, but denies that the right of subrogation precludes Mountain West's claims herein.

DATED:   August _6_, 2004.

The Law Offices of Robert S. Young, L.C.

Robert S. Young (ct 21935)
800 McIntyre Building
68 South Main Street
Salt Lake City, UT 84101
Tel. (801) 531-8300
Fax  (801) 359-7233
rsyav8rlaw@hotmail.com

## VERIFICATION

STATE OF UTAH     )
                  : ss:
COUNTY OF UTAH    )

Pursuant to Rules 33(a) and (b) Fed.R.Civ.P., I, Bryan J. Burr, being first duly sworn on oath, depose and say that I am the President of Plaintiff named above, I have read the foregoing responses to interrogatories no. 1 through 10 and know the contents thereof, and I affirm and verify they are true and correct to the best of my knowledge, information and belief.

Bryan J. Burr

SUBSCRIBED AND SWORN to before me this 6th day of August 2004.

Notary Public



NATALIE MARCHELLO
NOTARY PUBLIC • STATE OF UTAH
1676 NORTH 200 WEST
PROVO, UTAH 84604
COMM. EXPIRES 12-5-2007

8

# EXHIBIT
# B

## AIRCRAFT SALE AGREEMENT

THIS AIRCRAFT SALE AGREEMENT is made this 20th day of May, 1997 between KAMAN AEROSPACE CORPORATION, a Delaware corporation having an office at 1332 Blue Hills Avenue, Bloomfield, CT ("Kaman") and LONG-LINE LEASING, L.L.C., a Utah limited liability company having an office at 73 West 620 South, Orem, Utah ("Buyer").

In consideration of the sum of Fifty Thousand Dollars ($50,000) and other good and valuable consideration paid by Buyer to Kaman, the receipt and sufficiency of which Kaman hereby acknowledges, the parties agree as follows:

### SECTION 1
### SALE OF AIRCRAFT

1.1     Aircraft.  Subject to the terms and conditions of this Agreement, Kaman will sell, assign, transfer and set over to Buyer one model K-1200 helicopter as more particularly described in Exhibit A to this Agreement (the "Aircraft").  Buyer understands and agrees that the aircraft is not new, having already logged a certain number of flight hours.

1.2     Changes.  Kaman shall have the right to make whatever changes to the design or manufacture of the Aircraft that it deems advisable and to substitute equivalent equipment, accessories or material in order to prevent delays in manufacture or delivery or to improve the performance, producibility, stability, control, utility, maintenance, or appearance of the Aircraft.

### SECTION 2
### PRICE AND PAYMENT

2.1     Price.  The basic purchase price for the Aircraft shall be Two Million Nine Hundred Ninety-six Thousand Seven Hundred Ninety Dollars and 87/100 ($2,996,790.87)(the "Price").

2.2     Payment; Security Interest.

        (a)   The Price shall be due and payable as follows: (i) a non-refundable deposit of $50,000, receipt of which is acknowledged, plus (ii) $300,000 payable to Kaman in installments beginning July 15, 1997 and continuing through April 15, 1999, as shown on the Schedule of Payments attached hereto as Exhibit E and incorporated herein by reference, plus (iii) assumption from Kaman of the existing NationsBanc Leasing Corporation of North Carolina ("NationsBanc") financing applicable to the Aircraft in the principal amount of $2,646,790.87 as of May 15, 1997 (the "NationsBanc Financing").  All payments to Kaman under this Agreement shall be made by certified check, bank wire transfer of immediately available funds or business check and shall be considered to be paid by Buyer only upon actual

- 1 -

receipt by Kaman. Kaman acknowledges that it has received a check representing a deposit in the amount of Fifty Thousand Dollars ($50,000). The first deposit is non-refundable and shall be forfeited to Kaman in the event Buyer fails to fulfill its obligations under this Agreement. If Kaman does not fulfill its obligations under this Agreement, and is not excused under Section 7, Buyer's sole remedy shall be the return of the first deposit paid by Buyer (without interest) and the obligations of the parties shall be at an end.

(b) In order to secure payment of the amounts due Kaman under Section 2.2(a) and all other obligations of Buyer to Kaman, Buyer shall maintain and operate the Aircraft in accordance with the provisions of Section 3.2 (e) of the Aircraft Security Agreement dated as of December 22, 1995 (the "NBLC Security Agreement"), among Blue Mountain Helicopters, Inc. and NationsBanc Leasing Corporation of North Carolina, as assigned by Blue Mountain to Kaman and further assigned by Kaman to Buyer, which NBLC Security Agreement forms a part of the documentation in connection with the NationsBanc Financing and, provided further that Buyer shall name Kaman as an additional insured under Buyer's general liability insurance policy in accordance with the provisions of Section 4.1(ii) of the NBLC Security Agreement.

2.3    Contingencies.  This Agreement is contingent upon (a) NationsBanc's acceptance of Buyer's assumption of the NationsBanc Financing; (b) the guaranty of such NationsBanc Financing by each of the Natalie D. Burr Family Trust, Mountain West Helicopters, L.L.C., Bryan J. Burr, Natalie D. Burr, Jim R. Toothman and Connee Toothman (collectively referred to as the "Guarantors"); and (c) Kaman's having a validly perfected second priority security interest in the Aircraft to secure the payments due Kaman under Section 2.2(a) above and all other obligations to Kaman described herein or in any other document or instrument related to the transactions completed herein. This Agreement is further contingent upon execution of mutually satisfactory legal documentation for the transactions contemplated herein by all parties, including Buyer, Kaman, the Guarantors, and NationsBanc.

