## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT, HARTFORD

| | |
|---|---|
| MOUNTAIN WEST HELICOPTERS, LLC, a Utah Limited Liability Company; LONG-LINE LEASING, LLC, a Utah Limited Liability Company; HELOG AG, a Foreign Corporation; and HELI-AIR ZAGEL LUFTTRANSPORT AG, a foreign corporation,<br><br>        Plaintiffs,<br><br>  v.<br><br>KAMAN AEROSPACE CORPORATION, a Delaware corporation and JOHN DOES I through V,<br><br>        Defendants. | Case No. 301 CV 1746 (AVC)<br><br>September 7, 2004 |

### PLAINTIFFS', HELOG AG AND HELI-AIR ZAGEL LUFTRANSPORT AG, RESPONSE TO DEFENDANT'S FIRST INTERROGATORIES, REQUESTS FOR PRODUCTION AND REQUESTS FOR ADMISSION

Plaintiffs, Helog AG ("Helog") and Heli-Air Zagel Luftransport AG ("Heli-Air"), hereinafter collectively referred to as "Plaintiffs," through counsel, submit this response to Defendant's First Set of Interrogatories, Requests for Production and Requests for Admission dated June 30, 2004 ("First Discovery Requests"). Plaintiffs object to the "Definitions" section of Defendant's First Discovery Requests to the extent it seeks to impose duties and/or obligations upon Plaintiffs that exceed the duties and/or obligations imposed upon Plaintiffs by the Federal Rules of Civil Procedure and/or the Local Civil Rules of this court.

# I. RESPONSE TO INTERROGATORIES

1.    What is the total amount (in U.S. dollars) that Helog is claiming as damages in this case?

**Response:**    Helog and its related entities claim total damages of approximately $7,670,000.00, less any payment(s) made by Kaman and/or its liability insurance carrier to Helog and/or its aircraft hull insurance carrier as compensation, partial or otherwise, for losses suffered as a result of the September 13, 1999 crash of a Kaman Aerospace model K-1200 helicopter bearing serial number A94-0018 and German registration number D-HFZA (the "Heli-Air Helicopter").

2.    What is the amount of your claim (in U.S. dollars) attributable to each of the following categories of damages set forth in ¶ 30 of Plaintiffs' September 11, 2001 complaint?

a.    Lost profits and revenues for helicopter logging operations;

b.    Ongoing expenses in the form of excess salaried personnel unable to generate revenue in the absence of the helicopter;

c.    Loss of the benefit of pilot training expenses;

d.    Loss of the benefit of a portion of the annual premium paid to insure the helicopter;

e.    Increase in hull and liability and/or workers' compensation insurance premiums;

f.    The expense of a deductible for the portion of the insurance risk assumed by Helog;

g.    Interest expenses incurred between the time of the accident and the settlement of your hull claim with your insurer;

h.    The costs of investigating the accident; and

2

i.     The expense of replacing the helicopter at a less favorable currency exchange rate than the exchange rate at the time the helicopter was purchased.

**Response:**     In order of the subcategories listed above, based on an exchange rate of 1 Swiss Franc ("CHF") = U.S. Dollars 0.7549, Helog and its related entities calculate damages of: a) approximately $250,000.00; b) approximately $101,371.00; c) $0.00; d) $57,486.00; e) approximately $893,424.00; f) $188,725.00; g) $0.00; h) $0.00; and i) approximately $2,992,752.00.

3.     Describe how each of the dollar amounts listed in response to Interrogatory 2 was calculated.

**Response:**     For each of the subcategories identified in interrogatory no. 2 above, Helog and its related entities calculated their damages as follows: a) Through the combined efforts of Wolfgang Zagel, CEO Helog Lufttransport; Beat Ruckli, CEO Helog AG; Rudolf Kettel, CPA; Erich Zülig, CPA; and Dr. Oliver Felfernig, Attorney ("Helog Representatives"), Helog Representatives calculate lost profits of approximately $250,000.00; b) Helog Representatives calculate approximately $101,371.00 paid to salaried personnel unable to generate revenue in the absence of the helicopter; c) Helog Representatives calculate no damages for Kaman factory pilot training fees lost; d) Helog Representatives calculate approximately $57,486.00 for loss of the benefit of a portion of the annual premium; e) Helog Representatives calculate the increase in hull and liability insurance premium and workers' compensation insurance premium at approximately $893,424.00 based upon a post-accident increase in hull premium from 5.1% to 10% of the aircraft hull value; f) Helog's aviation hull and liability policy set the deductible applicable to this accident at approximately $188,725.00; g) Helog Representatives calculate no damages for interest expenses incurred, between the time of the accident and the settlement of the insurance claim; h) Helog Representatives calculate no

damages for costs associated with investigating the accident; and i) Helog Representatives calculate $2,992,752.00 for the expense of replacing the helicopter at a less favorable currency exchange rate than the exchange rate at the time the helicopter was purchased as follows:

1) Purchase of serial number A94-0018, on or about 5/20/97, for $3,500,000 = CHF 4,928,700 (or an exchange rate of 1.4082).

2) Partial Insurance proceeds received, on or about 12/15/99, CHF 2,063,000 = $1,294,716 (or an exchange rate of 0.62579).

3) Partial Insurance proceeds received, on or about 12/23/99, CHF 896,147 = $566,511 (or an exchange rate of 0.63076).

4) Remaining Insurance proceeds received, on or about 12/29/99, CHF 1,164,852 = $730,681 (or an exchange rate of 0.62727).

5) Total Insurance Proceeds Received = CHF 4,126,000 = $2,591,908.

6) Purchase of replacement aircraft serial number A94-0026, 3/22/00, for $3,900,000 = CHF 6,521,073 (or an exchange rate of 1.6541).

7) Difference (Purchase Price of Replacement Aircraft less Insurance Proceeds Received) = CHF 2,395,073 financed at 7.5% over 14 years = CHF 3,820,259 = $2,992,752.

    4.    Identify all documents supporting the each (sic) category of damages claimed by Helog.

**Response:**    Helog Representatives report they have forwarded the documents supporting these calculations to U.S. counsel, however, counsel has not yet received them.

As contemplated by Rule 34 Fed.R.Civ.P. and subject to a prior review by counsel for purposes of determining any applicable privileges, Helog will permit inspection and related activities, with respect to these items, at a mutually agreed time and place.

    5.    Are there any other categories of damages claimed by you in this action other than those identified in response to Interrogatories 2,3, and 4? If yes, for each additional category of damages, please: (a) describe the category of damages; (b) indicate the dollar

amount sought for each category; (c) describe how the dollar amount was calculated; and (d) identify all documents supporting the damage claim.

**Response:**    Other than those damages identified in response to Interrogatories 1, 2,3, and 4 above, there are no other categories of damages claimed by Helog and its related entities in this action.

6.    If you contend that you acquired the replacement free-wheeling sprag clutch on terms different than those contained in the parts catalog referred to in paragraph 10 of the affidavit of Wolfgang Zagel, sworn to on March 22, 2002, please identify all evidence, including documentation and testimony, supporting such a claim.

