EXHIBIT A

to

Aircraft Installment Sale Agreement
Kaman Aerospace Corporation and
Helog, A.G.

## AIRCRAFT DESCRIPTION:

| | |
|---|---|
| Model number: | K-1200 |
| Manufacturer: | Kaman Aerospace Corporation |
| Serial Number: | A94-0018 |
| LBA Registration No. | D-HFZA |
| Engine Model: | AlliedSignal T5317A-1 |
| Engine Serial Number: | LE81017 |

K-1200 STANDARD CONFIGURATION

AIRFRAME

Semi-monocoque aluminum alloy fuselage
Semi-monocoque aluminum alloy tailboom and vertical fin with rudder
Elevator with integral vertical fin
Plexiglass windshield and side panel windows
Plexiglass, full view, bubble side windows with integral ventilation panel
Swing out, removable crew doors
Fixed step for entry to cockpit, right side
Retractable work platforms, left and right
Sliding access cowling, engine compartment
Tool/storage compartment with downward-opening access panels, left and right (26 cubic feet, 500 lb
capacity, with tie down rings)
Nose compartment with upward-opening access door
Fixed shock absorbing landing gear with three wheel and tire assemblies, (2) main wheels with
independent brakes, and (1) 360 degree swiveling, self-centering, locking nose wheel
Parking brake
Bear paw, soft terrain wheel skids (3)
Tail bumper
Cargo hook (6000 lb capacity)
Load signal conditioner
LH or RH 6" Diameter Mirrors

INTERIOR

High-energy-absorbing pilot's seat with five-point safety harness and lumbar support
Collapsable cyclic
Collective stick with integral engine throttle ( includes manual cargo hook release handle)
Adjustable rudder pedals with individual toe brakes
Bleed air heater and defroster
Map and data case
Fire extinguisher (cockpit)
First Aid Kit

## POWER PLANT

AlliedSignal T5317A-1 turbine engine (1,500 SHP)
Magnetic, fuzz burning chip detectors (2)
Fuel system (228.5 U.S. gallons usable fuel)
Fuel Cell, bag type
Fuel boost pumps, cartridge type, externally accessible (2)
Fuel filter assembly (10 micron) with replaceable element
Gravity/pressure refueling port (closed circuit refueling receiver)
Oil tank (1.8 U.S. gallons usable)
Fire detection system
Fuel/oil firewall shutoff valves, electrical
Power turbine RPM control actuator
Inlet Particle separator
Engine Wash Provisions

## ROTORS AND CONTROLS

Semi-articulated, composite, counter-rotating rotors (2) with servo flap system (4 rotor blades)
Rotor RPM warning system, audio/visual
In flight tracking actuators (2)
Electric cyclic trim with trim release feature
Azimuth Installation

## TRANSMISSION SYSTEM

Transmission assembly with overriding clutch
Power take off pad for optional accessory (50 shp)
Magnetic, fuzz burning chip detector (3)
KAflex drive shaft coupling
Rotor brake
Oil tank (1.8 U.S. gallons usable)
Oil pump
Oil cooler/blower (engine/transmission)

## FLIGHT AND ENGINE INSTRUMENTS

Outside air temperature indicator
Altimeter (barometric)
Clock (electronic)
Magnetic compass
External load indicator/monitor
Airspeed indicator
Vertical speed indicator IVSI
Turn and slip indicator
Engine and rotor tachometer (dual)
Engine torquemeter/monitor
Engine gas generator (N1) indicator
        (Autotak Indicator/Monitor)
Exhaust gas temperature indicator

(Autotemp Indic. /Monitor)
Engine oil pressure/temperature indicator
Transmission oil pressure/temperature indicator
Fuel quantity indicator
Fuel pressure indicator
Volt/ammeter
Hobbs meter (hour)
Caution and advisory panel
Master warning panel    (MASTER CAUTION, FIRE, ROTOR RPM):
External Instrument panel
Attitude Indicator


## COMMUNICATIONS AND NAVIGATION

VHF COM/NAV: AlliedSignal KX-165
NAV: AlliedSignal KLN 90 GPS System
FM COM: Technisonic TFM 138B
NAT AA22-110 Siren/Loudhailer System
Allied Signal KT-71 Mode C Transponder
NAT AA12-001 Audio Distribution Panel
AlliedSignal K1525A Horizontal Situation Indicator


## ELECTRICAL

Starter/generator
        (28 volt DC, 300 ampere)
Lead acid battery
        (28 volt DC, 43 ampere-hour)
Generator control
Relay boxes (3)
Circuit breaker console - right side pilot compartment
Integral instrument lighting
Instrument panel flood lighting
Pilot controllable, retractable, and swivelling landing/search light:
Anticollision lights (2)
Navigation lights
Cockpit utility lights (2)
External power receptacle
Ignition starting system
Cargo compartment and fuselage utility light
Provisions for wiring accessory systems to cargo hook
Interior Power Receptacle
External ICS Connection
H-1008L        ICS Chord


