## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT, HARTFORD

| | |
|---|---|
| MOUNTAIN WEST HELICOPTERS, LLC, a Utah Limited Liability Company; LONG-LINE LEASING, LLC, a Utah Limited Liability Company; HELOG AG, a Foreign Corporation; and HELI-AIR ZAGEL LUFTTRANSPORT AG, a foreign corporation,<br><br>        Plaintiffs,<br><br>    v.<br><br>KAMAN AEROSPACE CORPORATION, a Delaware corporation and JOHN DOES I through V,<br><br>        Defendants. | <br><br>Case No. 301 CV 1746 (AVC)<br><br>October 20, 2004 |

## PLAINTIFFS' REPLY MEMORANDUM SUPPORTING THEIR CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DAMAGES ISSUES

Plaintiffs, Mountain West Helicopters, LLC ("Mountain West"), Long-Line Leasing, LLC ("Long-Line"), Helog AG ("Helog") and Heli-Air Zagel Lufttransport AG ("Heli-Air"), hereinafter collectively referred to as "Plaintiffs" and/or the "Helicopter Logging Companies," through counsel, submit this reply memorandum supporting their September 10, 2004 Cross-Motion for Partial Summary Judgment on the Damages Issue. This memorandum is supported by the Supplemental Local Rule 56(a)(2) Statement filed contemporaneously herewith.

# I. TABLE OF CONTENTS

I. TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

II. SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    a.    Connecticut Law Defines the Measure of Damages and the Deduction, Against That Measure of Damages, to Which Kaman Is Entitled; and the Doctrine of Subrogation and the Collateral Source Rule Contemplate Plaintiffs' Recovery of All Property-Loss Damages They Seek Herein . . . 1

        1.    The Law Is Clear, with Respect to Plaintiffs' Property-Loss Measure of Damages (A Measure Kaman Does Not Dispute), That Kaman May Deduct, from its Liability to Plaintiffs, Amounts Kaman and/or its Liability Insurance Carrier Have Paid but Not Amounts Plaintiffs' Helicopter Hull Insurers Have Paid to Plaintiffs as a Result of the Helicopter Accidents . . 1

        2.    The Law Rejects Kaman's Newest Argument That Plaintiffs Assigned, to Their Insurers, Their Claims Against Kaman . . . 11

        3.    The Claims Plaintiffs Assert Are Entirely Consistent with the Doctrine of Subrogation and the Collateral Source Rule . . . 15

    b.    In Addition to Recovering Damages for Their Personal Property Losses, the Helicopter Logging Companies Are Entitled to Recover All Other Damages Available, in Tort or Contract, under Connecticut Law Including Their Incidental or Consequential Damages . . . . . . . . . . . . 18

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

V. CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## II. SUMMARY OF ARGUMENT

Connecticut law clearly defines plaintiffs' measure of damages. Kaman's opposition does not challenge the measure of damages and, thus, it is established for purposes of these cross-motions for summary judgment. Kaman is entitled to a deduction, against plaintiffs' measure of damages, for the amount(s) paid by it or any insurance carrier under contract with Kaman to pay Kaman's liabilities. However, the collateral source rule establishes that Kaman gets no deduction, against the measure of damages, for the partial reimbursements plaintiffs received from their own helicopter hull insurers. Those partial reimbursements are irrelevant to this proceeding and, therefore, inadmissible as evidence herein.

The law rejects Kaman's newest argument, first raised in Kaman's October 4, 2004 Opposition to Plaintiffs' "Cross-Motion" For Summary Judgment ("Defendant's Opposing Memo"), that plaintiffs "assigned" to their helicopter hull insurers the hull claims they pursue herein against Kaman. And finally, Connecticut law, as Kaman now concedes, contemplates plaintiffs' recovery of their incidental, consequential and/or commercial losses suffered herein.

## III. ARGUMENT

**a.    Connecticut Law Defines the Measure of Damages and the Deduction, Against That Measure of Damages, to Which Kaman Is Entitled; and the Doctrine of Subrogation and the Collateral Source Rule Contemplate Plaintiffs' Recovery of All Property-Loss Damages They Seek Herein**

**1.    The Law Is Clear, with Respect to Plaintiffs' Property-Loss Measure of Damages (A Measure Kaman Does Not Dispute), That Kaman May Deduct, from its Liability to Plaintiffs, Amounts Kaman and/or its Liability Insurance Carrier Have Paid but Not Amounts Plaintiffs' Helicopter Hull Insurers Have Paid to Plaintiffs as a Result of the Helicopter Accidents**

At page two of their September 10, 2004 opening memorandum ("Plaintiffs' Opening Memo"), Plaintiffs set forth the long-established measure of their "property loss" damages herein as dictated by Connecticut law.

1

> The . . . measure of damages is the difference between the fair market value of the [helicopter] before the collision and its fair market value afterwards, plus interest from the date of loss. However, if the [helicopter] damage may be repaired and the repairs will restore the [helicopter] to substantially its former condition, the cost of repair will ordinarily furnish proper proof of the loss. *Littlejohn v. Elionsky*, 130 Conn. 541, 543, 36 A.2d 52.

*Stults v. Palmer*, 141 Conn. 709, 712, 109 A.2d 592, 594 (Conn. 1954). Defendant's Opposing Memo does not address, much less challenge, the measure of damages and, hence, unless the court concludes otherwise, the measure of damages is undisputed and established.

Against the measure of damages, the law establishes the amount of any deduction to which Kaman may be entitled. That amount is described in the Restatement (Second) of Torts § 920A and, as the U.S. Supreme Court recognized in *Field v. Mans*, 516 U.S. 59, 70 (1995), "the most widely accepted distillation of the common law of torts [is] the Restatement (Second) of Torts. . . ." Therefore, plaintiffs' begin with the Restatement, now, however, in painstaking detail since Kaman, apparently, was not persuaded by Plaintiffs' Opening Memo.