## SECTION 3
## DELIVERY AND TITLE

3.1    Delivery  The Aircraft shall be delivered to Buyer F.O.B. Kaman's facility in Bloomfield, Connecticut. Kaman shall give Buyer not less than two (2) days notice of the firm date on which the Aircraft will be available for delivery (the "Delivery Date"). It is presently anticipated that the Delivery Date will occur on or about May 23, 1997.

3.2    Transfer of Title.  Title to and ownership of the Aircraft shall remain vested in Kaman and shall not pass to Buyer until all contingencies under Section 2.3 above have been satisfied and Buyer shall have satisfied all of its other obligations under this Agreement. Upon satisfaction of all such contingencies under Section 2.3 and upon delivery of the Aircraft in accordance with this Section 3, Kaman shall deliver to Buyer a bill of sale substantially in the form of Exhibit B to this Agreement.

3.3    Risk.  All risk of loss of any kind with respect to the Aircraft shall pass to Buyer upon delivery by Kaman on the Delivery Date.

3.4   Inspection and Acceptance. Kaman shall deliver the Aircraft as follows:

(a)   Kaman shall make the Aircraft available for inspection and acceptance by Buyer as provided in Section 3.1.

(b)   Acceptance of the Aircraft shall be based upon the specifications set forth in Exhibit A. Prior to Acceptance, the Aircraft shall be subject to ground inspection by Buyer. Following ground inspection, Kaman will demonstrate the Aircraft to Buyer by such flight tests as are reasonably necessary and appropriate in order to establish the proper functioning of the Aircraft. Should any discrepancies from Exhibit A be revealed during inspection and acceptance, Kaman shall cause the same to be promptly corrected, in such manner as it determines appropriate, at no cost to Buyer.

(c)   On the Delivery Date, Buyer shall sign and deliver to Kaman a Certificate of Inspection and Acceptance substantially in the form of Exhibit C to this Agreement.

(d)   Kaman shall not be responsible for injuries of any kind to, or caused by, Buyer's representatives arising out of the inspection and/or acceptance of the Aircraft, or for injury, damage or loss to the property of Buyer or Buyer's representatives. Buyer shall indemnify and hold Kaman harmless from any and all such claims, including expenses and costs of any kind unless the same are caused solely and directly by Kaman's negligence or willful misconduct.

SECTION 4A
WARRANTIES

4A.1   Limited Warranties. Kaman warrants to Buyer that:

(a) on the date of the Certificate of Inspection and Acceptance the Aircraft shall be (i) in accordance with the configuration described in Exhibit A and (ii) in airworthy condition; and

(b) on the date of the Certificate of Inspection and Acceptance and for a period of one (1) year or Five Hundred (500) flight hours thereafter, whichever first occurs, (the "Warranty Period"), the Aircraft (excluding the engine) and the Aircraft's Kaman manufactured parts shall be free of defects in material and workmanship under normal use and service in accordance with all manufacturer manuals, bulletins, or any other written instructions as to inspection, maintenance or operation of the Aircraft.

4A.2   Warranty of Title. Kaman warrants to Buyer that it will convey good title to the Aircraft and its parts free and clear of any and all liens and encumbrances, except for the security interests of NationsBanc and Kaman, pursuant to the terms and conditions of this Agreement. Kaman's liability and Buyer's exclusive remedy under this warranty of title is limited to the removal of any title defect, or, if Kaman chooses, replacement of the Aircraft or the subject part.

- 3 -

4A.3   Notice of Claimed Noncompliance: Notice and Service During Warranty Period.
(a)  With respect to the limited warranty of Section 4A.1(a), Buyer shall have a period of thirty (30) days from the date of the Certificate of Inspection and Acceptance within which to notify Kaman in writing of any claimed noncompliance.  Kaman shall inspect the Aircraft and if it finds a noncompliance that is covered by 4A.1(a), Kaman shall correct such noncompliance in a manner determined in its sole discretion and without charge to Buyer.  Kaman's sole liability and Buyer's exclusive remedy under Section 4A.1(a) shall be the repair or replacement, at Kaman's option, of any Kaman manufactured part that is found to be in noncompliance and shall extend to no other matter.  Any Kaman manufactured parts that are so repaired or replaced shall be subject to the limited warranty described in 4A.1(b) for a period of one (1) year or five hundred (500) flight hours, whichever first occurs, following installation.  Unless otherwise approved by Kaman, all parts shall be shipped to Kaman's facility for warranty service. The limited warranty of 4A.1(a) shall not apply to the Aircraft or any Kaman manufactured parts that: (i) have been repaired or altered outside Kaman's facility in any way so as to affect the safety, function or reliability of the Aircraft or part; (ii) has been subjected to misuse, neglect, accident or abuse of any kind; (iii) has been damaged due to failure to operate and maintain the Aircraft in a prudent manner and in accordance with all manufacturer manuals, bulletins, or any other written instructions as to inspection, maintenance or operation of the Aircraft; (iv) have been affected by conditions in the environment; or (v) as to 4A.1(a)(ii), any event which occurs after the Delivery Date.