**Response:**    While Helog is generally aware of the warranty period applicable to new spare parts for the Heli Air Helicopter, as outlined in the Kaman parts catalog referred to in paragraph 10 of the affidavit of Wolfgang Zagel, sworn to on March 22, 2002, Helog is aware of no written agreements setting forth the terms under which it acquired the replacement free-wheeling sprag clutch assembly.  Moreover, Helog has asked Kaman to produce any documents that Kaman believes set forth the terms under which it sold the sprag clutch assembly to Helog.  Until Kaman responds to Helog's discovery requests, Helog cannot specify the terms and conditions under which it believes it purchased the sprag clutch assembly.

7.    Please indicate the fair market value of the helicopter on the day of the accident and describe how the fair market value calculation was determined.

**Response:**    Helog objects to interrogatory number 7 as the fair market value of the helicopter on the day of the accident is undoubtedly the subject of expert testimony in addition to whatever opinions Helog or Kaman may have regarding the issue.  At this stage of the litigation, Helog has not yet retained an expert to offer an opinion.  Notwithstanding the foregoing objection, Helog is of the opinion that the helicopter's fair market value on the day

of the accident is in the range of $3,000,000 to $3,200,000. This opinion is based upon the market and Kaman's increase in the price of new aircraft at the time.

8.    Please indicate the amount (in U.S. dollars) recieved (sic) from Helog's insurer for this accident.

**Response:**    Records maintained by Helog Representatives indicate Helog received approximately $2,591,908 from its aviation hull insurance carrier following the accident.

9.    (No Interrogatory no. 9 appears in defendant's discovery requests).

**Response:**    Not Applicable.

10.    Please identify every person who participated in the determination of any category of damages claimed by Helog.

**Response:**    Helog Representatives Wolfgang Zagel, CEO Helog Lufttransport; Beat Ruckli, CEO Helog AG; Rudolf Kettel, CPA; Erich Zülig, CPA; and Dr. Oliver Felfernig, Attorney, with the assistance of their U.S. counsel, determined the categories of damages claimed by Helog herein.

## II. RESPONSE TO REQUESTS FOR PRODUCTION

1.    All documents supporting the damage figure claimed in response to interrogatory 1.

**Response:**    See response to interrogatory number 4 above.

2.    All documents supporting the amount of each category of damages identified in interrogatory 2.

**Response:**    See response to interrogatory number 4 above.

3.    All documents supporting the calculations described in response to interrogatory 3.

**Response:**    See response to interrogatory number 4 above.

4.     All documents identified in response to interrogatory 4.

**Response:**     See response to interrogatory number 4 above.

5.     All documents supporting each category of damages identified in interrogatory 5.

**Response:**     See response to interrogatory number 4 above.

6.     All documents identified in response to interrogatory 6.

**Response:**     See response to interrogatory number 4 above.

7.     All documents supporting Helog's calculation of the helicopter's fair market value on the day of the accident.

**Response:**     See response to interrogatory number 4 above.

8.     All documents related to any recovery by and/or amounts received by Helog from any source (including any insurer) related to this accident.

**Response:**     See response to interrogatory number 4 above.

### III. RESPONSE TO REQUESTS FOR ADMISSION

1.     The Heli-Air Helicopter, a Kaman Aerospace model K–1200, A94-0018, was purchased by Helog under an Aircraft Sale Agreement dated May 2, 1997 ("Aircraft Sale Agreement"), a true and correct copy of which is attached hereto as exhibit A.

**Response:**     Other than the Aircraft Sale Agreement dated May 2, 1997, Helog is presently aware of no document under which it purchased the Heli Air Helicopter and, on that premise, admits request for admission number 1.

2.     A true and correct copy of the warranty provisions contained in Kaman's parts catalog that are referred to in paragraph 10 of the affidavit of Wolfgang Zagel, sworn to on March 22, 2002 are attached hereto as exhibit B.

**Response:**    The warranty provisions appear to be the same and, accordingly, Helog admits request for admission number 2.

3.    Aside from the warranty provisions of the aircraft sale agreement referenced in Request 1 and the parts catalog referenced in Request 2, Kaman did not provide Helog with any other warranties concerning the helicopter.

**Response:**    Deny.

4.    Helog received compensation from its insurance carrier for the total loss of the helicopter, and subrogated its claim to the insurer up to the amount paid by the insurer to Helog.

**Response:**    Helog, as noted above, admits it received approximately $2,591,908 compensation from its own aviation hull insurance carrier for the loss of the Heli Air Helicopter. Helog objects to the second half of request for admission number 4, since it seeks the admission or denial of a question of law to be addressed in the upcoming cross-motions for summary judgment. Notwithstanding the foregoing objection, Helog acknowledges the payment(s) by its hull insurance carrier gave rise to a right of subrogation, either by agreement or operation of law, in favor of the carrier, but denies that the right of subrogation precludes Helog's claims herein.

5.    Helog transferred the helicopter's title to its insurer as part of the settlement of its claim.

**Response:**    The standard "Institute of London Underwriters" aviation hull insurance policy, in the event of total loss, provides:

> If Insurers pay the market value or the amount insured, less the applicable deductible, the Aircraft will no longer be insured hereunder. The Aircraft shall not become the property of Insurers unless they elect to take the Aircraft as salvage, together with the documents of title, registration and record.

8

Helog has no knowledge that its aviation hull insurer elected to take the Aircraft as salvage, together with the documents of title, registration and record and therefore denies request for admission number 5.

6.    A true and correct copy of the October 28, 1998 Release and Discharge between Helog AG and Underwriters is attached hereto as Exhibit C.

**Response:**    The October 28, 1998 Release and Discharge attached as exhibit C predates the accident that is the subject of this dispute by nearly one full year.  Accordingly, it has no relevance to this proceeding and Helog denies request for admission number 6.

DATED:    September 7, 2004.

The Law Offices of Robert S. Young, L.C.

Robert S. Young (ct 21935)
800 McIntyre Building
68 South Main Street
Salt Lake City, UT 84101
Tel. (801) 531-8300
Fax  (801) 359-7233
rsyav8rlaw@hotmail.com

## VERIFICATION

Pursuant to Rules 33(a) and (b) Fed.R.Civ.P., I, Wolfgang Zagel state that I am the President of Helog Lufttransport, I have read the foregoing responses to interrogatories no. 1 through 10 and know the contents thereof, and I affirm and verify they are true and correct to the best of my knowledge, information and belief.

Wolfgang Zagel

9

Helog has no knowledge that its aviation hull insurer elected to take the Aircraft as salvage, together with the documents of title, registration and record and therefore denies request for admission number 5.

6.    A true and correct copy of the October 28, 1998 Release and Discharge between Helog AG and Underwriters is attached hereto as Exhibit C.

**Response:**    The October 28, 1998 Release and Discharge attached as exhibit C predates the accident that is the subject of this dispute by nearly one full year. Accordingly, it has no relevance to this proceeding and Helog denies request for admission number 6.

DATED:    September 7, 2004.

The Law Offices of Robert S. Young, L.C.

Robert S. Young (ct 21955)
800 McIntyre Building
68 South Main Street
Salt Lake City, UT 84101
Tel. (801) 531-8300
Fax (801) 359-7233
rsyav8rlaw@hotmail.com

## VERIFICATION

Pursuant to Rules 33(a) and (b) Fed.R.Civ.P., I, Wolfgang Zagel state that I am the President of Helog Lufttransport, I have read the foregoing responses to interrogatories no. 1 through 10 and know the contents thereof, and I affirm and verify they are true and correct to the best of my knowledge, information and belief.