## GROUND SUPPORT EQUIPMENT (FLY AWAY KIT)

K904006        Cover Assembly - Pitot
K904007        Tow/Tilly Bar
K904008        Cover Assembly, Rotor Hub (2 Req'd)
K904009        Cover Assembly, Rotor Blade (4 Req'd)

| K904010 | Support St─ ─ - Tail Section |
|---------|------------------------------|
| ─── | Cover As── ── y, Particle Separator |
| K904015 | Cover Assembly, Cabin |
| K904016 | Cover Assembly, Engine Exhaust |
| K904018 | Equipment Bag |
| K904019 | Blade Securing Tie-Down Kit |
| K904022 | Blade Teeter Lock Assembly (2 req'd) |
| K904034 | Cable Assembly, Download (Load Indicator) |
| K904072 | Wheel Chocks |

## MANUALS

K-MAX Maintenance Manual
K-MAX Illustrated Parts Catalog
K-MAX Rotorcraft Flight Manual
K-MAX Aircraft Logbook
T5317A-1 Logbook (Published by Engine Manufacturer and provided by Kaman at Delivery)
Aircraft Certificate
FCC License
AlliedSignal Engine Maintenance Manual To Be Provided Directly by the Engine Manufacturer

## Ground Support Equipment

### Primary Support Equipment

| K904004 | Sling Assembly, Hoist (Helicopter) |
|---------|------------------------------------|
| K904005 | Sling Assembly, Blade |
| K904011 | Holder Assembly, Rotor Shaft & Housing (2) |
| K904014 | Protractor, Blade to Flap |
| K904017 | Puller, Bearing Idler Assembly |
| K904020 | Adapter, Lifting (Transmission Assembly) |
| K904021 | Fixture, Inter-Blade Damper |
| K904023 | Set, Puller Assembly (Flap Bearing) |
| K904024 | Lock Assembly, Rigging (IFT Pin) |
| K904026 | Set, Hydraulic Pump/Ram |
| K904028 | Azimuth Bar Runout Tool (2) |
| K904029 | Blade Storage Rack (2) |
| K904030 | Kit, KAflex Drive Shaft Installation |
| K904031 | Spreader-Plunger, L-Cranks (2) |
| K904032 | Kit, Rigging Pins |
| K904033 | Bar, Alignment (L-Cranks) |
| K904035 | Lock Assy, Blade Dephasing |
| K904038 | Alignment Tool, Blower Shaft |
| K904039 | Rigging Block, Longitudinal |
| K904040 | Socket, Lag Pin Nut |
| K904041 | Gauge, Rigging (Azimuth Collective Height) |
| K904042 | Bar Assembly, Anti-Torque (Rotor Brake Disc) |
| K904044 | Wrench Adapter, Rotor Brake |
| K904047 | Puller Assembly, Torque Tube |
| K904058 | Rigging Bar, Collective Stick (Module) |
| K904063 | Wrench, Landing Gear Nut |
| K904066 | Template, Blade Idler L/H |

| K904066 | Template, Blade Idler R/H |
| K904067 | Gate, Snubbe Gear |
| K904068 | Locking Device, Main Gear (2) |
| K904069 | Azimuth Cam Rigging Pin |
| K904071 | Main Gear Servicing Dipstick |
| K904074 | Jacking Screws, Rotor Shaft |
| K904075 | Holding Bar, Engine Adapter |
| K904076 | Holding Fixture, Hub/Blade |
| K904078 | Removal/Installation Trolley Bearing |

EXHIBIT B

## AIRCRAFT BILL OF SALE

THIS BILL OF SALE made the ___ day of _____, 1997.

NOW THEREFORE THIS BILL OF SALE WITNESSES that in consideration of $3,500,000 US and other good and valuable consideration paid by Helog, A.G. ("Buyer") to Kaman Aerospace Corporation ("Kaman"), receipt of which is acknowledged, and pursuant to and subject to the terms and conditions of the Aircraft Installment Sale Agreement dated _____, 1997, between Kaman and Buyer, Kaman hereby sells, assigns, transfers and sets over to Buyer the following aircraft and installed engines:

| | |
|---|---|
| Aircraft Manufacturer: | Kaman Aerospace Corporation |
| Model of Aircraft: | K-1200 Helicopter |
| Airframe: | |
|     Manufacturer and Model: | Kaman Aerospace Corporation K-1200 |
|     Manufacturer's Serial No.: | A94-0018 |
| Engine: | |
|     Manufacturer and Model: | AlliedSignal T5317A-1 gas turbine |
|     Manufacturer's Serial No.: | LE81017 |

Together with all equipment, components and accessories installed thereon and used in connection therewith (the "Aircraft") in AS IS WHERE IS condition.

AND all right, title, interest, property, claim and demand whatsoever, both at law and in equity, and in and to the Aircraft, subject to Kaman's first priority purchase money security interest in the Aircraft.

TO HAVE AND TO HOLD the Aircraft and all of its right, title and interest thereto and therein unto and to the use of Buyer, its successors and permitted assigns for its and their use forever.

IN WITNESS WHEREOF, Kaman has duly executed this Bill of Sale as of the day and year first written above.