"A payment made by a tortfeasor or by a person acting for him to a person whom he has injured is credited against his tort liability. . . ." Restatement (Second) of Torts § 920A(1). The comment to section 920A(1) clarifies, in relevant part:

> a. *Payments by or for defendant.* If a tort defendant makes a payment toward his tort liability, it of course has the effect of reducing that liability. *This is also true of payments made under an insurance policy that is maintained by the defendant.* . . .

Restatement (Second) of Torts § 920A, Comment a (emphasis supplied). The undisputed facts (with citations to those facts appearing in prior memoranda) reveal that Kaman, "a tort defendant," has made no payment toward its tort liability to plaintiffs herein. However, Kaman's liability insurer has made, toward that same tort liability and *under an insurance policy . . . maintained by the defendant*, one payment of $1,120,000.00 (see ¶ 3.0 of exhibit H

2

attached to Kaman's Supplemental Local Rule 56(A)(1) Statement) and another of $285,000.00 (see ¶ 3.0 of exhibit G attached to Kaman's Supplemental Local Rule 56(A)(1) Statement). Accordingly, the law establishes, and plaintiffs acknowledge, that Kaman is entitled to a deduction, against the measure of damages, for the sum of $1,405,000.00.

But, cries Kaman, "Plaintiffs cannot recover twice for the same property damage - once from their insurers and then again from Kaman."[1] Defendant's Opposing Memo at 1. Therefore (although Kaman's opposing memo does not come right out and say it), to preclude Plaintiffs' "double dip," the court must deduct the sum of $3,621,908.00 because "Helog's insurer reimbursed Helog $2,591,908, and Mountain West's insurer paid $1,030,000 to Mountain West." Defendant's Opposing Memo at 3. Kaman's solicitation of a deduction for amounts paid to plaintiffs by collateral sources runs afoul of the common law of torts.

"Payments made to or benefits conferred on the injured party from other sources [i.e., sources other than "a tortfeasor or . . . a person acting for him,"] are *not* credited against

---

[1] Kaman cites no authority for the proposition and, in fact, states the law incorrectly. An "injured person can recover full damages from [a] tortfeasor, even when he has already been made whole by insurance or other compensatory payment. . . ." *McDermott, Inc. v. AmClyde*, 511 U.S. 202, 219, n. 30 (1994). Compare the concurring and dissenting opinion of Justice Berdon (the only Connecticut Supreme Court decision plaintiffs know of to consider the provisions of Restatement (Second) of Torts § 920A) in *Haynes v. Yale-New Haven Hosp.*, 243 Conn. 17, 699 A.2d 964 (1997):

> . . . *[I]f the plaintiff was himself responsible for the [collateral source] benefit, as by maintaining his own insurance* or by making advantageous employment arrangements, *the law allows him to keep it for himself.* If the benefit was a gift to the plaintiff from a third party or *established for him by law*, he should not be deprived of the advantage that it confers. The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him. One way of stating this conclusion is to say that it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives. . . ."

*Id.* at 46 and 978 (emphasis in original). Thus, plaintiffs can recover from their own insurers and still recover full damages from Kaman, the tortfeasor, subject, of course, to valid rights of subrogation.

the tortfeasor's liability. . . ."  Restatement (Second) of Torts § 920A(2) (emphasis supplied).[2]

The comment to section 920A(2) reads, in relevant part:

> b. *Benefits from collateral sources.*  Payments made or benefits conferred by other sources are known as collateral-source benefits.  They *do not have the effect of reducing the recovery against the defendant.*  The injured party's net loss may have been reduced correspondingly, and to the extent that the defendant is required to pay the total amount there may be a double compensation for a part of the plaintiff's injury.  *But it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor.  If the plaintiff was himself responsible for the benefit, <u>as by maintaining his own insurance</u> . . . , the law allows him to keep it for himself.*  If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers.  The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him.  *One way of stating this conclusion is to say that it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives.*

Restatement (Second) of Torts § 920A, Comment b (emphasis supplied).  In other words, this dispute focuses not on what plaintiffs have recovered or will recover for their losses, but, on what the defendant, i.e., Kaman the tortfeasor, has paid for the damages caused by its tortious conduct.  Compare *Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 83 (3d Cir. 1983) (The collateral source rule "focuses on what the defendant should pay rather than on what the plaintiff should receive.  See Restatement (Second) of Torts. . . , § 920A comment b; 2 F. Harper & F. James, The Law of Torts, § 25.22 at 1344 (1956 & Supp.1968))."

Despite five pages of argument and citation to numerous authorities in Plaintiffs' Opening Memo, Kaman's opposing memo, remarkably, contends "Plaintiffs offer no explanation for their bizarre contention that their recovery should be reduced by the amounts

---

[2] Compare 2 Restatement (Second), Judgments § 50, comment (e) (1979).  ". . . [T]he liability of a wrongdoer should not be diminished by the fact that provision against the loss had been made on behalf of the injured person. . . ."