(b)   Buyer must provide Kaman with written notice of any claimed noncompliance with the limited warranty of Section 4A.1(b) as soon as possible (but in any case within thirty (30) days) after Buyer has knowledge of same, all during the Warranty Period.  Kaman shall inspect the Aircraft and if it finds a noncompliance that is covered by 4A.1(b), Kaman shall correct such noncompliance in a manner determined in its sole discretion and without charge to Buyer. Kaman's sole liability and Buyer's exclusive remedy under Section 4A.1(b) shall be the repair or replacement, at Kaman's option, of any Kaman manufactured part that is found to be in noncompliance and shall extend to no other matter.  Any Kaman manufactured parts that are repaired or replaced during the Warranty Period shall be subject to the limited warranty for a period of one (1) year or five hundred (500) flight hours, whichever first occurs, following installation.   Unless otherwise approved by Kaman, all parts shall be shipped to Kaman's facility for warranty service. The limited warranty of 4A.1(b) shall not apply to the Aircraft or any Kaman manufactured parts that: (i) have been repaired or altered outside Kaman's facility in any way so as to affect the safety, function or reliability of the Aircraft or part; (ii) has been subjected to misuse, neglect, accident or abuse of any kind; or (iii) has been damaged due to failure to operate and maintain the Aircraft in a prudent manner and in accordance with all manufacturer manuals, bulletins, or any other written instructions as to inspection, maintenance or operation of the Aircraft; or (iv) have been affected by conditions in the environment.

4A.4   No Warranty of Engine or other Components: Assignment of Warranties.
Notwithstanding any other provision of this Agreement, Buyer specifically acknowledges that Kaman has not manufactured all of the components of the Aircraft, including, but not limited to the engine, and that Kaman makes no warranties with respect to those items.  To the extent allowed by the manufacturer or supplier, Kaman will assign to Buyer any warranties and/or

service contracts provided by such manufacturer(s) or supplier(s) of any part of the Aircraft. Buyer further specifically acknowledges that the manufacturer's warranty of the Aircraft's engine has expired.

4A.5  NO OTHER WARRANTIES.  OTHER THAN THE LIMITED WARRANTIES CONTAINED IN THIS SECTION 4A, KAMAN MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND WITH RESPECT TO THE AIRCRAFT AND ITS COMPONENT PARTS, AND HEREBY DISCLAIMS ALL OTHER WARRANTIES WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO:  (i) THE CONDITION, OPERATION, FITNESS FOR USE OR MERCHANTABILITY OF THE AIRCRAFT;  (ii) THE FITNESS OF THE AIRCRAFT FOR ANY PARTICULAR PURPOSE; (iii) THE AIRWORTHINESS OF THE AIRCRAFT SUBSEQUENT TO DELIVERY; OR (iv) ANY OTHER MATTER WHATSOEVER.  NO VERBAL OR WRITTEN INFORMATION OR  ADVICE GIVEN BY KAMAN, ITS AGENTS AND EMPLOYEES OR ANY THIRD PARTY SHALL CREATE A WARRANTY AND BUYER MAY NOT RELY UPON ANY SUCH INFORMATION OR ADVICE AS A WARRANTY.  NO AGREEMENT VARYING OR EXTENDING THE LIMITED WARRANTIES OR REMEDIES OF THIS SECTION 4A WILL BE BINDING UPON KAMAN UNLESS IN WRITING AND SIGNED BY A DULY AUTHORIZED OFFICER OF KAMAN.  BUYER ACKNOWLEDGES THAT THE AIRCRAFT IS NOT NEW.

SECTION 4B
LIMITATION OF LIABILITY

4B.1  LIMITATION OF LIABILITY.  EXCEPT FOR THE COST OF REPAIRING OR REPLACING A PART PURSUANT TO SUBSECTION 4A.2 OR 4A.3, KAMAN SHALL NOT BE LIABLE FOR ANY DEFECTS, EITHER LATENT OR PATENT, IN THE AIRCRAFT OR ITS PARTS.  IN NO EVENT SHALL KAMAN BE LIABLE TO BUYER OR ANY OTHER PERSON OR ORGANIZATION FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE AIRCRAFT PURCHASED HEREUNDER, INCLUDING WITHOUT LIMITATION, ANY DAMAGES FOR DIMINUTION OF MARKET VALUE, LOSS OF USE OF THE AIRCRAFT, LOSS OF PROFITS OR OTHER FINANCIAL OR ECONOMIC LOSS, OR FOR ANY INTERRUPTION IN BUYER'S BUSINESS OCCASIONED BY ITS INABILITY TO USE THE AIRCRAFT FOR ANY REASON WHATSOEVER, EVEN IF BUYER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES.  KAMAN SHALL NOT BE LIABLE FOR ANY DAMAGES CLAIMED BY BUYER OR ANY OTHER PERSON OR ENTITY WHETHER BASED IN CONTRACT OR IN TORT.  BUYER ACKNOWLEDGES THAT THE AIRCRAFT IS NOT NEW.