Wolfgang Zagel

9

# EXHIBIT D

## AIRCRAFT INSTALLMENT SALE AGREEMENT

THIS AIRCRAFT INSTALLMENT SALE AGREEMENT is made this _2d_ day of May, 1997 between KAMAN AEROSPACE CORPORATION, a Delaware corporation having an office at 1332 Blue Hills Avenue, Bloomfield, Connecticut, U.S.A. 06002 ("Kaman") and HELOG, A.G., a Swiss corporation having an office at Heliport Haltinon, 6403 Kussnacht, Switzerland ("Buyer"),

In consideration of Forty-nine Thousand Nine Hundred and Eighty-five Dollars US ($49,985 US) and other good and valuable consideration now paid by Buyer to Kaman, the receipt and sufficiency of which Kaman hereby acknowledges, the parties agree as follows:

### SECTION 1
### SALE OF AIRCRAFT

1.1    Aircraft.  Subject to the terms and conditions of this Installment Sale Agreement, Kaman will sell, assign, transfer and set over to Buyer one model K-1200 helicopter as more particularly described in Exhibit A, attached hereto and incorporated herein by reference (the "Aircraft").   Buyer understands and agrees that the Aircraft is not new, having logged a certain number of flight hours.

1.2    Changes.  Kaman shall have the right to make whatever changes to the design or manufacture of the Aircraft that it deems advisable and to substitute equivalent equipment, accessories or material in order to prevent delays in manufacture or delivery or to improve the performance, producibility, stability, control, utility, maintenance, or appearance of the Aircraft.

### SECTION 2
### PRICE AND PAYMENT

2.1    Price.   The basic purchase price for the Aircraft shall be Three Million Five Hundred Thousand Dollars US ($3,500,000 US) ("the Price").  All monetary amounts described herein and in the attached Exhibits are denominated in U.S. dollars.

2.2    Payment.  The Price shall be due and payable as follows:

(a)    a non-refundable deposit of $49,985 US, receipt of which is acknowledged; and

(b)    the balance of $3,450,015 US, together with interest, in monthly installment payments in accordance with the provisions of Section 2.3 below beginning on the Delivery Date (as defined below) for the Aircraft and ending on December 15, 1997 (the "Payment Period").

All payments to Kaman under this Installment Sale Agreement shall be made by bank wire transfer of immediately available U.S. funds, and shall be considered to be paid by Buyer only upon actual receipt by Kaman. The first deposit is non-refundable and shall be forfeited to Kaman in the event Buyer fails to fulfill its obligations under this Installment Sale Agreement.

2.3    <u>Monthly Payments; Security.</u>

(a)    During the Payment Period, Buyer shall make monthly payments as follows:

i. *Installment Payments* - A sum of $22,675 US, representing interest on the average outstanding principal balance of the Price, due on the first day of each month, in advance;

ii. *Use Charges* - A use charge of $265 US per flight hour (the "Use Charges"), due on the fifteenth day of each month, in arrears. Buyer guarantees a minimum of 750 flight hours during the Payment Period for this purpose; and

iii. *Maintenance Charges* - Maintenance charges of $400 US per flight hour (the "Maintenance Charges"), due on the fifteenth day of each month, in arrears. Buyer guarantees a minimum of 750 flight hours during the Payment Period for this purpose. This charge will provide a reserve for the cost of overhauls, shipping charges related to overhauls, and training for two pilots and two mechanics. All other maintenance costs, including any freight for spare parts, will be the responsibility of Buyer.

(b)    The Price will be due and payable on December 15, 1997, provided the non-refundable deposit under Section 2.2(a), Use Charges paid and any unused portion of Maintenance Charges that Buyer has paid will be credited to the Price. The Price (less the credits described in the preceding sentence) may be prepaid at any time.

(c)    If Buyer does not pay the Price (less the credits paid by Buyer as described in Section 2.3(b)) on December 15, 1997, Buyer shall be responsible for returning the Aircraft to Kaman's Bloomfield, CT, USA facility in the same condition as when received. Upon Kaman's receipt and acceptance of the Aircraft and all records related thereto, and subject to the terms of this Installment Sale Agreement, Kaman will "forgive" Buyer's obligation to pay the Price (less the credits paid by Buyer as described in Section 2.3(b)); provided, however, Buyer shall be and remain responsible for payments under Sections 2.3 a(ii) and (iii) at the time of the Aircraft's return with a minimum guarantee of 750 flight hours. The deposit of $49,985 will not be refunded to Buyer in any event.

(d)    In order to secure payment of the Price and all other obligations herein, which payment and obligations shall be absolute and unconditional (except as provided in Section 2.3(c)), Buyer covenants and agrees that Kaman shall have and retain a valid perfected first priority purchase money security interest in the Aircraft at the time of transfer and at all times

- 2 -

thereafter until the later of the time when the Price is received by Kaman or Kaman releases such first priority purchase money security interest.

## SECTION 3
## DELIVERY; TITLE; SECURITY INTEREST

3.1 <u>Delivery.</u> The Aircraft is currently located in Kassel-Calden, Germany (the "Delivery Facility"). The Aircraft shall be accepted at the Delivery Facility, with all costs of shipment and insurance from such facility being to the sole account of Buyer. Kaman shall give Buyer notice of the date on which the Aircraft will be available for delivery (the "Delivery Date"). It is presently anticipated that the Delivery Date will occur in the May 1997 time frame.

3.2 <u>Transfer of Title; First Priority Security Interest.</u>

(a) Title to and ownership of the Aircraft shall remain vested in Kaman and shall not pass to Buyer until Kaman has received the non-refundable deposit under Section 2.2(a) hereof and its first priority purchase money security interest has been properly recorded and perfected in accordance with all applicable laws and Buyer shall have satisfied all of its other obligations under this Installment Sale Agreement. Upon Kaman's receipt of the deposit, perfection of its security interest and upon delivery and acceptance of the Aircraft in accordance with this Section 3, Kaman shall deliver to Buyer a bill of sale substantially in the form of Exhibit B to this Installment Sale Agreement.

(b) Buyer shall cooperate with Kaman and shall execute any and all necessary documents in order for Kaman's first priority security interest in the Aircraft to be properly perfected.

3.3 <u>Risk.</u> All risk of loss of any kind with respect to the Aircraft shall pass to Buyer upon delivery by Kaman on the Delivery Date.

3.4 <u>Inspection and Acceptance.</u> Kaman shall deliver the Aircraft as follows:

(a) Kaman shall make the Aircraft available for inspection and acceptance by Buyer at the Delivery Facility specified in Section 3.1.

(b) Acceptance of the Aircraft shall be based upon the specifications set forth in Exhibit A. Prior to Acceptance, the Aircraft shall be subject to ground inspection by Buyer. Following ground inspection, Kaman will demonstrate the Aircraft to Buyer by such flight tests as are reasonably necessary and appropriate in order to establish the proper functioning of the Aircraft. Should any discrepancies from Exhibit A be revealed during inspection and acceptance, Kaman shall cause the same to be promptly corrected, in such manner as it determines appropriate, at no cost to Buyer.

(c)    On the Delivery Date, Buyer shall sign and deliver to Kaman a Certificate of Inspection and Acceptance substantially in the form set forth in Exhibit C.

(d)    Kaman shall not be responsible for injuries of any kind to, or caused by, Buyer's representatives arising out of the inspection and/or acceptance of the Aircraft, or for injury, damage or loss to the property of Buyer or Buyer's representatives. Buyer shall indemnify and hold Kaman harmless from any and all such claims, including expenses and costs of any kind unless the same are caused solely and directly by Kaman's negligence or willful misconduct.