KAMAN AEROSPACE CORPORATION


_____

Its: _____

EXHIBIT C

## CERTIFICATE OF INSPECTION AND ACCEPTANCE

Aircraft Manufacturer:                                Kaman Aerospace Corporation
Model of Aircraft:                                    K-1200 Helicopter
Airframe:
    Manufacturer and Model:                Kaman Aerospace Corporation K-1200
    Manufacturer's Serial No.:             A94-0018
Engine:
    Manufacturer and Model:                AlliedSignal T5317A-1 gas turbine
    Manufacturer's Serial No.:             LE81017

      Reference is made to the Installment Sale Agreement dated_____, 1997 between Kaman Aerospace Corporation ("Kaman") and Helog, A.G. ("Buyer") relating to the purchase and sale of the above-described aircraft together with all equipment installed thereon (the "Aircraft").

1.    Buyer certifies to Kaman that the Aircraft, including the Log Books, Records, and Operating Manuals delivered therewith, have been delivered to Buyer on the Delivery Date and they have been thoroughly examined and inspected to the satisfaction of Buyer and are unconditionally accepted by Buyer. Buyer also acknowledges that the Aircraft is:  (a) airworthy and in good and safe operating order, repair, and condition, (b) of the size, design, quality, type, and manufacture selected by Buyer (c) wholly suitable for Buyer's purposes, (d)  qualified with a current FAA Certificate of Airworthiness, (e)  in complete conformity with the requirements of the Installment Sale Agreement, and (f) not a new aircraft.

2.    Buyer acknowledges and agrees that on the date of this Certificate, the Aircraft has logged _____ flight hours.

3.    Buyer confirms acceptance of the Aircraft and installed engine in accordance with the terms of the Installment Sale Agreement, and Buyer waives and releases the right to revoke such acceptance for any reason, except as provided in that Installment Sale Agreement.

4.    Buyer acknowledges that each of the Warranty Period and Overhaul Period described in the Installment Sale Agreement shall begin on the Delivery Date which is _____. Each period shall expire at the end of the particular time period associated therewith, all in accordance with the Installment Sale Agreement.

      IN WITNESS WHEREOF, Buyer has caused this Certificate of Inspection and Acceptance to be executed by its duly authorized representative this ___day of _____, 19__.

BUYER

_____
Its: /

# EXHIBIT
# E

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT, HARTFORD

MOUNTAIN WEST HELICOPTERS, LLC,
a Utah Limited Liability Company; LONG-
LINE LEASING, LLC, a Utah Limited
Liability Company; HELOG AG, a Foreign
Corporation; and HELI-AIR ZAGEL
LUFTTRANSPORT AG, a foreign
corporation,

        Plaintiffs,

   v.

KAMAN AEROSPACE CORPORATION, a
Delaware corporation and JOHN DOES I
through V,

        Defendants.



Case No. 301 CV 1746 (AVC)

March 8, 2002

## AFFIDAVIT OF WOLFGANG ZAGEL OPPOSING KAMAN AEROSPACE CORPORATION'S DECEMBER 17, 2001 MOTION TO DISMISS

HAMMERAU, GERMANY

    WOLFGANG ZAGEL, being first duly sworn upon oath, deposes and says:

    1.    I reside in Hammerau, Germany and, if called to testify in this proceeding, would competently testify as outlined below.

    2.    My family and/or I are shareholders in Heli-Air Zagel Lufttransport AG ("Heli-Air") which operates the helicopter, identified below, owned by Helog AG ("Helog").

    3.    Heli-Air is a German corporation having places of business in Hersbruck and Hammerau, Germany and Helog is a Swiss corporation having a place of business in Küssnacht, Switzerland.

4.    From May 1997 until September 13, 1999, Helog owned and Heli-Air operated a Kaman Aerospace model K-1200 helicopter, bearing serial number A94-0018 and German registration number D-HFZA (the "Helicopter").

5.    Throughout August and September 1999 we operated the Helicopter in Germany and Austria.

6.    The Helicopter crashed in September 1999 following the malfunction of a spare part free-wheeling sprag clutch assembly, including part number K974110-005, identified by serial number 014 (the "Clutch").

7.    On or about May 2, 1997, Kaman sold the Helicopter to Helog under the terms and conditions of an Aircraft Sale Agreement bearing the same date. At the time of the sale the Helicopter included a free-wheeling sprag clutch assembly other than the Clutch.

8.    Approximately twenty-six months later, i.e., about July 1999, Kaman sold us the Clutch.

9.    It is my recollection that Kaman technical representatives carried, delivered and installed the Clutch, but there were no written agreements executed governing the terms and conditions of that sale. After installation, Kaman billed us and we then paid for the Clutch.

10.    The Kaman parts catalogue we possess, notes that Kaman's standard warranty of 500 flight hours or one year, whichever occurs first, applies to spare parts such as the Clutch.

11.    At the urging of Kaman, on or about July 24, 1999, Kaman technical representatives removed the existing free-wheeling sprag clutch assembly from the Helicopter and replaced it with the Clutch.

12.    About seven weeks after installing the Clutch, we had employed the Helicopter in helicopter logging operations near Flirsch, Austria, a use for which Kaman designed, manufactured and placed the Helicopter in the stream of commerce.

2

13.     Without warning, on September 13, 1999, the Helicopter suffered a complete loss of power due to torsional overstress of the drive train resulting from the malfunction/failure of the Clutch.

14.     Following the power failure, the Helicopter entered a steep descent and crashed to the ground causing minor personal injuries to our pilot, and a total loss of the Helicopter.