4

Kaman paid in settlement to plaintiffs' insurers, rather than the amounts plaintiffs received in insurance proceeds. . . . The sole case cited by plaintiffs is an unreported trial court opinion providing no support for plaintiffs' position." Defendant's Opposing Memo at 5, n.3.[3]

The Restatement (Second) of Torts and the decisions of every court[4] that has considered the principles of § 920A thereof are the "explanation for [the] bizarre contention that [plaintiffs'] recovery should be reduced by the amounts Kaman paid . . . rather than the amounts plaintiffs received in insurance proceeds." Moreover, authority from the Connecticut Supreme Court, the U.S. Supreme Court and the Second Circuit Court of Appeals confirms that each of those courts is every bit as "bizarre" as the plaintiffs herein.[5]

In their opening memorandum, Plaintiffs cited *Wasko v. Manella*, 269 Conn. 527, 548, 849 A.2d 777, 790 (2004) for the proposition that there is "no logical reason to permit a

---

[3] Defendant's Opening Memo contends the "sole case" is *Sylvan Piling Corp. v. Harbor Petroleum Corp.*, 1990 WL 269364, *1–*2 (Conn.Super. 1990). Plaintiffs' Opening Memo cited *Sylvan* only to demonstrate, by paraphrasing the *Sylvan* language, the existence of a Connecticut case that shows, as against plaintiffs' measure of damages, Kaman is entitled to deduct not what plaintiffs received from their own insurers, but what Kaman (or its liability insurer) paid as a result of the helicopter crashes. "'The [Helicopter Logging Companies are] . . . entitled to recover for lost [and damaged helicopters] . . . the amount of [$4,155,000.00] of which the defendant has already paid the amount of [$1,405,000.00] leaving a balance due of [$2,750,000.00],' plus interest thereon from the dates of loss." Plaintiffs' Opening Memo at 8.

[4] The substantial research conducted in preparing these memoranda for the court has failed to locate a single case that rejects the rationale of Restatement (Second) of Torts § 920A and numerous decisions, cited both in Plaintiffs Opening Memo and in this reply, that follow that rationale.

[5] In this diversity action, where the court has already ruled Connecticut law applies, only the law of Connecticut really matters. See *In re Air Crash Disaster Near Chicago, May 25, 1979*, 803 F.2d 304, 308 (7th Cir.1986) ("a federal court sitting in diversity must apply the collateral source rule of the state whose law governs the case. . . ."). Applying Connecticut law, in *Perry v. Allegheny Airlines, Inc.*, 489 F.2d 1349, 1352, n.4 (2d Cir. 1974), the Second Circuit noted "'The reason for the [collateral source] rule (is that) . . . 'it is more just that the injured person shall profit . . . rather than the wrongdoer shall be relieved of his full responsibility of his wrongdoing.'"

tortfeasor [such as Kaman] to be unjustly enriched by virtue of having its debt paid by the insurance company of a party [such as the Helicopter Logging Companies] who had the foresight to obtain insurance coverage. . . ."  Plaintiffs also cited the concurring and dissenting opinion of Justice Berdon[6] in *Haynes v. Yale-New Haven Hosp.*, 243 Conn. 17, 43-44, 699 A.2d 964, 977 (1997) because the collateral source rule, insofar as Connecticut courts are concerned, "has been faithfully applied in this state since 1891."  And finally, plaintiffs cited *Gurliacci v. Mayer*, 218 Conn. 531, 556-557, 590 A.2d 914, 928 (1991) for two collateral source rule statements of the law: (1) "a defendant is not entitled to be relieved from paying any part of the compensation due for injuries proximately resulting from his act where payment [for such injuries or damages] comes from a collateral source, wholly independent of him" and (2) "a wrongdoer shall not benefit from a windfall from an outside source.  That rule is applicable . . . in any tort case."  If the foregoing is insufficient Connecticut Supreme Court authority to support plaintiffs' "bizarre contention," then plaintiffs hasten to add:

> Connecticut follows the rule that payments from a collateral source to an injured plaintiff may not be considered in mitigation of damages. *Healy v. White*, 173 Conn. 438, 448, 378 A.2d 540 (1977); *Gorham v. Farmington Motor Inn, Inc.*, 159 Conn. 576, 579, 271 A.2d 94 (1970); 22 Am.Jur.2d, Damages, § 206; annot., 19 A.L.R.2d 557, 561, § 3; see also annot., 75 A.L.R.2d 885, as to funds received from public or private pensions. . . . Thus, the trial court in the present case was not in error in refusing to charge that unemployment compensation benefits could be deducted from plaintiff's [damages].

*Apuzzo v. Seneco*, 178 Conn. 230, 233, 423 A.2d 866, 868 (1979).  Connecticut law also recognizes the collateral source rule is not just a rule of damages.  It is a rule of evidence too!  "[T]he collateral source rule is both a rule of damages and a rule of evidence.  Its operation prevents a tort defendant from introducing evidence [of collateral source payments]. . . ."

---

[6] Justices Katz and McDonald joined in Justice Berdon's concurring and dissenting opinion.

*Haynes v. Yale-New Haven Hosp.*, 243 Conn. 17, 41, 699 A.2d 964, 976 (1997) (Justice Berdon concurring and dissenting). The "'[collateral source] rule proscribes the use of payments from a collateral source to an injured plaintiff to mitigate damages.' *Apuzzo v. Seneco*, 178 Conn. 230, 233, 423 A.2d 866 (1979); see also *Kurta v. Probelske*, 324 Mich. 179, 188, 36 N.W.2d 889 (1949)." *Aspiazu v. Orgera*, 205 Conn. 623, 636, 535 A.2d 338, 344 (1987). Compare *Acampora v. Ledewitz*, 159 Conn. 377, 384, 269 A.2d 288, 292 (1970) ("Ordinarily, the fact that a third party has paid the plaintiff's bills would be irrelevant and inadmissible under the collateral source rule"). How can Kaman obtain a deduction for amounts paid to plaintiffs by their helicopter hull insurers when the rules of evidence preclude the introduction of the very evidence necessary to prove the same?

In addition to Connecticut law, in their opening memorandum plaintiffs also relied upon a U.S. Supreme Court decision, *McDermott, Inc. v. AmClyde*, 511 U.S. 202 (1994), for the propositions that (1) an "injured person can recover full damages from [a] tortfeasor, even when he has already been made whole by insurance or other compensatory payment. . . ," *Id.* at 219, n. 30, and (2) "[t]he law contains no rigid rule against overcompensation. Several doctrines, such as the collateral benefits rule, recognize that making tortfeasors pay for the damage they cause can be more important than preventing overcompensation." *Id.* at 219 (footnote omitted). If this is inadequate U.S. Supreme Court authority for plaintiffs' bizarre contention, then plaintiffs hasten to add the following (which also reflects on the evidentiary value of payments from collateral sources). Ordinarily the "fact that plaintiff is insured is irrelevant to [the] amount of tort recovery." *Metro-North Commuter R.R. Co. v. Buckley*, 521 U.S. 424, 441 (1997), citing Restatement (Second) of Torts § 920A(2).