## SECTION 5
## CERTIFICATE AND REGISTRATION

5.1    <u>Type Certificate and Airworthiness Certificate</u>  On or before the Delivery Date Kaman shall have obtained a valid airworthiness certificate issued by the U.S. Federal Aviation Administration ("FAA").  Kaman shall not be responsible or liable for any other licenses, certifications, approvals or registrations in connection with the Aircraft or its operation.

5.2    <u>Registration</u>  Buyer shall be responsible and liable for the registration of the Aircraft by the FAA and any other approvals, certificates, registrations or permits as may be applicable for the ownership or operation of the Aircraft by Buyer.

5.3    <u>Contingency.</u>  This Agreement is contingent upon Kaman's receipt of all requisite governmental approvals and certifications.

5.4    <u>Certain FAA Overhauls.</u>  For a period of two (2) years  after the Delivery Date (the "Overhaul Period"), Kaman will pay the reasonable pro rata cost (which shall be determined in its discretion) of such overhauls of the Aircraft's major components (excluding the engine) as may be established by the FAA but only to the extent that such overhauls are required more frequently than a TBO of 2,500 hours.  Kaman shall not be responsible for any portion of the cost of overhauls which are necessary or appropriate as a result of damage, neglect, misuse or abuse to the Aircraft.  Kaman's obligations under this Section are solely for the benefit of Buyer; in the event that the Aircraft is sold or this Agreement assigned as permitted herein, this Section 5.4 will cease to be effective.  During the Overhaul Period, Buyer shall assure that all records pertaining to the Aircraft and its engines are prepared and maintained in accordance with all applicable rules and regulations of the FAA, any other pertinent governmental authorities, and the requirements of Kaman and the Engine Manufacturer.  These records shall provide a complete historical record of the Aircraft, including but not limited to the use, operation, servicing and maintenance of the Aircraft, and all Airworthiness Directives and Service Bulletins that may be issued relative to the Aircraft and the engine.  In addition, Buyer shall operate and maintain the Aircraft in full compliance with Kaman's and/or Engine Manufacturer's manuals, bulletins, or any other written instructions as to inspection, maintenance or operation of the Aircraft and its engine as well as all applicable governmental requirements, including the FAA.  During the Overhaul Period, Kaman shall have the right to inspect the Aircraft and any records relating thereto at any time upon reasonable prior notice.

## SECTION 6
## TAXES

6.1    <u>In General.</u>    Buyer shall be responsible for, shall pay, and shall indemnify and save Kaman harmless on an after-tax basis from and against, all taxes, duties, assessments, withholdings, charges and fees of every nature and kind whatsoever (including but not limited to sales taxes, goods and services taxes, import duties, excise taxes, luxury taxes, income taxes and licensing fees) assessed or imposed by any government or other taxing authority with

respect to or by reason of the transaction contemplated by this Agreement other than taxes imposed on the net income of Kaman by the Federal Government of the United States or by the State of Connecticut.

6.2    Procedures When Withholding is Legally Required.   All payments by Buyer to Kaman pursuant to this Agreement shall be free of withholding of any nature and free of expense to Kaman for collection or other charges, except that if Buyer is required by law to withhold any amount from any such payment, Buyer shall withhold the required amount, pay the withheld amount to the relevant tax authority when due and pay such additional amount to Kaman such that Kaman receives, after all withholding, the amount that Kaman would have received if such withholding had not been required.

## SECTION 7
## FORCE MAJEURE

7.1    If Kaman or Buyer fail to perform or delays performance of any of their obligations pursuant to this Agreement (excluding the obligation to pay monies due and payable) and such failure or delay is due to any cause beyond that party's reasonable control, including but not limited to any acts of God or the public enemy, sabotage or blockades, insurrections, riots, lightning, earthquakes, storms, fires, washouts, nuclear and radiation activity or fallout, civil disturbances or explosions, labor disturbances, strikes, any legislative, administrative, judicial or governmental action, governmental priorities, allocation regulations or orders affecting materials, equipment, facilities or completed aircrafts,  unforeseen circumstances, failure of supply from vendors, or compliance with any federal, state, or local law or regulation, neither party shall be liable to the other for such failure or delay and the date for performance shall be extended for such period of delay.

## SECTION 8
## GENERAL

8.1    Governing Law  This Agreement shall be governed by and construed in accordance with the applicable laws in the State of Connecticut, exclusive of its choice of law rules. Any and all disputes, claims, actions, suits, or proceedings arising out of or relating to this Agreement shall be brought exclusively in a federal or state court of competent jurisdiction established or sitting in the State of Connecticut. The parties will not raise, and hereby irrevocably waive, any defenses based upon improper venue, inconvenience of the forum, lack of personal jurisdiction, sufficiency of service, or the like, in connection therewith.

8.2    Notices  Any notice required to be given hereunder by any party shall be deemed to have been well and sufficiently given if mailed by prepaid registered mail, transmitted by facsimile, or delivered at the address of the parties first written above or at such address or addresses as the parties may from time to time advise in writing, and any such notice shall be deemed to have been received, if mailed, on the fourth business day after the date of mailing and if delivered or transmitted by facsimile, upon the date of delivery or transmission.

8.3     Further Assurances  The parties shall do such things and execute such further documents as may be necessary from time to time in order to carry out the intent of this Agreement.