## SECTION 4A
## WARRANTIES

4A.1    Limited Warranties. Kaman warrants to Buyer that:

(a) on the date of the Certificate of Inspection and Acceptance the Aircraft shall be (i) in accordance with the configuration described in Exhibit A and (ii) in airworthy condition; and

(b) on the date of the Certificate of Inspection and Acceptance and until the earlier thereafter of: (i) a period of one (1) year or (ii) the number of flight hours remaining until the Aircraft reaches Five Hundred (500) flight hours, (the "Warranty Period"), the Aircraft (excluding the engine) and the Aircraft's Kaman manufactured parts shall be free of defects in material and workmanship under normal use and service in accordance with all manufacturer manuals, bulletins, or any other written instructions as to inspection, maintenance or operation of the Aircraft.

4A.2    Warranty of Title. Kaman warrants to Buyer that it will convey good title to the Aircraft and its parts free and clear of any and all liens and encumbrances. Kaman's liability and Buyer's exclusive remedy under this warranty of title is limited to the removal of any title defect, or, if Kaman chooses, replacement of the Aircraft or the subject part.

4A.3    Notice of Claimed Noncompliance; Notice and Service During Warranty Period.

(a)    With respect to the limited warranty of Section 4A.1(a), Buyer shall have a period of thirty (30) days from the date of the Certificate of Inspection and Acceptance within which to notify Kaman in writing of any claimed noncompliance. Kaman shall inspect the Aircraft and if it finds a noncompliance that is covered by 4A.1(a), Kaman shall correct such noncompliance in a manner determined in its sole discretion and without charge to Buyer. Kaman's sole liability and Buyer's exclusive remedy under section 4A.1(a) shall be the repair or replacement, at Kaman's option, of any Kaman manufactured part that is found to be in noncompliance and shall extend to no other matter. Any Kaman manufactured parts that are so repaired or replaced shall be subject to the limited warranty described in 4A.1(b) for a period of one (1) year or five hundred (500) flight hours, whichever first occurs, following

installation. Unless otherwise approved by Kaman, all parts shall be shipped to Kaman's facility for warranty service. The limited warranty of 4A.1(a) shall not apply to the Aircraft or any Kaman manufactured parts that: (i) have been repaired or altered outside Kaman's facility in any way so as to affect the safety, function or reliability of the Aircraft or part; (ii) has been subjected to misuse, negligence, accident or abuse of any kind; (iii) has been damaged due to failure to operate and maintain the Aircraft in a prudent manner and in accordance with all manufacturer manuals, bulletins, or any other written instructions as to inspection, maintenance or operation of the Aircraft; or (iv) as to 4A.1(a)(ii), any event which occurs after the Delivery Date.

(b)     Buyer must provide Kaman with written notice of any claimed noncompliance with the limited warranty of section 4A.1(b) as soon as possible (but in any case within thirty (30) days) after Buyer has knowledge of same, all during the Warranty Period. Kaman shall inspect the Aircraft and if it finds a noncompliance that is covered by 4A.1(b), Kaman shall correct such noncompliance in a manner determined in its sole discretion and without charge to Buyer. Kaman's sole liability and Buyer's exclusive remedy under section 4A.1(b) shall be the repair or replacement, at Kaman's option, of any Kaman manufactured part that is found to be in noncompliance and shall extend to no other matter. Any Kaman manufactured parts that are repaired or replaced during the Warranty Period shall be subject to the limited warranty for a period of one (1) year or five hundred (500) flight hours, whichever first occurs, following installation. Unless otherwise approved by Kaman, all parts shall be shipped to Kaman's facility for warranty service. The limited warranty of 4A.1(b) shall not apply to the Aircraft or any Kaman manufactured parts that: (i) have been repaired or altered outside Kaman's facility in any way so as to affect the safety, function or reliability of the Aircraft or part; (ii) has been subjected to misuse, negligence, accident or abuse of any kind; or (iii) has been damaged due to failure to operate and maintain the Aircraft in a prudent manner and in accordance with all manufacturer manuals, bulletins, or any other written instructions as to inspection, maintenance or operation of the Aircraft; or (iv) have been affected by conditions in the environment.

**4A.4     No Warranty of Engine or other Components; Assignment of Warranties.** Buyer specifically acknowledges that Kaman has not manufactured all of the components of the Aircraft, including, but not limited to the engine, and that Kaman makes no warranties with respect to those items. To the extent allowed by the manufacturer or supplier, Kaman will assign to Buyer any warranties and/or service contracts provided by such manufacturer(s) or supplier(s) of any part of the Aircraft.

**4A.5     NO OTHER WARRANTIES.** OTHER THAN THE LIMITED WARRANTIES CONTAINED IN THIS SECTION 4A, KAMAN MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND WITH RESPECT TO THE AIRCRAFT AND ITS COMPONENT PARTS, AND HEREBY DISCLAIMS ALL OTHER WARRANTIES WHETHER EXPRESS, IMPLIED OR STATUTORY, INCLUDING, BUT NOT LIMITED TO: (i) THE CONDITION, OPERATION, FITNESS FOR USE OR MERCHANTABILITY OF THE AIRCRAFT; (ii) THE FITNESS OF THE AIRCRAFT FOR ANY PARTICULAR

PURPOSE; (iii) THE AIRWORTHINESS OF THE AIRCRAFT SUBSEQUENT TO DELIVERY; OR (iv) ANY OTHER MATTER WHATSOEVER.  NO VERBAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY KAMAN, ITS AGENTS AND EMPLOYEES OR ANY THIRD PARTY SHALL CREATE A WARRANTY AND BUYER MAY NOT RELY UPON ANY SUCH INFORMATION OR ADVICE AS A WARRANTY.  NO AGREEMENT VARYING OR EXTENDING THE LIMITED WARRANTIES OR REMEDIES OF THIS SECTION 4A WILL BE BINDING UPON KAMAN UNLESS IN WRITING AND SIGNED BY A DULY AUTHORIZED OFFICER OF KAMAN.  BUYER ACKNOWLEDGES THAT THE AIRCRAFT IS NOT NEW.

SECTION 4B
LIMITATION OF LIABILITY

4B.1   <u>LIMITATION OF LIABILITY.</u>  EXCEPT FOR THE COST OF REPAIRING OR REPLACING A PART PURSUANT TO SUBSECTION 4A.2 OR 4A.3, KAMAN SHALL NOT BE LIABLE FOR ANY DEFECTS, EITHER LATENT OR PATENT, IN THE AIRCRAFT OR ITS PARTS.  IN NO EVENT SHALL KAMAN BE LIABLE TO BUYER OR ANY OTHER PERSON OR ORGANIZATION FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, OR EXEMPLARY DAMAGES, ARISING OUT OF OR RELATING TO THIS INSTALLMENT SALE AGREEMENT OR THE AIRCRAFT PURCHASED HEREUNDER, INCLUDING WITHOUT LIMITATION, ANY DAMAGES FOR DIMINUTION OF MARKET VALUE, LOSS OF USE OF THE AIRCRAFT, LOSS OF PROFITS OR OTHER FINANCIAL OR ECONOMIC LOSS, OR FOR ANY INTERRUPTION IN BUYER'S BUSINESS OCCASIONED BY ITS INABILITY TO USE THE AIRCRAFT FOR ANY REASON WHATSOEVER, EVEN IF BUYER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES.  KAMAN SHALL NOT BE LIABLE FOR ANY DAMAGES CLAIMED BY BUYER OR ANY OTHER PERSON OR ENTITY WHETHER BASED IN CONTRACT OR IN TORT.  BUYER ACKNOWLEDGES THAT THE AIRCRAFT IS NOT NEW.