15.     At the time of the accident, the Clutch was not yet one year old nor had it been in operation for 500 flight hours.

16.     In addition to causing substantial damage to our Helicopter, the crash caused us to (a) lose revenues and profits from our helicopter logging operations; (b) incur ongoing expenses in the form of excess salaried personnel unable to generate revenue in the absence of the Helicopter; (c) lose the benefit of pilot training expenses paid by us to Kaman for pilots trained in the Helicopter and unable to generate revenue in the absence thereof; (d) lose the benefit of a portion of the annual premium paid to insure the Helicopter; (e) incur increased hull and liability and/or workers' compensation insurance premiums during the years following the crash; (f) incur the expense of a deductible for the portion of the insurance risk assumed by us; (g) incur the expense of ongoing interest charged, with no corresponding revenue generated, during the period between the crash and settlement of the hull claims; (h) incur the expense associated with investigating the crash; (i) incur the expense associated with replacing the Helicopter at an exchange rate that had significantly worsened and, accordingly, cost Helog and/or Heli-Air approximately 2,145,000 Swiss Francs more than originally paid for the Helicopter and (j) suffer other and further losses we may not yet have determined.

17.     More damaging to us than all of the foregoing was the fact this was the second Kaman Aerospace model K-1200 helicopter crash we suffered during a one-year period, each

3

crash having occurred due to a manufacturing defect or other negligent design and/or manufacture, and the damage to our reputation in the industry was substantial.

18.    Our insurer paid approximately $ 2,600,000 for the loss of the Helicopter.

19.    Helog initially paid $ 3,500,000 to purchase the Helicopter and, after receiving the above-mentioned approximately $ 2,600,000 from the insurers for the total loss of the Helicopter, paid $ 3,900,000 to purchase a replacement helicopter from Kaman.

20.    Due to the Helicopter accident we suffered approximately $ 4,500,000 in losses, exclusive of the damage to our reputation, for which we were not reimbursed by insurance proceeds and have no reimbursement to date.

DATED:  March 22 , 2002.

Wolfgang Zagel

SUBSCRIBED AND SWORN TO before me this 22 day of March 2002.

NOTARY PUBLIC

L 0352

My Commission Expires:                 Residing At:

Urk.Rolle Nr. L  0 3 5 2 /2002
===============================

Ich beglaubige die Echtheit der vorstehenden, vor mir
gefertigten Unterschrift von

     Herrn Wolfgang   Z a g e l , geboren am 22.01.1950,
     wohnhaft in 91230 Happurg, Reicheneck 12,
     nach Angabe in gesetzlichem Güterstand lebend;

vorgestellt zu meiner Gewißheit durch die Notarangestellte
Frau Gertraud Maul.

Hersbruck, den zweiundzwanzigsten März
zweitausendzwei



Notar

# EXHIBIT F

dates Included on the face of this form are approximate and are subject to timely receipt of all Products from K-MAX's vendors and are further based on the assumption that there will be no other delays or contingencies beyond K-MAX's reasonable control. K-MAX shall have no liability whatsoever for delays, failure of performance or damages due to: fire, explosion, power failures, strikes or labor disputes, acts of God, the elements, war, civil disturbances, inability to secure materials, lack of transportation facilities, fuel or energy shortages, or other causes beyond K-MAX's reasonable control whether or not similar to the foregoing.  In the event of delay, K-MAX may, but shall not be required to allocate production and delivery among its customers.

5.    RISK OF LOSS: SECURITY: Customer shall bear all risk of loss of, or damage to Products sold hereunder from and after delivery of such Products by K-MAX to the carrier or the FOB point specified on the face of this form.  K-MAX shall have a purchase money security interest in the Products to secure payment of the purchase price until payment in full is received by K-MAX.  Customer agrees to execute and deliver all documents requested by K-MAX to perfect and maintain K-MAX's security interest and agrees that K-MAX shall have the right to execute such documents in Customer's name and stead in the event Customer shall refuse to do so.

6.    WARRANTY:

A.    *Disclaimer of Warranty For Products or Services*:   Customer acknowledges that all Products sold or loaned by K-MAX are manufactured by third parties and that all Services for which K-MAX makes arrangements hereunder are provided by third parties. K-MAX will, to the extent allowed by the manufacturer of the Product or provider of the Service, assign the benefit of any available manufacturer's or service provider's warranty to Customer.  K-MAX IS NOT RESPONSIBLE FOR, AND EXPRESSLY DISCLAIMS AND EXCLUDES ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO: (i) WARRANTIES PERTAINING TO THE CONDITION, OPERATION, FITNESS FOR USE OR MERCHANTABILITY OF THE PRODUCTS OR SERVICES; (ii) WARRANTIES PERTAINING TO THE FITNESS OF THE PRODUCTS FOR ANY PARTICULAR PURPOSE; (iii) OR ANY OTHER WARRANTIES OF ANY NATURE WHATSOEVER.  IN NO EVENT WILL ANY DEFECT IN OR FAILURE OF ANY PRODUCT OR SERVICE PROVIDED HEREUNDER AFFECT CUSTOMER'S OBLIGATIONS TO K-MAX.  NO VERBAL OR WRITTEN INFORMATION OR ADVICE GIVEN BY K-MAX, ITS AGENTS AND/OR EMPLOYEES OR ANY THIRD PARTY SHALL CREATE A WARRANTY AND CUSTOMER MAY NOT RELY UPON ANY SUCH INFORMATION OR ADVICE AS A WARRANTY.