And finally, no principle of the Second Circuit Court of Appeals is more "bedrock" than is the principle that tortfeasors get no deduction, from their tort liability, for payments

made to tort plaintiffs by collateral sources. "The collateral source rule is intended to insure

that the 'benefit that is directed to the injured party [from a third party is] not shifted so as to

become a windfall for the tortfeasor' since *it is the tortfeasor's responsibility to compensate for*

*all harm* that he causes.' Restatement (Second) of Torts § 920A(2) cmt. b." *Moran Towing &*

*Transp. Co. v. Lombas*, 58 F.3d 24, 27 (2d Cir. 1995) (alterations in original and emphasis in

*italics* supplied). The Second Circuit further explains:

> . . . [A] tortfeasor is not entitled to use a plaintiff's settlement with
> collateral sources of payment to avoid liability for damages. Under this
> [collateral source] doctrine,
>
>> [t]he question is not whether a windfall is to be conferred, but
>> rather who shall receive the benefit of a windfall which already
>> exists. As between the injured person and the tortfeasor, the
>> former's claim is the better. *This may permit a double recovery,*
>> *but it does not impose a double burden. The tortfeasor bears only*
>> *the single burden for his wrong.*
>
> *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 534 (9th Cir.1962);
> see Restatement (Second) of Torts § 920A(2) (1979).
>
> Applying the collateral source doctrine to the facts of this case, it
> is apparent that Thyssen, rather than Licetus and the Vessel, is entitled to
> any "windfall" under the contracts it entered into and that it is entitled to
> recover from both the Vessel and Licetus. The Vessel and Licetus are
> liable only for the damage that they caused, and Thyssen is entitled to
> receive the benefit of its bargain with Stahlunion.

*Thyssen, Inc. v. S/S Eurounity*, 21 F.3d 533, 537-538 (2d Cir. 1994) (emphasis supplied).

Kaman's complaint that it is contrary to the law for the court to require Kaman to bear "the

single burden for [its] wrong" can only fall on deaf ears. To paraphrase the Second Circuit,

"[a]pplying the collateral source doctrine to the facts of this case, it is apparent that [plaintiffs],

rather than [Kaman], [are] entitled to any 'windfall' under the contracts [they] entered into and

that [they are] entitled to recover from both [their insurers and Kaman]. [Kaman is] liable only

for the damage that [it] caused, and [plaintiffs are] entitled to receive the benefit of [their]

bargain with [their insurers]."[7]    And finally, "[t]he collateral source rule *prohibits* courts from

---

[7] The Circuit Courts of Appeals *unanimously* follow the collateral source rule!  Moreover, with the exceptions of the fourth and eleventh circuit decisions cited below, every decision quotes from or otherwise cites and relies upon Restatement (Second) of Torts § 920A as authority for the statements of the law quoted.  See, e.g., *Villarini-Garcia v. Hospital del Maestro*, 112 F.3d 5, 7 (1st Cir. 1997) ("This 'collateral source' rule allows a plaintiff to receive payments such as charitable donations and payments from his own insurer without losing the ability to recover the full amount of his loss from the wrongdoer or wrongdoers"); *Moran Towing & Transp. Co. v. Lombas*, 58 F.3d 24, 27 (2d Cir. 1995) (see language quoted above); *Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77, 83 (3d Cir. 1983) ("The rationale for a [collateral source] rule that at first glance may appear to provide an inequitable double recovery is that a wrongdoer should not get the benefit of payments that come to the plaintiff from a source collateral to the defendant. Citations omitted. There is no reason why the benefit should be shifted to the defendant, thereby depriving the plaintiff of the advantage it confers"); *Ward v. Allied Van Lines, Inc.*, 231 F.3d 135, 139 (4th Cir. 2000) ("[W]hen the victim of a tort receives payment for his injuries from a collateral source, that is, a source independent of the tortfeasor, the payment should not be deducted from the damages owed by the tortfeasor. 'Insurance proceeds are the most common collateral source.' Black's Law Dictionary 256-57 (7th ed.1999)"); *Amwest Sav. Ass'n v. Statewide Capital, Inc.*, 144 F.3d 885, 889 (5th Cir. 1998) ("The rationale underlying the collateral source rule is that a plaintiff should not be forced to transfer to a wrongdoer a benefit that the plaintiff has received either as a gift or as a result of foresight and planning, as by purchasing insurance or bargaining for employment benefits"); *Knafel v. Pepsi-Cola Bottlers of Akron, Inc.*, 899 F.2d 1473, 1480 (6th Cir. 1990) ("[T]he [trial] court correctly applied the law in finding that workers' compensation, like unemployment benefits, are subject to the collateral source rule"); *Molzof v. U.S.*, 6 F.3d 461, 465 (7th Cir. 1993) ("Permitting the plaintiff to recover twice for the same injury pursuant to the collateral source rule is generally justified on the ground that the tortfeasor should not be permitted to reap the benefits of the plaintiff's foresight in obtaining coverage for future harm or his good fortune in obtaining compensation gratuitously"); *Clark v. Burlington Northern, Inc.*, 726 F.2d 448, 449 (8th Cir. 1984) ("[T]he collateral source rule . . . permits a plaintiff to recover the full measure of damages--without setoff or credit-- even though the plaintiff is also compensated from an independent source such as insurance"); *Siverson v. U.S.*, 710 F.2d 557, 559 (9th Cir. 1983) ("[I]t is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor.  If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance . . . the law allows him to keep it for himself"); *Branson School Dist. RE-82 v. Romer*, 161 F.3d 619, 631, n.9 (10th Cir. 1998) ("Payments made or benefits conferred by other sources . . . do not have the effect of reducing the recovery against defendant"); *Southern v. Plumb Tools, A Div. of O'Ames Corp.*, 696 F.2d 1321, 1323 (11th Cir. 1983) ("Under the 'collateral source rule,' compensation for injuries from a source wholly independent of the tortfeasor is not deducted from the damages recovered against the tortfeasor"); and *Hotel and Restaurant Employees Local 25 v. JPR, Inc.*, 136 F.3d 794, 805, n.13 (D.C. Cir. 1998) ("Under the collateral-source rule, '[p]ayments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable'").