8.4     Entire Agreement  This Agreement contains the entire agreement between the parties pertaining to this sale and supersedes all previous understandings, communications, representations, warranties, conditions or agreements, written or oral, express or implied, legal, statutory, or otherwise, on the part of either party.

8.5     Amendment  This Agreement shall not be amended except by an instrument in writing signed by the parties.

8.6     Binding Effect.  This Agreement and the rights, title and interests provided herein shall enure to the benefit of, and be binding upon, Kaman and Buyer and their respective successors and permitted assigns but neither the rights nor the duties of either party under this Agreement may be assigned, in whole or in part, without the prior written consent of the other party.  Any purported assignment in contravention of this subsection 8.6 shall be null and void.

8.7     Default; Waiver  If Buyer fails to make any payments as and when due or fails to fulfill any of its other obligations under this Agreement, and such failure to fullfill any of Buyer's obligations hereunder, except for any payment obligation or the requirment to name Kaman as an additional insured under Section 2.2(b) above, continues for a period of thirty (30) days from either the date Buyer first knows of such failure or the date on which Kaman gives written notice to Buyer of such failure, Buyer shall be deemed in Default. In the event of a Default by Buyer, in addition to retention of the first deposit, Kaman shall have all the rights and remedies as established or permitted upon agreement by the Uniform Commercial Code in addition to all other rights established herein or at law or in equity, which rights and remedies, to the extent permitted by law, shall be cumulative. The exercise of any right or remedy by Kaman is without prejudice, and shall be in addition to, all other rights or remedies that may be available to Kaman as aforesaid. If Kaman does not fulfill its obligations under this Agreement, and is not excused under Section 7, Buyer's sole remedy shall be the return of the first deposit paid by Buyer (without interest) and the obligations of the parties shall be at an end.  The waiver of any default by either party of any of the terms and conditions of this Agreement or the waiver of any breach of any of the terms and conditions of this Agreement shall be in writing, and shall not be construed as a waiver of any other or subsequent default, but the terms and conditions shall continue and remain in full force and effect as if no such waiver had occurred.

8.8     Fair Labor Standards Act.  Kaman hereby certifies that all goods sold hereunder which are produced or manufactured in the United States of America are produced in compliance the Fair Labor Standards Act of 1938, as amended (29 U.S. Code §§ 201-219). All requirements as to the certificate contemplated in the October 26, 1949 amendment to the Fair Labor Standards Act of 1938 shall be considered as satisfied by this certification.

8.9     Survival of Terms.  All provisions of this Aircraft Sale Agreement shall survive the closing of this purchase and sale.

8.10    Document Execution; Legal Fees.

(a) Buyer and Guarantors will, whenever requested by Kaman and/or NationsBanc, execute and deliver to the requesting party any agreements, instruments and documents, in a form satisfactory to such requesting party, and take such further actions as Kaman and/or NationsBanc may request, which may be necessary or appropriate to fully consummate the various undertakings contemplated in this Agreement or necessary for the protection of Kaman's and/or NationsBanc's security interests in the Aircraft and the rights, interests and remedies created or intended to be created in favor of such secured parties by this Agreement. Buyer's failure to execute such documents within ten (10) days of Kaman's and/or NationsBanc's, as the case may be, request to do so shall constitute Buyer's appointment of the requesting party as Buyer's attorney-in-fact to execute such documents in Buyer's name, place and stead.

(b) Kaman will pay the NationsBanc's legal fees and expenses associated with the sale contemplated herein, but only if there is no change in any of the terms of the existing NationsBanc Financing being assumed by Buyer, other than as outlined in Kaman's May 8, 1997 letter to Bryan J. Burr relating to changes in the existing loan documentation with regard to the non-assessment of a pre-payment penalty in the event of a casualty loss, and the parties to the transaction described herein are the same as those involved in the purchase of the first K-MAX aircraft by Bryan Burr, et. al.

SECTION 9
FAMILIARIZATION COURSES FOR PILOTS/MECHANICS

9.1    Familiarization Course.    Kaman will provide a familiarization training course for two (2) pilots chosen by Buyer and otherwise fully qualified and licensed. Kaman will also provide basic training for two (2) of Buyer's mechanics for purposes of airframe maintenance. The sole purpose of the training is to familiarize individuals with the operation of the Aircraft. Kaman cannot and does not warrant that any person who has attended the training course is thereby qualified to perform their jobs; Buyer is fully responsible for the acts or omissions of such individuals at all times and shall indemnify and hold harmless Kaman from all costs, claims, damages, suits, or expenses of any kind or nature (including attorneys' fees) to which Kaman may be subjected and which are attributable to the acts or omissions of these individuals. Training will be provided at Kaman's facility in Bloomfield, Connecticut and will consist of up to ten (10) days of instruction at a time mutually convenient to Kaman and Buyer. Buyer shall be solely responsible in all respects for the individuals that it sends to this training program, each of whom shall be deemed to be a representative of Buyer for all purposes. Buyer's responsibilities, include, but are not limited to: (a) payment of all expenses of such individuals in connection with their activities pursuant to this Section; (b) the duty to indemnify and hold harmless Kaman from all costs, claims, damages, suits, or expenses of any kind or nature (including attorneys' fees) to which Kaman may be subjected and which are attributable to the acts or omissions of these individuals; and (c) sole responsibility for injuries of any kind that might be suffered by its representatives and agrees that it shall maintain at all times workers' compensation coverage and other appropriate insurance coverages with respect to such individuals.