SECTION 5
CERTIFICATE AND REGISTRATION

5.1   <u>Type Certificate and Export Airworthiness Certificate.</u>  On or before the Delivery Date Kaman shall have obtained a valid type certificate for the Aircraft and a valid airworthiness certificate as necessary, but Kaman shall not be responsible or liable for any other licenses, certifications, approvals or registrations in connection with the Aircraft or its operation.

5.2   <u>Registration.</u>  Buyer shall be responsible and liable for the registration of the Aircraft by the governmental authority having jurisdiction over the Aircraft and any other approvals, certificates, registrations or permits as may be applicable for the ownership or operation of the Aircraft by Buyer.

5.3    Contingency.  This Installment Sale Agreement is contingent upon Kaman's receipt of all requisite governmental approvals and certifications.

5.4    Certain FAA Overhauls.  For a period of two (2) years after the Delivery Date (the "Overhaul Period"), Kaman will pay the reasonable pro rata cost (which shall be determined in its discretion) of such overhauls of the Aircraft's major components (excluding the engine) as may be established by the FAA but only to the extent that such overhauls are required more frequently than a TBO of 2,500 hours.  Kaman shall not be responsible for any portion of the cost of overhauls which are necessary or appropriate as a result of damage, misuse or abuse to the Aircraft.  Kaman's obligations under this section are solely for the benefit of Buyer; in the event that the Aircraft is sold or this Installment Sale Agreement assigned as permitted herein, this Section 5.4 will cease to be effective. During the Overhaul Period, Buyer shall assure that all records pertaining to the Aircraft and its engines are prepared and maintained in accordance with all applicable rules and regulations of the FAA, any other pertinent governmental authorities, and the requirements of Kaman and the Engine Manufacturer.  These records shall provide a complete historical record of the Aircraft, including but not limited to the use, operation, servicing and maintenance of the Aircraft, and all Airworthiness Directives and Service Bulletins that may be issued relative to the Aircraft and the engine.  In addition, Buyer shall operate and maintain the Aircraft in full compliance with Kaman's and/or Engine Manufacturer's manuals, bulletins, or any other written instructions as to inspection, maintenance or operation of the Aircraft and its engine as well as all applicable governmental requirements (including FAA and FOCA).  During the Overhaul Period, Kaman shall have the right to inspect the Aircraft and any records relating thereto at any time upon reasonable prior notice.

## SECTION 6
## MAINTENANCE AND RECORDS

6.1    Buyer's Responsibilities.  Until the Price is received by Kaman or, if later, the Aircraft is returned to and accepted by Kaman, Buyer shall be responsible, at its sole cost and expense, for all care and maintenance of the Aircraft and shall, at all times during the Payment Period and until the Aircraft is returned to and accepted by Kaman, at its own expense, cause the Aircraft to be in good and safe operating order, repair and condition in accordance with the requirements of Kaman, the FAA, FOCA and any other governmental authorities having jurisdiction.  All maintenance shall be performed in accordance with Kaman's operating, inspection, and maintenance instructions and manuals, and in compliance with all applicable regulations under Title 14 of the Code of Federal Regulations.

6.2    Coordination of Service with Engine Manufacturer.  Buyer acknowledges that Kaman is not the manufacturer of the Aircraft Engine.  Kaman will support Buyer in coordinating service and the provision of spare parts and technical assistance for the engine with AlliedSignal (the "Engine Manufacturer").

- 7 -

6.3    <u>Records</u>.  Buyer shall be responsible for assuring that all records pertaining to the Aircraft and its engine are prepared and maintained during the Payment Period in accordance with all applicable rules and regulations of the FAA, FOCA, any other governmental authorities, Kaman and the Engine Manufacturer.  Such records shall be prepared and maintained in a commercially prudent manner and shall provide a complete historical record of the Aircraft, including but not limited to the use, operation, servicing and maintenance of the Aircraft, and all Airworthiness Directives and Service Bulletins that may be issued relative to the Aircraft and the engine.

6.4    <u>Inspection of Records</u>.  All records which Buyer is required to cause to be prepared, maintained, and retained under this Section shall be available for examination and copying by Kaman and/or the Engine Manufacturer at all times.  Buyer agrees to furnish any information in respect to the location and use of the Aircraft that Kaman may reasonably request.  Buyer shall deliver, free of charge, all such records in complete and current form to Kaman in the event the Aircraft is returned pursuant to Section 2.3(c).

6.5    <u>No Alterations</u>.  Until the Price is received by Kaman or, if later, the Aircraft is returned to and accepted by Kaman, Buyer shall not have the right to make any alterations, modifications, additions, or improvements to the Aircraft, without the prior written consent of Kaman, which may be withheld in its sole discretion.

## SECTION 7
## USE AND OPERATION OF AIRCRAFT

7.1    <u>Business Purpose and Geographic Area</u>.  During the Payment Period, Buyer shall use and operate the Aircraft for logging operations and other lawful purposes related to its business operations and not for any other purpose without the prior written consent of Kaman, which may be withheld in its sole discretion.  The location where the Aircraft shall be principally hangared is  Hersbruck, Germany. Due to the need for type certification of the Aircraft in other jurisdictions as well as the need for complete insurance coverages, the Aircraft shall not be used or operated in any geographic area other than Germany, Switzerland, Austria, and France without the prior written consent of Kaman, which consent will not be unreasonably withheld. Buyer will provide Kaman evidence of effective insurance coverage as required under Section 8 hereof with respect to any other geographic area for which it has requested the right to use the Aircraft and in no event shall the Aircraft be operated  in any jurisdiction where such insurance coverage is not in full force and effect.

7.2    <u>Authorized Users</u>.  Buyer warrants that the Aircraft shall be operated:

(a)    only by duly licensed pilot operators who are authorized by Buyer to operate the Aircraft, are currently certified as qualified to operate the Aircraft in compliance with the laws of Germany, Switzerland, the United States or any other state or local governmental

authorities having jurisdiction therefor, and whose actions are fully covered by Buyer's insurance required under Section 8; and

(b)      in accordance with the provisions of the insurance policies issued in connection with this Installment Sale Agreement, and fully covered thereby.

7.3    <u>Compliance with Laws</u>.  Until the Price is received by Kaman or, if later, the Aircraft is returned to and accepted by Kaman, Buyer will abide by and conform to all laws, ordinances, orders, rules, and regulations, whether federal, state, municipal, foreign or otherwise, now existing or hereafter enacted (including, without limitation, those now or hereafter promulgated by the FAA and any other government agency having jurisdiction over the Aircraft), which control or in any manner affect the possession, maintenance, condition, operation, use or airworthiness of the Aircraft, or the use of any premises or facilities occupied by the Aircraft.

7.4    <u>Care of Aircraft</u>.  Until the Price is received by Kaman or, if later, the Aircraft is returned to and accepted by Kaman, Buyer will exercise the highest standards in caring for the Aircraft at all times and will not load, use, operate, maintain, service, repair, hangar, or store the Aircraft improperly or in violation of this Installment Sale Agreement or so as to void or adversely affect any insurance covering the Aircraft.  Buyer will keep the Aircraft adequately protected at all times when not in use.