B.    *Exclusive Remedy; Limitations of Liability*: K-MAX'S SOLE OBLIGATION AND CUSTOMER'S EXCLUSIVE REMEDY IN THE EVENT OF ANY CLAIM BY CUSTOMER IN CONNECTION WITH ANY PRODUCTS OR SERVICES SHALL BE LIMITED TO MAKING AVAILABLE TO CUSTOMER ANY EXISTING APPLICABLE WARRANTY OF THE MANUFACTURER OF SUCH PRODUCTS OR THE PROVIDER OF SUCH SERVICES, TO THE EXTENT K-MAX CAN DO SO.  K-MAX SHALL NOT BE LIABLE FOR ANY DEFECTS IN THE PRODUCTS OR SERVICES (AND AS TO SERVICES, INCLUDING BUT NOT LIMITED TO, ANY SUPPLIES, COMPONENTS, PRODUCTS OR DEVICES UTILIZED OR FURNISHED AS PART OF THE SERVICES).  IN NO EVENT SHALL K-MAX BE LIABLE TO CUSTOMER OR ANY OTHER PERSON OR

ORGANIZATION FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES OF ANY NATURE WHATSOEVER, ARISING OUT OF OR RELATING TO THE SALE WHICH IS THE SUBJECT OF THIS INVOICE FORM, INCLUDING WITHOUT LIMITATION, ANY DAMAGES FOR LOST PROFITS OR OTHER FINANCIAL OR ECONOMIC LOSS OR FOR ANY INTERRUPTION IN CUSTOMER'S BUSINESS OCCASIONED BY ITS INABILITY TO USE THE PRODUCTS OR SERVICES FOR ANY REASON WHATSOEVER, EVEN IF K-MAX HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES. K-MAX SHALL NOT BE LIABLE FOR ANY DAMAGES CLAIMED BY CUSTOMER OR ANY OTHER PERSON OR ENTITY WHETHER BASED IN CONTRACT OR IN TORT. THIS PARAGRAPH SHALL SURVIVE FAILURE OF THE EXCLUSIVE REMEDY.

C.    *Warranties by Affiliated Companies*:   In the event that this Customer order consists of a Product that is manufactured by, or a Service that is provided by, an affiliated company of K-MAX, K-MAX hereby assigns all of its right, title and interest in and to any written warranty made by such affiliated company for such Product or Service, effective upon the date of this invoice. Customer hereby accepts and agrees to be bound by the terms of any such warranty.   For the purposes of this provision, "affiliated company" shall mean any company which controls, is controlled by, or which is under common control with, K-MAX.

7.    RETURNED GOODS: Products may not be returned to K-MAX without prior authorization.   K-MAX will charge a handling fee equal to the higher of: (i) ten percent (10%) of the price or (ii) $10.00, for each Product returned for credit. Products returned for credit must be returned within ten (10) days of delivery at Customer's sole cost and expense to K-MAX's Bloomfield, CT facility and must be accompanied by K-MAX's invoice number and the date of delivery. Credit for returned Products will be based on original invoice unit price and all returned Products will be subject to K-MAX Corporation's quality control acceptance. Products having an expired shelf life cure date are not returnable and all Products being returned must be of the same configuration as that published in the price listing in effect at the same time of return.

8.    EXPORT SALES:

A.    *Applicable Laws, Export Regulations*:  Customer shall comply with all applicable laws including the export regulations of the U.S. Department of Commerce and all other appropriate governmental authorities, as necessary, in connection with the export and/or re-export of Products (including the obtaining of a valid export license as appropriate prior to shipment). In addition, Customer shall be responsible for complying with all regulations in connection with the importation of Products to the country of destination. Before shipment can be made Customer shall have a valid export license on file with K-MAX and will designate a reputable U.S. freight forwarder.

B.    *Foreign Corrupt Practices Act*:  Customer shall not undertake, permit to be undertaken, or cause, any activity which (i) is illegal under any applicable laws, decrees, rules, regulations or public policies, or (ii) would have the effect of causing K-MAX to suffer a tax penalty or be in violation of any United States or other applicable laws, decrees, rules, regulations, or public policies, including, but not limited to, the U.S. Foreign Corrupt Practices Act. Customer shall not, directly or indirectly, give, offer, or

# EXHIBIT
# G



# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT, HARTFORD

MOUNTAIN WEST HELICOPTERS, LLC,
a Utah Limited Liability Company; LONG-
LINE LEASING, LLC, a Utah Limited
Liability Company; HELOG AG, a Foreign
Corporation; and HELI-AIR ZAGEL
LUFTTRANSPORT AG, a foreign
corporation,

    Plaintiffs,

 v.

KAMAN AEROSPACE CORPORATION, a
Delaware corporation and JOHN DOES I
through V,

    Defendants.