considering benefits received from third parties in determining the extent of the plaintiff's recovery. Citations omitted. . . . *See Restatement (Second) of Torts § 920A."* *Barkanic v. General Admin. of Civil Aviation of the People's Republic of China*, 923 F.2d 957, 964, n.8 (2d Cir. 1991)(emphasis in *italics* supplied).[8]

If "[t]he collateral source rule *prohibits* courts from considering benefits [plaintiffs] received from third parties in determining the extent of the plaintiff's recovery," then the court can only consider the "benefits" paid by the defendant in determining the extent of the plaintiff's recovery. Here the benefits paid by the defendant total $1,405,000.00. The $3,621,908.00 benefit came from third parties, i.e., collateral sources. Thus, it is evident the only deduction Kaman could receive, against plaintiffs' measure of damages, is the amount paid by the defendant. That amount is, undisputedly, $1,405,000.00.

Kaman's position that the authority for plaintiffs' "rather bizarre contention that their recovery should be reduced by the amounts Kaman paid . . . rather than the amounts plaintiffs received in insurance proceeds" is limited to "[t]he sole case cited by plaintiffs [in] an

---

[8] The Second Circuit also recognizes the collateral source rule is not just a rule of damages but a rule of evidence too. In *Perry v. Allegheny Airlines, Inc.*, 489 F.2d 1349 (2d Cir.1974), where both the trial court and the Second Circuit applied Connecticut law, the Second Circuit noted:

> Applying the 'collateral source' rule, *which precludes evidence by the defense of compensation to a plaintiff from an independent source on account of the accident forming the basis of the suit*, the trial court excluded evidence that decedent's survivors received over $150,000 in accident insurance and workmen's compensation benefits. Appellant argues that the evidence should have been received. We disagree. The district court's ruling is in accord with Connecticut precedent and authorities elsewhere. Compare *Gorham v. Farmington Motor Inn, Inc.*, 159 Conn. 576, 271 A.2d 94 (1970), and *Lashin v. Corcoran*, 146 Conn. 512, 152 A.2d 639 (1959), with *Lobalzo v. Varoli*, 409 Pa. 15, 185 A.2d 557 (1962), and *Long v. Landy*, 35 N.J. 44, 171 A.2d 1 (1961).

*Id.* at 1352 (emphasis supplied).

10

unreported trial court opinion" plainly misrepresents the content of Plaintiffs' Opening Memo. The authority is overwhelming, if not unanimous, and clearly not limited to one "unreported trial court opinion." Kaman is entitled to a deduction, against plaintiffs' measure of damages, for the sum of $1,405,000.00 and not the sum of $3,621,908.00.

2.    **The Law Rejects Kaman's Newest Argument That Plaintiffs Assigned, to Their Insurers, Their Claims Against Kaman**

Kaman's opening memo never uses the word "assign" or any derivative thereof.[9] Therefore, Plaintiffs' Opposing Memo argued Kaman apparently misunderstood the distinction between "assignment" and "subrogation." However, with Kaman's opposing memo, and a "Supplemental Rule 56(a)(1) Statement," Kaman now contends "plaintiffs contractually *assigned and subrogated* their rights to assert hull claims against Kaman to their insurers."[10] Defendant's Opposing Memo at 3 (emphasis supplied). In support of this argument Kaman relies upon Helog's execution, on November 15, 1999 (i.e., two months after the Helog helicopter crash and at the time of paying the hull insurance claims related thereto), of an "Interim Hull Release and Discharge." Kaman also relies upon Mountain West's execution, on

---

[9] Initially Kaman argued "Plaintiffs *Subrogated* Their Claims for Damage to the Helicopters to Their Insurers." Defendant's Opening Memo at 9 (emphasis supplied). The Introduction section of Kaman's opening memo likewise notes "Part III examines the plaintiffs' *subrogation* to their insurers of their claims for damage to the plaintiffs' helicopters. . . ." Defendant's Opening Memo at 1-2 (emphasis supplied). Kaman's opening memo never used the word "assign" or any derivative thereof! Now Kaman argues "The Doctrine of Subrogation and Plaintiffs' *Assignment* of Their Hull Claims Preclude Plaintiffs from Recovering Twice for the Same Harm." Defendant's Opposing Memo at 2 (emphasis supplied).

[10] Remarkably, in the case of plaintiff Mountain West, Kaman now argues that, at the time Mountain West's insurer(s) paid the Mountain West insurance claim(s), Mountain West "assigned" its hull claims despite the fact the language Kaman cites never uses the word "assign." Kaman claims Mountain West executed a "Subrogation Receipt" wherein Mountain West "released" (rather than "assigned") "all of the rights I (we) now have or which I (we) may hereafter have against anyone whomsoever, with respect to said loss and damage." Defendant's Opposing Memo at 3.

11

October 10, 2000 (i.e., eleven months after the Mountain West helicopter crash and at the time of paying the hull insurance claims related thereto), of a "Sworn Statement in Proof of Loss."