SECTION 10
CONSIGNMENT OF PARTS; LOANER PROGRAM

10.1   Consignment of Parts.   During the Overhaul Period, Kaman will consign to Buyer its then standard cabinet of spare parts.  Kaman will invoice Buyer for any parts that are used. Payment and other terms shall be in accordance with Kaman's then standard terms and conditions.

10.2   Loaner Program.   During the Overhaul Period, Kaman will make available to Buyer the major airframe components listed on Exhibit D for Buyer's use during the period required for overhaul (as required by the FAA) or for necessary repairs of such components.  Buyer will pay Kaman's then standard charge per flight hour for each component during the period of its use.

IN WITNESS AND IN AGREEMENT WHEREOF, the parties hereto have executed this Agreement on the day and year first written above.

LONG-LINE LEASING, L.L.C.                         KAMAN AEROSPACE CORP.

By _____                         By _____
Bryan J. Burr, Manager                           Robert M. Garneau, Vice President

By _____
Jim R. Toothman, Manager

- 10 -

EXHIBIT A
to
Aircraft Sale Agreement
Kaman Aerospace Corporation and Long-Line Leasing, L.L.C.


## AIRCRAFT DESCRIPTION:

| | |
|---|---|
| Model number: | K-1200 |
| Manufacturer: | Kaman Aerospace Corporation |
| Serial Number: | A94-0014 |
| FAA Registration No. | N164KA |
| Engine Model: | AlliedSignal (f/k/a Textron Lycoming) T5317A-1 |
| Engine Serial Number: | -- |


## K-1200 STANDARD CONFIGURATION

### AIRFRAME

Semi-monocoque aluminum alloy fuselage
Semi-monocoque aluminum alloy tailboom and vertical fin with rudder
Elevator with integral vertical fin
Plexiglass windshield and side panel windows
Plexiglass, full view, bubble side windows with integral ventilation panel
Swing out, removable crew doors
Fixed step for entry to cockpit, right side
Retractable work platforms, left and right
Sliding access cowling, engine compartment
Tool/storage compartment with downward-opening access panels, left and right (26 cubic feet, 500 lb capacity, with tie down rings)
Nose compartment with upward-opening access door
Fixed shock absorbing landing gear with three wheel and tire assemblies, (2) main wheels with independent brakes, and (1) 360 degree swiveling, self-centering, locking nose wheel
Parking brake
Bear paw, soft terrain wheel skids (3)
Tail bumper
Cargo hook (6000 lb capacity)
Load signal conditioner
LH or RH 6" Diameter Mirrors


### INTERIOR

High-energy-absorbing pilot's seat with five-point safety harness and lumbar support
Collapsable cyclic
Collective stick with integral engine throttle ( includes manual cargo hook release handle)
Adjustable rudder pedals with individual toe brakes
Bleed air heater and defroster
Map and data case
Fire extinguisher (cockpit)
First Aid Kit


- 11 -

POWER PLANT

Allied Signal T5317A-1 turbine engine (1,500 SHP)
Magnetic, fuzz burning chip detectors (2)
Fuel system (228.5 U.S. gallons usable fuel)
Fuel Cell, bag type
Fuel boost pumps, cartridge type, externally accessable  (2)
Fuel filter assembly (10 micron) with replaceable element
Gravity/pressure refueling port (closed circuit refueling receiver)
Oil tank (1.8 U.S. gallons usable)
Fire detection system
Fuel/oil firewall shutoff valves, electrical
Power turbine RPM control actuator
Inlet Particle separator
Engine Wash Provisions


ROTORS AND CONTROLS

Semi-articulated, composite, counter-rotating rotors (2) with servo flap system (4 rotor blades)
Rotor RPM warning system, audio/visual
In flight tracking actuators (2)
Electric cyclic trim with trim release feature
Azimuth Installation


TRANSMISSION SYSTEM

Transmission assembly with overriding clutch
Power take off pad for optional accessory (50 shp)
Magnetic, fuzz burning chip detector  (3)
KAflex drive shaft coupling
Rotor brake
Oil tank (1.8 U.S. gallons usable)
Oil pump
Oil cooler/blower (engine/transmission)


FLIGHT AND ENGINE INSTRUMENTS

Outside air temperature indicator
Altimeter (barometric)
Clock (electronic)
Magnetic compass
External load indicator/monitor
Airspeed indicator
Vertical speed indicator IVSI
Turn and slip indicator
Engine and rotor tachometer (dual)
Engine torquemeter/monitor
Engine gas generator (N1) indicator

- 12 -

(Autotak Indicator/Monitor)
Exhaust gas temperature indicator
(Autotemp Indicator/Monitor)
Engine oil pressure/temperature indicator
Transmission oil pressure/temperature indicator
Fuel quantity indicator
Fuel pressure indicator
Volt/ammeter
Hobbs meter (hour)
Caution and advisory panel
Master warning panel     (MASTER CAUTION, FIRE, ROTOR RPM):
External Instrument panel
Attitude Indicator