SECTION 8
INSURANCE

8.1    <u>Maintenance of Coverage</u>.  Buyer shall, at its sole expense and at all times during the Payment Period and until the Aircraft is returned to and accepted by Kaman pursuant to Section 13, obtain and carry the types and amounts of insurance coverage as follows:

(a)      Legal liability insurance, in kind and form and with any deductibles fully secured by an irrevocable letter of credit for Kaman's benefit, with limits no less than Twenty-Five Million Dollars US ($25,000,000 US) per occurrence, specifically for the Aircraft subject to this Installment Sale Agreement, for bodily injury and property damage.  All policies of insurance carried in accordance with this subsection (a) shall name Kaman (and Kaman's Assignee, if any) as an additional insured.  Should Kaman determine, in its reasonable discretion, that the limits of coverage should be increased, Buyer agrees to obtain an increase in such limits.  The insurance required by this subsection shall specifically include contractual liability coverage with respect to this Installment Sale Agreement between Kaman and Buyer.

(b)      "All Risk" hull insurance on the Aircraft, both In Flight and Not In Flight, in kind and form and with any deductibles fully secured by an irrevocable letter of credit for Kaman's benefit and in an amount not less than Three Million Five Hundred Thousand Dollars US ($3,500,000 US).  All policies of insurance carried in accordance with this Section

8 .1(b) shall name Kaman (and Kaman's Assignee, if any) as direct loss payee, so that the insurance proceeds from any loss involving the Aircraft shall be payable directly to Kaman (or its Assignee, if applicable). The policies shall include, but not be limited to, coverage against the perils of strikes, riots, civil commotions, or labor disturbances, and any act of vandalism, malice, sabotage, conversion or theft, and war risks. The policies shall also specify that any losses shall be adjusted by the insurer with Kaman.

(c)    Workers' Compensation, automobile liability, general public liability insurance and inland marine insurance for cargo, all in commercially reasonable and/or legally required amounts.

(d)    "All Risk" property insurance for spare parts owned by Kaman and which will be in the care, custody, and control of Buyer.

8.2    Other Requirements. All insurance policies maintained by Buyer in accordance with this Section shall also comply with each of the following requirements:

(a)    be issued by insurers of recognized responsibility which are satisfactory to Kaman in its sole discretion;

(b)    provide that if such insurance is to be canceled for any reason whatsoever, or any change is made in policy terms, conditions, or coverage, or the policy is allowed to lapse for nonpayment of premium, such cancellation, change, or lapse shall not be effective as to Kaman until thirty (30) days after Kaman's receipt of written notice from Buyer's insurers of the cancellation, change or lapse in policy terms, conditions, or coverage and Kaman is afforded the right, but not the obligation, to cure;

(c)    provide that in respect of the interest of Kaman in such policies, the insurance shall not be invalidated by any action or inaction of Buyer and shall insure Kaman regardless of any breach or violation by Buyer of any warranty, declaration, or condition contained in such policies;

(d)    be primary without right of contribution from any other insurance which is carried by Kaman with respect to its interest in the Aircraft;

(e)    waive any right of subrogation of the insurer against Kaman, except in its capacity as manufacturer or repairer;

(f)    provide that the geographic limits, if any, contained in such policy shall include at a minimum all territories over which Buyer (or its designated operator, which designated operator shall be subject to the written approval by Kaman prior to operating the Aircraft) will operate the Aircraft;

(g)    contain a cross liability clause; and

(h)    provide that Kaman shall have no obligation or liability for premiums, commissions, assessments, or calls in connection with such insurance policies.

8.3    Evidence of Insurance; Etc.  Buyer shall furnish certified copies of all required insurance policies to Kaman prior to the Delivery Date and binders for such coverage at the time of inspection and acceptance. Evidence of renewal of each policy shall thereafter be furnished to Kaman within 30 days prior to the renewal date. Buyer covenants that it will not do any act or voluntarily suffer or permit any act to be done whereby any insurance required hereunder shall or may be suspended, impaired, or defeated. Buyer in no circumstance will suffer or permit the Aircraft or any part thereof to be used or operated at any time when Kaman may be at risk for the risks protected against by the above-described insurance without all said insurance being fully in effect. In the event that Buyer should for any reason fail to renew or replace each and every policy or contract of insurance at least thirty (30) days prior to the expiration thereof, or fail to keep any such policy or contract in full force and effect, Buyer shall immediately so notify Kaman, and Kaman shall have the option to pay the premiums on said policies or contracts of insurance or to take out new insurance in type, amount, coverage, and terms satisfactory to Kaman, and any sum paid therefor by Kaman shall be immediately due and payable to Kaman by Buyer, together with interest at the prime rate in effect from time to time at Fleet National Bank of Connecticut.

8.4    Failure to Maintain Insurance.  In the event Buyer fails to maintain in force any of the insurance coverage required under this Section, Buyer's use of the Aircraft may be immediately terminated by Kaman and the Aircraft immediately repossessed without the need for notice of any kind.

SECTION 9
LOSS OR DAMAGE

9.1    Risk of Loss.  During the Payment Period and until the Aircraft is returned to and accepted by Kaman, Buyer assumes and shall bear the entire risk of loss, destruction, theft, taking of or damage to the Aircraft and spare parts from any cause whatsoever. Buyer shall immediately report to Kaman in writing any loss, destruction, theft, taking of or damage to the Aircraft, and shall promptly provide to Kaman copies of all reports or documents made or given by Buyer relating thereto.

9.2    Total Loss.  In the event the Aircraft shall have been lost, destroyed, stolen, or damaged to such an extent that the Kaman determines that repair of the Aircraft is impractical, or in the event of a total taking of the Aircraft (which term includes, without limitation, seizure, hijacking, condemnation, requisition, or taking of possession of the Aircraft by any governmental authority, domestic or foreign, or any agency or political subdivision thereof) [each such occurrence being deemed a "Total Loss"], Buyer shall pay to Kaman within thirty (30) days after such loss, destruction, theft, taking or damage, a sum equal to the then current balance of the Price as determined under Section 2 hereof as of the date of such Total Loss, plus all other sums payable under this Installment Sale Agreement (including, but not limited

- 11 -

to, the sums payable under any indemnity provisions). Any nonpayment of insurance proceeds that may be due hereunder will not excuse Buyer from its obligation to pay Kaman as set forth herein.

9.3    <u>Insurance Proceeds</u>. To the extent that any loss, destruction, theft, taking or damage is covered by insurance, all proceeds of such insurance and any deductible amounts shall be first applied by Buyer toward satisfaction of the payments required to be made to Kaman pursuant to this Installment Sale Agreement. In the case of a Total Loss, upon Kaman's receipt of payment in full as required under this Installment Sale Agreement, this Installment Sale Agreement shall terminate (if Buyer is not then in default under this Installment Sale Agreement) and the Aircraft (or such portion of it as is still in existence) shall be returned to Kaman, if possible. Buyer shall become entitled to all remaining proceeds of insurance pertaining to the Aircraft, and all rights and ownership in the insurance policies required under this Installment Sale Agreement, except as to such policies insuring or covering liabilities of Kaman or any other person named as insured or covered thereby, caused by or arising out of or in connection with any events, matters or circumstances arising prior to termination.