Case No. 301 CV 1746 (AVC)

January 31, 2002

## AFFIDAVIT OF BRYAN J. BURR OPPOSING KAMAN AEROSPACE CORPORATION'S DECEMBER 17, 2001 MOTION TO DISMISS

STATE OF UTAH    )
       : ss.
COUNTY OF UTAH   )

  BRYAN J. BURR, being first duly sworn upon oath, deposes and says:

  1.  I am a resident of Utah County, State of Utah and, if called to testify in this proceeding, would competently testify as outlined below.

  2.  My family and/or I own Mountain West Helicopters, LLC ("Mountain West") and Long-Line Leasing, LLC ("Long-Line").

  3.  Mountain West and Long-Line are Utah Limited Liability Companies having a place of business in Orem, Utah.

4. From May 1997 until the latter part of 2000, Long-Line owned and Mountain West operated a Kaman Aerospace model K-1200 helicopter, bearing serial number A94-0014 and Federal Aviation Administration registration number N164KA (the "Helicopter").

5. The Helicopter crashed in 1999 following the malfunction of a spare part free-wheeling sprag clutch assembly, including part number K974110-005, identified by serial number 032 (the "Clutch").

6. On or about May 20, 1997, Kaman sold the Helicopter to Long-Line under the terms and condition of an Aircraft Sale Agreement bearing the same date. At the time of the sale the Helicopter included a free-wheeling sprag clutch assembly other than the Clutch.

7. Approximately twenty-eight months later, i.e., about September 1999, Kaman sold us the Clutch.

8. It is my recollection that Kaman technical representatives carried, delivered and installed the Clutch, but there were no written agreements executed governing the terms and conditions of that sale. After installation, Kaman billed us and we then paid for the Clutch.

9. The Kaman parts catalogue we possess, notes that Kaman's standard warranty of 500 flight hours or one year, whichever occurs first, applies to spare parts such as the Clutch.

10. At the urging of Kaman, on or about September 24, 1999, Kaman technical representatives removed the existing free-wheeling sprag clutch assembly from the Helicopter and replaced it with the Clutch.

11. Approximately six weeks after installing the Clutch, on November 4, 1999, we had employed the Helicopter in helicopter logging operations near Emida, Idaho, a use for which Kaman designed, manufactured and placed the Helicopter in the stream of commerce.

12. Throughout October and early November we operated the Helicopter in the eastern regions of the state of Washington or the western regions of the Idaho panhandle.

2

13.    Without warning, on November 4, 1999, the Helicopter suffered a complete loss of power due to torsional overstress of the drive train resulting from the malfunction/failure of the Clutch.

14.    Following the power failure, the Helicopter entered a steep descent and crashed to the ground causing minor personal injuries to our pilot, and substantial damage to the Helicopter requiring repairs that cost approximately $1,500,000.

15.    At the time of the accident, the Clutch was not yet one year old nor had it been in operation for 500 flight hours.

16.    In addition to causing substantial damage to our Helicopter, the crash caused us to (a) lose revenues and profits from our helicopter logging operations; (b) incur ongoing expenses in the form of excess salaried personnel unable to generate revenue in the absence of the Helicopter; (c) lose the benefit of pilot training expenses paid by us to Kaman for pilots trained in the Helicopter and unable to generate revenue in the absence thereof; (d) lose the benefit of a portion of the annual premium paid to insure the Helicopter; (e) incur increased hull and liability and/or workers' compensation insurance premiums during the years following the crash; (f) incur the expense of a deductible for the portion of the insurance risk assumed by us; (g) incur the expense of ongoing interest charged, with no corresponding revenue generated, during the period between the crash and settlement of the hull claims; (h) incur the expenses associated with investigating the crash; and (j) suffer other and further losses we may not yet have determined.

17.    Following the crash, we sent the Helicopter to Kaman, the only entity authorized by the FAA, for repair of the damage.

3

18.    Our insurer paid approximately $1,375,000 toward the cost of Kaman's repair and we contributed the amount of our deductible, i.e., approximately $125,000, toward the cost of repair.

19.    As a result of the Helicopter accident our companies suffered approximately $500,000 in losses for which we were not reimbursed by insurance proceeds and have no reimbursement to date.

20.    Moreover, I recently received word from my insurance broker, Caledonian Insurance Group, that my insurance company has asserted a claim against Kaman and proposes to settle that claim, for its contribution to the repair of the aircraft, for the sum of $285,000.

21.    My insurer has not sought my approval to settle the claim on those terms and if it does settle the claim under such terms, I expect my hull insurance premiums to remain high for a longer period of time than they would with a larger settlement.

DATED:    January _31_, 2002.

_____
Bryan J. Burr

SUBSCRIBED AND SWORN TO before me this _31_ day of January 2002.

_____
NOTARY PUBLIC

My Commission Expires:         Residing At: Provo, UT

6-14-03



ROGER BJARNSON
NOTARY PUBLIC · STATE of UTAH
2160 NORTH 140 WEST
PROVO, UTAH 34604
COMM. EXP. 6-14-2003

4

## Certificate of Service

I certify that on January _3/_, 2002, I caused to be filed with the court and served upon the individuals identified below, in the manner identified, the foregoing AFFIDAVIT OF BRYAN J. BURR OPPOSING KAMAN AEROSPACE CORPORATION'S DECEMBER 17, 2001 MOTION TO DISMISS.