The opposition to Kaman's newest argument is really quite simple. As a matter of law, plaintiffs' insurers cannot "improve" their equitable right of subrogation or obtain an "assignment" of claims, in lieu of an equitable right of subrogation, in consideration of merely paying a claim under the policy. The insurer's payment of a claim does nothing more than satisfy the insurer's contractual obligation existing by virtue of the insured's premium payments! The payment of the claim does not serve as new consideration for an agreement to give the insurer an "improved" right of equitable subrogation or an assignment in lieu of the common-law equitable right of subrogation! Furthermore, Kaman's present assertion that an "assignment" of claims occurred when plaintiffs' insurers paid the claims, now reveals Kaman's misunderstanding of the distinction between "conventional subrogation," which is not the case here, and "legal or equitable subrogation," which is.

In *Ness v. Ford Motor Co.*, 835 F.Supp. 453 (N.D. Ill. 1993) the insurer argued it could rely upon subrogation language contained in a "Release" executed at the time of paying the claim which was "broader than the [subrogation] language contained in the [insurance policy]. . . ." *Id.* at 458. The court rejected the insurer's position.

> It is well established that parties to a contract may freely modify their agreement. A valid modification to an existing agreement must meet all the criteria necessary for a valid contract: offer, acceptance and consideration. (Citations omitted). The subrogation clause in the Release is a modification of the subrogation clause contained in the "Transfer of rights" provision [of the insurance contract]. However, Chubb and Vigilant provided no new and additional consideration to validate the modification. Therefore, the broader subrogation clause in the Release will not expand the rights of Chubb and Vigilant.

12

*Id.* at 458.[11]  Again, for emphasis, the insurer's payment of a claim under an insurance policy is not "new and additional consideration to validate [a] modification," whether that modification merely improves a right of subrogation or makes the right of subrogation an actual "assignment" of ownership.  The payment of a claim merely satisfies the insurer's contractual obligation existing by virtue of the insured's payment of the policy premiums.  Taking another road to the same destination, the Connecticut Supreme Court reaches the same conclusion.

> The law has recognized two types of subrogation: conventional; and legal or equitable.  73 Am.Jur.2d 599, Subrogation § 2 (1974 and 1995 Sup.)  . . . . *Conventional subrogation can take effect only by agreement and has been said to be synonymous with assignment.*  It occurs where one having no interest or any relation to the matter pays the debt of another, and by agreement is entitled to the rights and securities of the creditor so paid. . . .  By contrast, [t]he right of [legal or equitable] subrogation is not a matter of contract; it does not arise from any contractual relationship between the parties, but takes place as a matter of equity, with or without an agreement to that effect. . . .  The object of [legal or equitable] subrogation is the prevention of injustice.  It is designed to promote and to accomplish justice, and is the mode which equity adopts to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it. . . .
>
> Under this legal framework, the Appellate Court noted that '[a]t first blush,' this case would appear to involve conventional subrogation, due to the insurance contract between the Waskos and Middlesex.  *Wasko v. Manella*, supra, 74 Conn.App. at 36-37, 811 A.2d 727.  Upon further analysis, however, the Appellate Court concluded that '[t]he contract . . . is not the source of the right, but rather is a reference to those rights that may exist at law or in equity."  *Id.*, at 37, 811 A.2d 727.  We agree with this conclusion.  As we stated in *Westchester Fire Ins. Co. v. Allstate Ins. Co.*, supra, 236 Conn. at 372, 672 A.2d 939, *insurers that are obligated by a preexisting contract to pay the losses of an insured proceed in a subsequent action against the responsible party under the theory of equitable subrogation, and* not *conventional subrogation.*  See also *DiLullo v. Joseph*, supra, 259 Conn. at 853, 792 A.2d 819 (equitable principles used to address fire insurance company's claimed right of subrogation against negligent tenant); *Hanover Ins. Co. v. Fireman's Fund*

---

[11] Just as the court rejected the insurer's position in *Ness v. Ford Motor Company*, Plaintiffs respectfully submit the court should, *a fortiori*, reject Kaman's arguments regarding the insurer's position here, but, in reality, arguments made for the benefit of Kaman, the tortfeasor.

*Ins. Co.*, 217 Conn. 340, 344, 586 A.2d 567 (1991) (affirming trial court's finding that equitable subrogation action by insurance company was untimely). This is because the insurer, as well as the insured, has a preexisting financial interest in the out-come of the litigation. *Westchester Fire Ins. Co. v. Allstate Ins. Co.*, supra, at 372, 672 A.2d 939; *Berlinski v. Ovellette*, 164 Conn. 482, 496, 325 A.2d 239 (1973) (MacDonald, J., dissenting), overruled, *Westchester Fire Ins. Co. v. Allstate Ins. Co.*, supra, at 364, 672 A.2d 939. In sum, while "[a] right of true [equitable] subrogation may be provided for in a contract . . . the exercise of the right will . . . have its basis in general principles of equity rather than in the contract, which will be treated as being merely a declaration of principles of law already existing. 83 C.J.S., Subrogation § 3(b) (1953).

*Wasko v. Manella*, 269 Conn. 527, 533-534, 849 A.2d 777, 781-782 (2004)(all alterations in original and emphasis in *italics* supplied). If plaintiffs' insurers had paid plaintiffs' losses, "having no interest or any relation to the matter," then a subsequent "conventional subrogation" agreement, "synonymous with assignment," would "entitle[] [plaintiffs' insurers] to the rights and securities of the creditor so paid," i.e., the insurers would "own" plaintiffs' claims. But, "insurers that are obligated by a preexisting contract to pay the losses of an insured proceed in a subsequent action against the responsible party *under the theory of equitable subrogation, and not conventional subrogation*," i.e., there is no "assignment!"