## COMMUNICATIONS AND NAVIGATION

VHF COM/NAV: AlliedSignal KX-165
NAV: AlliedSignal KLN 90 GPS System
FM COM: Technisonic TFM 138B
NAT AA22-110 Siren/Loudhailer System
Allied Signal KT-70 Mode S Transponder
NAT AA12-001 Audio Distribution Panel
AlliedSignal K1525A Horizontal Situation Indicator

## ELECTRICAL

Starter/generator
(28 volt DC, 300 ampere)
Lead acid battery
(28 volt DC, 43 ampere-hour)
Generator control
Relay boxes (3)
Circuit breaker console - right side pilot compartment
Integral instrument lighting
Instrument panel flood lighting
Pilot controllable, retractable, and swivelling landing/search light:
Anticollision lights (2)
Navigation lights
Cockpit utility lights (2)
External power receptacle
Ignition starting system
Cargo compartment and fuselage utility light
Provisions for wiring accessory systems to cargo hook
Interior Power Receptacle
External ICS Connection

## GROUND SUPPORT EQUIPMENT (FLY AWAY KIT)

K904006-001      (1) Cover Assy; Pitot
K904007-001      (1) Tow/Tilly bar

- 13 -

| | |
|---|---|
| K904010-001 | (1) Support Stand, Tail Section |
| K904013-003 | (1) Cover Assy, Particle Separator |
| K904016-001 | (1) Cover Assy, Engine Exhaust |
| K904018-001 | (1) Equipment Bag, Storage Cargo Bay |
| K904019-001 | (1) Kit, Blade Securing Tie-Down |
| K904022-001 | (2) Lock Assy, Teeter Blade |
| K904072-001 | (1) Wheel Chocks |
| H-1008L | ICS Chord |

## MANUALS

K-MAX Maintenance Manual
K-MAX Illustrated Parts Catalog
K-MAX Rotorcraft Flight Manual
K-MAX Aircraft Logbook
T5317A-1 Logbook (Published by Engine Manufacturer and provided by Kaman at Delivery)
Aircraft Certificate
FCC License
AlliedSignal Engine Maintenance Manual To Be Provided Directly by the Engine Manufacturer

## Ground Support Equipment

Primary Support Equipment

| | |
|---|---|
| **(1) K904901-001** | **Bearing Puller/Installation** |
| K904017-001 | (1) Puller, Bearing Idler Assy |
| K904023-001 | (1) Set, Puller Assy, (Flap Bearing) |
| **(1) K904902-001** | **Landing Gear Maintenance Set** |
| K904063-001 | (1) Wrench, Landing Gear Nut |
| K904067-001 | (1) Locking Device, Nose Gear |
| K904068-001 | (2) Locking Device, Main Gear |
| K904071-001 | (1) Dip Stick, Main Gear Servicing |
| **(1) K904903-001** | **Controls Rigging Set** |
| K904014-001 | (1) Protractor, Blade to Flap |
| K904031-001 | (2) Spreader Plunger, L-Cranks |
| K904032-001 | (1) Kit, Rigging Pins |
| K904033-001 | (1) Bar, Alignment, L-Cranks |
| K904039-001 | (1) Rigging Gage, Longitudinal |
| K904041-003 | (1) Gage, Rigging-Azimuth/Collective |
| K904058-001 | (1) Rigging Bar, Collective Stick |
| K904069-001 | (1) Rigging Pin, Azimuth Cam |
| **(1) K904904-001** | **Rotor Rigging Set** |
| K904024-001 | (1) Lock Assy, IFT Rigging Pin |
| K904028-001 | (2) Azimuth Bar Runout Tool |
| K904066-001 | (1) Template, Blade Idler LH |
| K904066-002 | (1) Template, Blade Idler RH |
| K904070-001 | (1) Lockout Tool, Damper |
| **(1) K904905-001** | **Drive Shaft Installation Set** |
| K904030-001 | (1) Kit, KAflex Drive Shaft Installation |

```
        K904038-001         (1) Alignment Tool, Blower Drive Shaft
    (1) K904906-001         Rotor Hub/Blade Removal Set
        K904026-001         (1) Set, Hydraulic Pump/Ram
        K904040-001         (1) Socket, Lag Pin
```

Miscellaneous Support Equipment

```
        K904004-001         (1) Sling Assy, Hoist Helicopter
        K904005-003         (1) Sling Assy, Blade
        K904008-003         (2) Cover Assy, Rotor Hub
        K904009-003         (2) Cover Assy, Blade LH
        K904009-004         (2) Cover Assy, Blade RH
        K904011-001         (2) Holder Assy, Rotor Shaft & Hsg
        K904015-001         (1) Cover Assy, Cabin
        K904020-001         (1) Adapter, Lifting Transmission Assy
        K904021-001         (1) Fixture, Inter-blade Damper
        K904029-001         (2) Blade Storage Rack
        K904034-001         (1) Cable Assy, Download
        K904042-001         (1) Bar Assy, Anti-Torque, Rtr Brake
        K904044-001         (1) Wrench Adapter, Rotor Brake
        K904047-001         (1) Puller, Rotor Shaft Guide Tube
        K904074-001         (1) Jacking Screws, Rotor Shaft & Hsg
        K904075-001         (1) Holding Bar, Engine Adapter
        K904076-001         (1) Holding Fixture, Hub/Blade
        K904078-001         (1) Trolley Brg Removal/Installation Tool
```

EXHIBIT B
AIRCRAFT BILL OF SALE

THIS BILL OF SALE made the  -  day of May, 1997.