9.4    <u>Other Loss</u>. If the Aircraft or any part or component thereof shall suffer any loss, destruction, theft, taking or damage, other than a Total Loss as contemplated in Section 9.2 above, Kaman shall have the right in its sole discretion, either to (a) restore the Aircraft at the expense of Buyer, or (b) terminate during the Payment Period and repossess the Aircraft. If Kaman elects to restore the Aircraft, it shall have the right to do so in the manner it determines appropriate, replacing all equipment, parts or components of the Aircraft as shall have been lost, destroyed, stolen, taken or damaged with equipment, parts and components of equal or greater value. Kaman will be reimbursed by Buyer as and when Kaman submits requests for such reimbursement (but not more frequently than twice per month) for all costs of restoration, including Kaman's labor costs. Kaman shall provide Buyer with a statement in reasonable detail of such costs. If Kaman elects to terminate during the Payment Period, Kaman shall give Buyer written notice thereof, specifying the date of termination of the Installment Sale Agreement, and Buyer shall be responsible for return of the Aircraft in accordance with Section 13 of this Installment Sale Agreement. Whichever election is made by Kaman [(a) or (b) above], all insurance proceeds shall be paid directly to Kaman. If Kaman elects to repair the Aircraft, such proceeds shall be applied to the cost of repairs and any deductible amounts drawn on the irrevocable letter of credit under Section 8.1(b).

9.5    <u>Continuation of Obligations</u>. No loss, destruction, theft, taking of or damage to the Aircraft, however occurring and whether or not the same is covered by insurance, shall relieve Buyer of any of its obligations under this Installment Sale Agreement.


SECTION 10
GENERAL INDEMNIFICATION

10.1   <u>Buyer's Responsibilities</u>. Buyer shall indemnify and hold harmless Kaman, its officers, directors, employees, representatives, shareholders, insurers, agents and assigns, against and

from, any and all claims, actions, suits, proceedings, losses, judgments, damages, and liabilities (including attorneys' fees) and all other costs and expenses in connection therewith or incident thereto, for death or injury to any person whomsoever, and for any loss or damage to, or destruction of, any property whatsoever, caused by or arising out of, or in any way connected with or resulting from:

      (a)    the Aircraft or any property or persons aboard or connected with the Aircraft; or

      (b)    the acquisition, selection, delivery, possession, use, condition, operation, storage, maintenance, servicing, repair or return of the Aircraft or training provided in connection with the Aircraft,

with the exception of any of the foregoing which is caused directly and solely by the negligence or intentional misconduct of Kaman.

10.2    <u>Survival</u>. With respect to any event or cause of action accruing during the Payment Period (and thereafter in the event that Buyer purchases the Aircraft), Buyer's indemnification responsibilities shall remain in full force and effect notwithstanding the expiration or other termination of this Installment Sale Agreement.

10.3    <u>No Limitation</u>. This Section 10 is not intended to limit the effect of any other indemnification responsibilities described elsewhere in this Installment Sale Agreement.


SECTION 11
TAXES

11.1    <u>In General.</u>  Buyer shall be responsible for, shall pay and shall immediately indemnify and save Kaman harmless on an after-tax basis from and against, all taxes, duties, assessments, withholdings, recording or registration fees of any kind (including for registration of a mortgage in Germany), charges and fees of every nature and kind whatsoever (including but not limited to sales taxes, goods and services taxes, import and export duties, customs duties, excise taxes, luxury taxes, income taxes and licensing fees) assessed or imposed by any government or other taxing authority with respect to or by reason of the transaction contemplated by this Installment Sale Agreement other than taxes imposed on the net income of Kaman by the Federal Government of the United States or by the State of Connecticut.

11.2    <u>Procedures When Withholding Is Legally Required.</u>  All payments by Buyer to Kaman pursuant to this Installment Sale Agreement shall be free of withholding of any nature and free of expense to Kaman for collection or other charges, except that if Buyer is required by law to withhold any amount from any such payment, Buyer shall withhold the required amount, pay the withheld amount to the relevant tax authority when due and pay such additional amount to Kaman such that Kaman receives, after all withholding, the amount that Kaman would have received if such withholding had not been required.

## SECTION 12
### FORCE MAJEURE

12.1   If Kaman fails to perform or delays performance of any of its obligations pursuant to this Installment Sale Agreement and such failure or delay is due to any cause beyond Kaman's reasonable control, including but not limited to any acts of God, or the public enemy, sabotage or blockades, insurrections, riots, lightning, earthquakes, storms, fires, washouts, nuclear and radiation activity or fallout, civil disturbances or explosions, labor disturbances, strikes, any legislative, administrative, judicial or governmental action, governmental priorities, allocation regulations or orders affecting materials, equipment, facilities or completed aircrafts, unforeseen circumstances, failure of supply from vendors, compliance with any federal, state, or local law or regulation, Kaman shall not be liable to Buyer for such failure or delay and the date for such performance shall be extended such period of delay.

## SECTION 13
### RETURN OF AIRCRAFT

13.1   Return of Aircraft; Risk of Loss.  If Buyer fails to pay the Price in accordance with the provisions of Section 2 above, Buyer immediately shall return the Aircraft and all other items listed on Exhibit A at its sole cost and expense FOB Kaman's factory Bloomfield, Connecticut, but in no event later than January 15, 1998. All risk of loss with respect to the Aircraft shall be and remain with Buyer until the closing for the return of the Aircraft is completed; i.e, a bill of sale satisfactory to Kaman has been signed and delivered by Buyer (and all documentation necessary to transfer title to Kaman free and clear of any liens and encumbrances) and the Aircraft has been delivered (along with the items listed below) and accepted by Kaman.  Buyer shall also deliver with the Aircraft all of the following items relating thereto: All records relating to the Aircraft, including all aircraft, engine, and component records updated and current as of said date, maintenance records, inspection status records for airworthiness directives and service bulletins, avionics checks, time/cycle index cards with airworthiness releases or equivalent attached thereto, and major alteration and repair records including applicable FAA 337 forms and any other records related to the Aircraft.

13.2   Certain Conditions to Closing.  Buyer shall be required to return the Aircraft: (i) in the same condition as when received by Buyer (ordinary wear and tear excepted); (ii) in a condition such that it may be immediately registered in the United States without any further action by Kaman; and (iii) together with Buyer's warranty and satisfactory evidence that Buyer has good and marketable title to the Aircraft and that the Aircraft is free and clear of all liens and encumbrances of any kind.

## SECTION 14
### GENERAL

14.1   Governing Law.  This Installment Sale Agreement shall be governed by and be construed in accordance with applicable the laws in the State of Connecticut, exclusive of its choice of law rules. Any and all disputes, claims, actions, suits, or proceedings arising out of or relating to this Installment Sale Agreement shall be brought exclusively in a federal or state

court of competent jurisdiction established or sitting in the State of Connecticut. The parties will not raise, and hereby irrevocably waive, any defenses based upon improper venue, inconvenience of the forum, lack of personal jurisdiction, sufficiency of service, or the like, in connection therewith.

14.2    Notices.  Any notice required to be given hereunder by any party shall be deemed to have been well and sufficiently given if mailed by prepaid registered mail, transmitted by facsimile, or delivered at the address of the parties first written above or at such address or addresses as the parties may from time to time advise in writing, and any such notice shall be deemed to have been received, if mailed, on the fourth business day after the time of mailing and if delivered or transmitted by facsimile, upon the date of delivery or received transmission.