The original, via first class mail, postage prepaid, to "be filed with the court within a reasonable time after service," as contemplated by Rule 5(d) Fed.R.Civ.P., addressed to:

> Clerk of the Court
> 450 Main Street
> Hartford, CT 06103

And one copy each, via first class mail, postage prepaid addressed to:

Tim Bishop, Esq.
BISHOP & JACKSON
80 Ferry Blvd.
Stratford, CT 06615

Shaun S. Sullivan, Esq.
Timothy A. Diemand, Esq.
WIGGIN & DANA
1 Century Tower
P.O. Box 1832
New Haven, CT 06508

C:\My Files\Mt. West v. Kaman\Memo Opposing MTD PELD AFF BJB.131.wpd

5

# EXHIBIT H

CLERK
U.S. DISTRICT COURT
BRIDGEPORT, CONN.

SEP 11  10 00 AM '01

Robert S. Young, USB #4174
Law Offices of Robert S. Young, L.C.
800 McIntyre Building
68 South Main Street
Salt Lake City, UT 84101
Telephone: (801) 531-8300
Facsimile: (801) 359-7233
e-mail: rsylaw@prodigy.net

Timothy A. Bishop, Esq. (ct05774)
Bishop & Jackson, LLC
80 Ferry Blvd., Suite 103
Stratford, CT  06615
Telephone: (203) 386-1282
Facsimile: (203) 386-1795
e-mail: tab@bishopjackson.com

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT, HARTFORD

| | |
|---|---|
| MOUNTAIN WEST HELICOPTERS, LLC, a Utah Limited Liability Company; LONG-LINE LEASING, LLC, a Utah Limited Liability Company; HELOG AG, a Foreign Corporation; and HELI-AIR ZAGEL LUFTTRANSPORT AG, a foreign corporation,<br><br>Plaintiffs,<br><br>v.<br><br>KAMAN AEROSPACE CORPORATION, a Delaware corporation and JOHN DOES I through V,<br><br>Defendants. | **COMPLAINT**<br><br><br><br>Case No. **301CV1746** |

Plaintiffs, Mountain West Helicopters, LLC ("Mountain West"), Long-Line Leasing,

LLC ("Long-Line"), Helog AG ("Helog"), and Heli-Air Zagel ("Heli-Air"), complain of

Defendants and for their causes of action allege as follows:

## JURISDICTION AND VENUE

1.     Mountain West is a Utah Limited Liability Company having a principal place of business in Orem, Utah.

2.     Long-Line is a Utah Limited Liability Company having a principal place of business in Orem, Utah.

3.     Helog is a foreign corporation having a principal place of business in Küssnacht, Switzerland.

4.     Heli-Air is a foreign corporation having a principal place of business in Hammerau, Germany.

5.     Defendant, Kaman Aerospace Corporation ("Kaman"), is a Delaware corporation with a principal place of business in Bloomfield, Connecticut.

6.     Kaman designs, manufactures and places into the stream of commerce the Kaman Aerospace model K-1200 helicopter, including helicopters bearing serial number A94-0014 and Federal Aviation Administration ("FAA") registration number N164KA (the "Mountain West Helicopter") and serial number A94-0018 and German registration number D-HFZA (the "Heli-Air Helicopter"), hereinafter collectively identified as the "Helicopters," each of which crashed following the malfunction of a spare/replacement free-wheeling sprag clutch assembly, including part number K974110-005, leading to this complaint.

7.     Long-Line, a company under common ownership with Mountain West, purchased from Kaman and Mountain West operates the Mountain West Helicopter.

8.    Helog, a company under common ownership with Heli-Air, purchased from Kaman and Heli-Air operates the Heli-Air Helicopter.

9.    Defendants, John Does I through V, are manufacturing, subcontracting, maintenance, overhaul and/or repair facilities, presently unknown to plaintiffs, that supplied defective component and/or spare/replacement parts for the Helicopters, performed negligent maintenance, overhaul and/or repair upon, breached express and/or implied warranties or made material misrepresentations of fact with respect to the Helicopters and/or one or more of the various component and/or spare/replacement parts thereof, causing or contributing to cause the crashes of the Helicopters and leading to this complaint.

10.    All defendants have conducted business or have contracted to supply services or goods within the State of Connecticut, each is a "Product Seller" as such term is defined in Connecticut General Statutes §52-572m, and each is engaged in "trade" and "commerce," as defined in Connecticut General Statutes §42-110a.

11.    The plaintiffs and Kaman previously agreed to jurisdiction in Connecticut and to a Connecticut forum with the following language contained in paragraph 8.1 of the agreement under which Kaman sold the Mountain West Helicopter and paragraph 14.1 of the agreement under which Kaman sold the Heli-Air Helicopter.

> Governing Law and Jurisdiction.  This Agreement shall be governed by and be construed in accordance with the laws in the State of Connecticut, exclusive of its choice of law rules.  Any and all disputes, claims, actions, suits, or proceedings arising out of or relating to this Agreement shall be brought exclusively in a federal or state court of competent jurisdiction established or sitting in the State of Connecticut.  The parties will not

raise, and hereby irrevocably waive, any defenses based upon improper
venue, inconvenience of the forum, lack of personal jurisdiction,
sufficiency of service, or the like, in connection therewith.