With this understanding of the law, the distinction initially described in Plaintiffs' Opposing Memo lives on. "Assignment . . . differs from equitable subrogation in that equitable subrogation is an act of the law growing out of the relation of the parties to the original contract of insurance . . . whereas an assignment is the act of the parties to the assignment, dependent upon actual intention." See 16 Couch on Insurance § 222:53 at 222-92 (West Group edition 2000). "In essence, while [legal or equitable] subrogation is a designation of proceeds recovered from a wrongdoer, an assignment transfers the entire cause of action to the insurer." *Id.* As outlined below, plaintiffs' claims to recover their full damages, less any amount that Kaman or its liability insurance carrier has already paid, are entirely consistent

14

with the doctrine of equitable subrogation (serving merely as "a designation of proceeds recovered from a wrongdoer," rather than an "assignment") and the collateral source rule.

### 3. The Claims Plaintiffs Assert Are Entirely Consistent with the Doctrine of Subrogation and the Collateral Source Rule

Plaintiffs' demonstrate the consistency of their property loss claims, with the doctrine of subrogation and the collateral source rule, using the Helog claim as an example. Helog claims Kaman's defective clutch caused it to lose a $3,000,000.00 helicopter, i.e., Helog's full measure of damages is $3,000,000.00. With respect to that loss, it is undisputed, for purposes of these cross-motions for summary judgment, that Kaman or its liability insurance carrier has paid a total of $1,120,000.00. It is also undisputed that Helog received, from its own helicopter hull insurer, the sum of $2,591,908.00. The collateral source rule, and more particularly Restatement (Second) of Torts § 920A, establishes that Kaman is entitled to no deduction, against Helog's measure of damages, for payments Helog received from collateral sources, such as its helicopter hull insurer. However, Kaman gets a full deduction for whatever it or its liability insurance carrier has paid. Thus, Helog's $3,000,000.00 full measure of damages is subject to a deduction, in the amount of $1,120,000.00, thus reducing Helog's maximum recovery for property losses, in this proceeding, to $1,880,000.00.

If Helog recovers the full $1,880,000.00 for the loss of its helicopter, then, when added to the $2,591,908.00 Helog already recovered from its helicopter hull insurer, Helog's total recovery, for the loss of a $3,000,000.00 helicopter, is $4,471,908.00. With that recovery, of course, Kaman shouts "double recovery" or "double dip" (even though Kaman's total payments are only $3,000,000.00, i.e., $1,120,000.00 already paid, plus $1,880,000.00 paid herein). And that, of course, is where the doctrine of subrogation comes into play.

As Kaman's opposing memo notes: "[Subrogation] seeks first to prevent the insured from recovering twice for one harm, as it might if it could recover from both the insurer and from the third person who caused the harm, and second to require the party who has caused the damage to reimburse the insurer for the payment the insurer has made." Defendant's Opposing Memo at 2-3, quoting *Allstate Ins. Co. v. Mazzola*, 175 F.3d 255, 258 (2d Cir. 1999).[12] In other words, subrogation seeks to (1) limit Helog's recovery to reimbursement for the $3,000,000.00 helicopter it lost while (2) requiring Kaman to fully pay for Helog's loss of the same $3,000,000.00 helicopter as a result of Kaman's defective part. How does subrogation do this? Through "a designation of proceeds recovered from a wrongdoer" of course.

Once again, the Connecticut Supreme Court's recent decision in *Wasko v. Manella*, explains how this "designation of proceeds recovered" occurs. ". . . [U]nder traditional principles of subrogation if an insured brings an action against a negligent party, an insurer generally is entitled to recover the amount it paid to the insured only if the amount of damages awarded exceeds the difference between the amount the insurer paid and the insured's actual damages."[13] *Wasko v. Manella*, 269 Conn. 527, 537, 849 A.2d 777, 784 (2004) (footnote in

---

[12] It is evident this statement of the law proceeds on the premise the insured has recovered, from the insurer, at least once for the full harm suffered. Indeed, the *Allstate* decision notes: "Kevin Hall suffered serious burns in the accident and his medical expenses totaled $133,637.22. Allstate paid *the entire amount of medical expenses*, as provided by the no-fault insurance provisions of the Personal Auto Policy." *Allstate*, 175 F.3d at 257. Here, in contrast, plaintiffs have not yet fully recovered once for their property losses, let alone twice! Nevertheless, the second circuit language is still persuasive. Moreover, in *Allstate*, New York and New Jersey law applied! Connecticut law was irrelevant! *Id.*

[13] See, e.g., *Skauge v. Mountain States Telephone & Telegraph*, 172 Mont. 521, 528, 565 P.2d 628 (1977) (reviewing various theories and "adopt[ing] the view that when the insured has sustained a loss in excess of the reimbursement by the insurer, the insured is entitled to be made whole for his entire loss and any costs of recovery, including attorney's fees, before the insurer can assert its right of legal subrogation against the insured or the tort-feasor"); *Transamerica Ins. Co. v. Barnes*, 29 Utah 2d 101, 105, 505 P.2d 783 (1972) ("[e]quitable principles apply to subrogation, and the insured is entitled to be made whole before the insurer may recover any portion of the recovery from the tortfeasor"); 6A

16

original). Thus, since Helog's actual property loss damages are $3,000,000.00 and the amount Helog's insurer paid is $2,591,908.00, then when Helog recovers, in this action, an additional $408,092.00 in property loss damages, a valid right of subrogation designates Helog's insurer as the entity entitled to additional damages awarded since, under those circumstances, "the amount of damages awarded exceeds the difference between the amount the insurer paid and the insured's actual damages."[14]

This, of course, is the very purpose of subrogation. "If the [insured], and the . . . insurer as a result of its subrogation rights, are thereby made whole . . . the [insured] should

---

J. Appleman, Insurance Law and Practice (1972) § 4094, p. 265 ("[b]ut where the loss was greater than the insurance, and the insured settled with the wrongdoer for damages which, when added to the insurance, were less than the loss, the insurer could recover nothing from the insured").