NOW THEREFORE THIS BILL OF SALE WITNESSES that for good and valuable consideration paid by Long-Line Leasing, L.L.C. ("Buyer") to Kaman Aerospace Corporation ("Kaman"), receipt of which is acknowledged, and pursuant to and subject to the terms and conditions of the Aircraft Sale Agreement dated May   , 1997 between Kaman and Buyer, Kaman hereby sells, assigns, transfers and sets over to Buyer the following aircraft and installed engines:

| | |
|---|---|
| Aircraft Manufacturer: | Kaman Aerospace Corporation |
| Model of Aircraft: | K-1200 Helicopter |
| Airframe: | |
|    Manufacturer and Model: | Kaman Aerospace Corporation K-1200 |
|    Manufacturer's Serial No.: | A94-0014 |
| Engine: | |
|    Manufacturer and Model: | Lycoming T5317A-1 gas turbine |
|    Manufacturer's Serial No.: | LE81014 |

Together with all equipment, components and accessories installed thereon and used in connection therewith (the "Aircraft") in AS IS WHERE IS condition.

AND all right, title, interest, property, claim and demand whatsoever, both at law and in equity, in and to the Aircraft.

TO HAVE AND TO HOLD the Aircraft and all of its right, title and interest thereto and therein unto and to the use of Buyer, its successors and permitted assigns for its and their use forever.

IN WITNESS WHEREOF, Kaman has duly executed this Bill of Sale as of the day and year first written above.


KAMAN AEROSPACE CORPORATION


Its _____

- 16 -

EXHIBIT C
CERTIFICATE OF INSPECTION AND ACCEPTANCE

Aircraft Manufacturer:                    Kaman Aerospace Corporation

Model of Aircraft:                        K-1200 Helicopter

Airframe:
    Manufacturer and Model:              Kaman Aerospace Corporation K-1200
    Manufacturer's Serial No.:           A94-0014

Engine:
    Manufacturer and Model:              Lycoming T5317A-1 gas turbine
    Manufacturer's Serial No.:           LE81014

    Reference is made to the Aircraft Sale Agreement dated May    , 1997 between Kaman Aerospace Corporation ("Kaman") and Long-Line Leasing, L.L.C. ("Buyer") relating to the purchase and sale of the above-described aircraft together with all equipment installed thereon (the "Aircraft").

1.  Buyer certifies to Kaman that the Aircraft, including the Log Books, Records, and Operating Manuals delivered therewith, has been delivered to Buyer on the Delivery Date, has been thoroughly examined and inspected to the satisfaction of Buyer and is unconditionally accepted by Buyer. Buyer also acknowledges that the Aircraft is:  (a) airworthy and in good and safe operating order, repair, and condition, (b) of the size, design, quality, type, and manufacture selected by Buyer (c) wholly suitable for Buyer's purposes, (d) qualified with a current FAA Certificate of Airworthiness, (e) in complete conformity with the requirements of the Aircraft Sales Agreement, and (f) not a new aircraft.

2.  Buyer acknowledges and agrees that on the date of this Certificate, the Aircraft has logged _____ flight hours.

3.  Buyer confirms acceptance of the Aircraft and installed engines in accordance with the terms of the Aircraft Sale Agreement, and Buyer waives and releases the right to revoke such acceptance for any reason.

4.  Buyer acknowledges that the Warranty Period and Overhaul Period described in the Agreement shall begin on the Delivery Date which is _____. Each period shall expire at the end of the particular time period associated therewith, all in accordance with the Agreement.

    **IN WITNESS WHEREOF**, Buyer has caused this Certificate of Inspection and Acceptance to be executed by its duly authorized representative this ___ day of _____, 19__.
**BUYER**

_____

Its _____

- 17 -

EXHIBIT D
LOANER PROGRAM ITEMS

Rotor Blade Assembly - L/H Set (including servo flap)

Rotor Blade Assembly - R/H Set (including servo flap)

Transmission Assembly

Transmission - LH Shaft and Housing

Transmission - RH Shaft and Housing

EXHIBIT E
to
Aircraft Sale Agreement
Kaman Aerospace Corporation and Long-Line Leasing, L.L.C.

## SCHEDULE OF PAYMENTS:

| | |
|---|---|
| JULY 15, 1997 | $ 25,000 |
| AUGUST 15, 1997 | 25,000 |
| OCTOBER 15, 1997 | 50,000 |
| NOVEMBER 15, 1997 | 25,000 |
| JANUARY 15, 1998 | 25,000 |
| APRIL 15, 1998 | 25,000 |
| JUNE 15, 1998 | 25,000 |
| AUGUST 15, 1998 | 25,000 |
| NOVEMBER 15, 1998 | 25,000 |
| JANUARY 15, 1999 | 25,000 |
| APRIL 15, 1999 | 25,000 |
| | $300,000 |

Note: Loan payments will not be considered in default if a particular installment payment is not made, provided that in 1997, at least $125,000 is paid; in 1998, at least $100,000 is paid; and in 1999, the remaining balance is paid by June 15, 1999.

- 19 -