14.3    Further Assurances.  The parties shall do such things and execute such further documents as may be necessary from time to time in order to carry out the intent of this Installment Sale Agreement.

14.4    Entire Agreement.  This Installment Sale Agreement constitutes the entire agreement between the parties with respect to the Aircraft.  There are no verbal understandings, agreements, representations or warranties between the parties which are not expressly set forth in this Installment Sale Agreement.  This Installment Sale Agreement supersedes and merges all prior agreements and understandings between Kaman and Buyer, both verbal and written.

14.5    Amendment.  This Installment Sale Agreement shall not be amended except by an instrument in writing signed by the parties.

14.6    Binding Effect.  This Installment Sale Agreement and the rights, title and interests provided herein shall enure to the benefit of, and be binding upon, Kaman and Buyer and their respective successors and permitted assigns but neither the rights nor the duties of either party under this Installment Sale Agreement may be assigned, in whole or in part, without the prior written consent of the other party.  Any purported assignment in contravention of this subsection 14.6 shall be null and void.

14.7    Default: Waiver.  If Buyer fails to make any payments as and when due or fails to fulfill any of its other obligations under this Installment Sale Agreement, Buyer shall be deemed in Default.  In the event of a Default by Buyer, in addition to retention of the first deposit, Kaman shall have the immediate right to repossess the Aircraft without notice to Buyer or any other party together with all rights and remedies as established or permitted by the Uniform Commercial Code in addition to all other rights established herein or at law or in equity, which rights and remedies, to the extent permitted by law, shall be cumulative. The exercise of any right or remedy by Kaman is without prejudice, and shall be in addition to, all other rights or remedies that may be available to Kaman as aforesaid.  If Kaman does not fulfill its obligations under this Installment Sale Agreement and is not excused under Section 12, Buyer's sole and exclusive remedy shall be the return of the deposit paid by Buyer (without interest) and the obligations of the parties shall be at an end.  The waiver of any default by either party of any of the terms and conditions of this Installment Sale Agreement or the waiver of any breach of any of the terms and conditions of this Installment Sale Agreement shall be in writing, and shall not be construed as a waiver of any other or subsequent default, but the terms and

- 15 -

conditions shall continue and remain in full force and effect as if no such waiver had occurred. During the Payment Period, if Buyer is not deemed in Default, Kaman shall not have the right to terminate this Installment Sale Agreement.

14.8   <u>Fair Labor Standards Act</u>. Kaman hereby certifies that all goods sold hereunder which are produced or manufactured in the United States of America are produced in compliance the Fair Labor Standards Act of 1938, as amended (29 U.S. Code §§201-219). All requirements as to the certificate contemplated in the October 26, 1949 amendment to the Fair Labor Standards Act of 1938 shall be considered as satisfied by this certification.

14.9   <u>No Brokers</u>. Each Party represents as to itself that the parties hereto were not introduced by any third person and that all negotiations relating to this Installment Sale Agreement and the sale and purchase provided for herein have been carried on by it directly with the other party without the intervention of any third person. Each party shall indemnify and hold harmless the other party against and in respect of all claims for brokerage commissions, finders' fees and similar compensation arising out of this Installment Sale Agreement or the sale and purchase provided for herein, which claims are based in any way upon breach of the indemnifying party's foregoing representation.

14.10   (a) <u>Foreign Corrupt Practices Act</u>. Buyer shall not undertake, permit to be undertaken, or cause, any activity which (i) is illegal under any applicable laws, decrees, rules, regulations or public policies, or (ii) would have the effect of causing Kaman to suffer a tax penalty or be in violation of any United States or other applicable laws, decrees, et cetera as in (i) above, including, but not limited to, the U.S. Foreign Corrupt Practices Act. Buyer shall not, directly or indirectly, give, offer, or promise, authorize, or allow to be given, offered or promised, anything of value on behalf of Kaman to an official or employee of any government (or subdivision thereof) or to any political party or candidate for the purpose of influencing an official act of such person in order to assist Kaman in obtaining or retaining business, or in directing business to any person.

(b) <u>Export Regulations.</u>  Buyer shall comply with the export regulations of the U.S. Department of Commerce and the appropriate German and Swiss authorities, as necessary, in connection with the export and/or re-export of the Aircraft and spare parts, including the obtaining of a valid export license as appropriate prior to shipment.

(c) <u>Others.</u>  In no case shall Kaman or Buyer be obligated to take any action or make any payment which would cause either of them to violate any applicable law, decree, rule, regulation or public policy of the United States, Germany or Switzerland. Each party will use its best efforts to inform the other party in the event of any circumstances coming to its attention which may be indicative of a violation or potential violation of applicable law.

14.11   <u>Document Execution</u>. Buyer will, whenever requested by Kaman, execute and deliver to Kaman any agreements, instruments, and documents, in a form satisfactory to Kaman, and take such further actions as Kaman may request, which may be necessary or appropriate to

fully consummate the various undertakings contemplated in this installment Sale Agreement or necessary for the protection of Kaman's security interest in the Aircraft and the rights, interests, and remedies created, or intended to be created in favor of Kaman by this Installment Sale Agreement. Buyer's failure to execute such documents within ten (10) days of Kaman's request to do so shall constitute Buyer's appointment of Kaman as Buyer's attorney-in-fact to execute such documents in Buyer's name, place, and stead.

14.12   Language. All documents to be supplied by either party under this Installment Sale Agreement and any verbal communications or proceedings of any kind, including dispute resolutions, shall be in the English language.

14.13   Survival of Terms. All provisions of this Installment Sale Agreement shall survive the closing of this aircraft sale.

## SECTION 15
## FAMILIARIZATION COURSES FOR PILOTS/MECHANICS

15.1   Familiarization Course.  Kaman will provide a familiarization training course for two (2) pilots chosen by Buyer and otherwise fully qualified and licensed. Kaman will also provide basic training for up to two (2) of Buyer's mechanics for purposes of airframe maintenance. The sole purpose of the training is to familiarize individuals with the operation of the Aircraft. Kaman cannot and does not warrant that any person who has attended the training course is thereby qualified to operate the Aircraft nor is Kaman in any way responsible for assessing the qualifications or capability of Buyer's representatives to perform their jobs; Buyer is fully responsible for the acts or omissions of such individuals at all times and shall indemnify and hold harmless Kaman from all costs, claims, damages, suits, or expenses of any kind or nature (including attorneys' fees) to which Kaman may be subjected and which are attributable to the acts or omissions of these individuals. Training will be provided at Kaman's facility in Bloomfield, Connecticut and will consist of up to ten (10) days of instruction at a time mutually convenient to Kaman and Buyer. Buyer shall be solely responsible in all respects for the individuals that it sends to this training program, each of whom shall be deemed to be a representative of Buyer for all purposes. Buyer's responsibilities, include, but are not limited to: (a) payment of all expenses of such individuals in connection with their activities pursuant to this Section; (b) the duty to indemnify and hold harmless Kaman from all costs, claims, damages, suits, or expenses of any kind or nature (including attorneys' fees) to which Kaman may be subjected and which are attributable to the acts or omissions of these individuals; and (c) sole responsibility for injuries of any kind that might be suffered by its representatives and agrees that it shall maintain at all times workers' compensation coverage and other appropriate insurance coverages with respect to such individuals.