12.    The amount in controversy exceeds $75,000 exclusive of interest and costs.

13.    The Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C.

§ 1332 .

14.    Venue lies in this court under the provisions of 28 U.S.C. § 1391.

## ALLEGATIONS COMMON TO ALL COUNTS

15.    On or about May 2, 1997, Kaman sold the Heli-Air Helicopter to Helog under

the terms and conditions of an Aircraft Sale Agreement of the same date.

16.    Heli-Air operates the Heli-Air Helicopter.

17.    At the urging of Kaman, on or about July 24, 1999, Heli-Air removed the free-

wheeling sprag clutch assembly in the Heli-Air Helicopter and replaced it with a new free-

wheeling sprag clutch assembly including part number K974110-005 and serial number 014.

18.    Approximately seven weeks later, on September 13, 1999, Heli-Air had

employed its helicopter in helicopter logging operations near Flirsch, Austria, a use for which

the Helicopter was designed, manufactured and placed into the stream of commerce by Kaman.

19.    Without warning, the helicopter suffered complete loss of power due to torsional

overstress of the drive train resulting from the malfunction/failure of the new spare/replacement

freewheeling sprag clutch assembly, including part number K974110-005 and serial number

014, (the "Heli-Air Clutch").

4

20.    Following the power failure, the Heli-Air Helicopter entered a steep descent and crashed into the ground.

21.    The crash resulted in minor personal injuries to the pilot and a total loss of the Heli-Air Helicopter (less whatever salvage value the wreckage may have).

22.    On or about May 20, 1997, Kaman sold the Mountain West Helicopter to Long-Line under the terms and conditions of an Aircraft Sale Agreement of the same date.

23.    Mountain West operates the Mountain West Helicopter.

24.    At the urging of Kaman, on or about September 24, 1999, Mountain West removed the free-wheeling sprag clutch assembly in the Mountain West Helicopter and replaced it with a new free-wheeling sprag clutch assembly including part number K974110-005 and serial number 032.

25.    Approximately six weeks later, on November 4, 1999, Mountain West had employed its helicopter in helicopter logging operations near Emida, Idaho, a use for which the Helicopter was designed, manufactured and placed into the stream of commerce by Kaman.

26.    Without warning, the helicopter suffered complete loss of power due to torsional overstress of the drive train resulting from the malfunction/failure of the new spare/replacement freewheeling sprag clutch assembly, including part number K974110-005 and serial number 032, (the "Mountain West Clutch").

27.    Following the power failure, the Mountain West Helicopter entered a steep descent and crashed into the ground.

28. The crash resulted in minor personal injuries to the pilot, and substantially damaged the Mountain West Helicopter requiring repairs of approximately $1,500,000.

29. The crashes of the Mountain West Helicopter and the Heli-Air Helicopter (the "Helicopters"), were caused respectively by the Mountain West Clutch and the Heli-Air Clutch (the "Clutches"). The Clutches, while having different serial numbers, each included part number K974110-005.

30. In addition to causing the total loss of or substantial damage to the Helicopters, the crashes caused plaintiffs to: (a) lose revenues and profits from their helicopter logging operations; (b) incur ongoing expenses in the form of excess salaried personnel unable to generate revenue in the absence of the Helicopters; (c) lose the benefit of pilot training expenses paid by plaintiffs to Kaman for pilots trained in the Helicopters and unable to generate revenue in the absence thereof; (d) lose the benefit of a portion of the annual premium paid to insure the Helicopters; (e) incur increased hull and liability and/or workers' compensation insurance premiums during the years following the crashes; (f) incur the expense of a deductible for the portion of the insurance risk assumed by plaintiffs; (g) incur the expense of ongoing interest charged, with no corresponding revenue generated, during the period between the crashes and settlement of the hull claims; (h) incur the expenses associated with investigating the crashes; (i) in the case of Helog and/or Heli-Air, incur the expense associated with replacing the Helicopter at an exchange rate that had significantly worsened and, accordingly, cost Helog and/or Heli-Air approximately $1,000,000 more than originally paid

for the Heli-Air Helicopter; and (j) suffer such other and further losses as may be established at the time of trial.

**COUNT I**
**(STRICT PRODUCTS LIABILITY AGAINST KAMAN)**

31.    Plaintiffs incorporate by reference the allegations of paragraphs 1 through 30 above as though fully set forth herein.

32.    Kaman designed, manufactured, supplied and/or sold into commerce, the Helicopters and their component and/or spare/replacement parts including the Clutches.

33.    Kaman is engaged in the business of designing, developing, manufacturing, supplying and/or selling such helicopters and their component and/or spare/replacement parts, thereby placing them into the stream of commerce.

34.    Kaman expects the helicopters and/or component and/or spare/replacement parts it designs, develops, manufactures, supplies and sells to reach ultimate users or consumers without substantial change in the condition in which they are placed into commerce.

35.    In addition to designing, manufacturing and/or supplying the Helicopters and/or their component and/or spare/replacement parts, Kaman also provides accompanying product support, product support materials and continuing airworthiness directions and materials with respect thereto, including, among other things, service bulletins, service letters, service instructions and service manuals.

36.    At the time Kaman placed the Helicopters and/or their component and/or spare/replacement parts into the stream of commerce, they were, due to manufacturing and/or

7