[14] However, even if Helog, rather than its insurer, is entitled to those excess damages, i.e., to a "windfall," the law still recognizes "[t]he collateral source rule is intended to insure that the 'benefit that is directed to the injured party [from a third party is] not shifted so as to become a windfall for the tortfeasor' since *it is the tortfeasor's responsibility to compensate for all harm* that he causes.' Restatement (Second) of Torts § 920A(2) cmt. b." *Moran Towing & Transp. Co. v. Lombas*, 58 F.3d 24, 27 (2d Cir. 1995) (alterations in original and emphasis in *italics* supplied).

> "[A] tortfeasor is not entitled to use a plaintiff's settlement with collateral sources of payment to avoid liability for damages. Under this [collateral source] doctrine,
>
> > [t]he question is not whether a windfall is to be conferred, but rather who shall receive the benefit of a windfall which already exists. As between the injured person and the tortfeasor, the former's claim is the better. This may permit a double recovery, but it does not impose a double burden. The tortfeasor bears only the single burden for his wrong.
>
> *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 534 (9th Cir.1962); see Restatement (Second) of Torts § 920A(2) (1979).

*Thyssen, Inc. v. S/S Eurounity*, 21 F.3d 533, 537-538 (2d Cir. 1994). And finally, compare the concurring and dissenting opinion of Justice Berdon in *Haynes v. Yale-New Haven Hospital*, 243 Conn. 17, 42, 699 A.2d 964, 976 (1997) ("The end result of the operation of the collateral source rule is that in some cases the tort plaintiff may recover twice or more for some elements of damages-one [sic] from the tortfeasor who caused the harm and again from any source of benefits collateral to the tortfeasor").

not suffer any significant increases in its . . . premiums or costs." *RK Constructors, Inc. v. Fusco Corp.*, 231 Conn. 381, 391, 650 A.2d 153, 158 (1994) (Justice Berdon concurring). Here, however, Kaman seeks not only to avoid having to pay the full property loss damages it caused, but also to avoid having to pay the consequences of its tortious conduct including the increased insurance premiums plaintiffs have had to pay as a direct result of Kaman's conduct! The court's ruling on these cross-motions for summary judgment simply must not allow that.

> **b.     In Addition to Recovering Damages for Their Personal Property Losses, the Helicopter Logging Companies Are Entitled to Recover All Other Damages Available, in Tort or Contract, under Connecticut Law Including Their Incidental or Consequential Damages**

On this issue, the most significant development of Kaman's opposing memorandum is Kaman's admission that the "warranty provisions of the Uniform Commercial Code allow for the recovery of consequential damages. . . ." Defendant's Opposing Memo at 5. Kaman concedes this, however, only in the context of an argument that the warranty provisions of the Uniform Commercial Code "are irrelevant here as the terms governing the sale of the replacement clutches unequivocally bar consequential damages." *Id.* at 5-6. And finally, Kaman also argues the terms governing the sale of the replacement clutches unequivocally bar consequential damages because "it is undisputed that the replacement clutches are subject to the warranty provisions of Kaman's parts catalogue - provisions which clearly bar any claim for consequential damages. . . ." *Id.* at 5.

Plaintiffs' Opposing Memo and the Local Rule 56(a)(2) Statement filed contemporaneously therewith disputed Kaman's position "that the replacement clutches are subject to the warranty provisions of Kaman's parts catalog." The same memo also sets forth plaintiffs' position that it is a question of fact, not subject to resolution on summary judgement, whether Kaman and the plaintiffs herein agreed on the terms of the warranty provisions that

18

governed the sales of the replacement clutches. Plaintiffs see no need to add to those arguments here.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs continue to seek the court's order granting partial summary judgement in their favor, ruling that the Helicopter Logging Companies are entitled to recover: (1) for their "Property Losses," the fair market value of (or, if the facts and circumstances warrant, the cost to replace) the Heli-Air Helicopter, as of September 13, 1999 when it became a total loss, and the actual cost to repair the Mountain West Helicopter, following its November 4, 1999 crash, with interest thereon from the date(s) of loss (less any amount paid by Kaman (and/or its insurance carrier) as a result of the helicopter accidents); and (2) following resolution (in Plaintiffs' favor), at trial, of existing questions of fact, their incidental, consequential and/or commercial losses for Kaman's breach of contract or, at the very least, that at this stage of the litigation, the Helicopter Logging Companies' claims for incidental, consequential and/or commercial losses, are not foreclosed by Connecticut law.

DATED:   October _20_, 2004.

The Law Offices of Robert S. Young, L.C.

Robert S. Young (ct 21935)
800 McIntyre Building
68 South Main Street
Salt Lake City, UT 84101
Tel. (801) 531-8300
Fax  (801) 359-7233
rsyav8rlaw@hotmail.com

## V. CERTIFICATE OF SERVICE

I certify that on October 20th, 2004, I caused to be filed with the court and served upon the individuals identified below, in the manner stated, the foregoing PLAINTIFFS' REPLY MEMORANDUM SUPPORTING THEIR CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE DAMAGES ISSUES.  The original, via overnight courier, all expenses prepaid, to "be filed with the court within a reasonable time after service," as contemplated by Rule 5(d) Fed.R.Civ.P., and addressed to:

> Clerk of the Court
> 450 Main Street
> Hartford, CT  06103

And one copy each, via first class mail, postage prepaid addressed to:

Tim Bishop, Esq.
BISHOP & JACKSON
80 Ferry Blvd.
Stratford, CT  06615

Timothy A. Diemand, Esq.
Aaron Singer, Esq.
WIGGIN & DANA
One City Place
185 Asylum Street
Hartford, CT  06103-3402

C:\Documents and Settings\Robert S. Young\My Documents\My Files\Mt. West v. Kaman\Memo Supporting Cross-MSJ re Damages (Reply).020.wpd

20