# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MOUNTAIN WEST HELICOPTER,        :
LLC, LONG-LINE LEASING, LLC,     :
HELOG AG and HELI-AIR ZAGEL      :
LUFTTRANSPORT AG,                :
  Plaintiffs,                    :
                                 :
vs.                              : Civil No. 3:01CV1746(AVC)
                                 :
KAMAN AEROSPACE CORP. and        :
JOHN DOES I THROUGH V,           :
  Defendants.                    :

## RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This is an action for damages brought pursuant to the
Connecticut Product Liability Act ("CPLA"), Conn. Gen. Stat. §§
52-572m et seq, and common law tenets concerning breach of
warranty.  The plaintiffs, Mountain West Helicopter, LLC
("Mountain West"), Long-Line Leasing, LLC ("Long- Line"), Helog
AG ("Helog"), and Heli-Air Zangel Lufttransport AG ("Heli-Air"),
(collectively the "logging companies"), allege that the
defendant, Kaman Aerospace Corporation ("Kaman"), designed,
manufactured and sold defective helicopter clutches that
subsequently caused two helicopters to crash.

The parties have filed the within cross-motions for partial
summary judgment (document nos. 44 and 47) on the issue of
damages.  Specifically, Kaman argues, 1) "most if not all of the
damages sought by plaintiffs are 'economic losses' that are not
recoverable under the CPLA," 2) "unambiguous warranty provisions
. . . plainly exclude incidental and consequential economic

damages," and 3) the logging companies' "subrogation of their claims for damage" to their respective insurance companies bars the logging companies' recovery of property damages to the extent that their insurance companies have already paid their claims.

The logging companies respond in their cross-motion for summary judgment that: 1) their "claims for incidental, consequential and/or commercial losses, are not foreclosed by Connecticut law;" 2) genuine issues of material fact exist as to whether contractual provisions barring the recovery of consequential damages apply to the replacement clutches; 3) the logging companies did not "assign" their rights against Kaman to their insurance companies therefore the logging companies are entitled to recover property damages without regard to the insurance proceeds they received.

The issues presented are: 1) whether the damages that the logging companies seek constitute commercial damages prohibited under the CPLA; 2) whether contractual provisions bar the logging companies from recovering consequential damages in contract; 3) what effect the partial subrogation of the logging companies' claims against Kaman to their insurers and their insurers' subsequent settlement of such claims with Kaman has on the amount of property damages the logging companies may now recover from Kaman.

2

The court concludes: 1) the CPLA bars the logging companies from recovering certain damages in tort because the damages constitute commercial damages under Connecticut law; 2) genuine issues of material fact exist as to whether contractual provisions barring the recovery of consequential damages apply to the replacement clutches; 3) the partial subrogation of the logging companies' claims against Kaman to their insurers and their insurers' subsequent settlement of such claims bar the logging companies from recovering property damages to the extent that they received payment from their insurers.

For the reasons set forth below, Kaman's motion for summary judgment (document no. 44) is GRANTED in part and DENIED in part. The logging companies' motion for summary judgment (document no. 47) is GRANTED in part and DENIED in part.

## FACTS

Examination of the complaint, Local Rule 56(a)(1) statements, exhibits, cross-motions for summary judgment, and the responses thereto reveals the following undisputed, material facts:

On May 2, 1997, Heli-Air, a German corporation, and Helog, a Swiss corporation, purchased a helicopter from Kaman, a Delaware corporation with an office in Bloomfield, Connecticut. Later that month, on May 20, 1997, Mountain West and Long-Line, both Utah limited liability companies, also purchased a helicopter from Kaman.

The purchase agreements for the helicopters each expressly excluded recovery of consequential damages. Specifically, section 4B of each of the purchase agreements provides, in part:

> In no event shall Kaman be liable to buyer . . . for any indirect, incidental, consequential, special or exemplary damages, arising out of or relating . . . [to] the aircraft including without limitation, any damages for diminution of market value, loss of use of the aircraft, loss of profits or other financial or economic loss, or for any interruption in buyer's business occasioned by its inability to use the aircraft for any reason whatsoever . . .

The parties agree that this language governed the sale of the original helicopters.

Similarly, a January 1, 1999 parts catalog states:

> In no event shall K-Max be liable to customer or any other person or organization for any indirect, incidental, consequential, special or exemplary damages of any nature whatsoever . . . including without limitation, any damages for lost profits or other financial or economic loss or for any interruption in customer's business occasioned by its inability to use the products or services for any reason whatsoever.[1]

The parties dispute whether this clause bars the logging companies from recovering consequential damages in this action.

In or around July 1999, Kaman instructed the logging companies to replace "free wheeling sprag clutches" in both helicopters. Kaman sent the logging companies replacement clutches. The logging companies promptly replaced the old clutches with the new replacement clutches.

---

[1] Neither party has informed the court of the relationship between K-Max and Kaman.

4

On September 13, 1999, approximately two months after the installation of the replacement clutches, Heli-Air's helicopter crashed.  Heli-Air argues that the crash resulted in a "total loss" of their helicopter.  Two months after the Heli-Air crash, on November 4, 1999, Mountain West's helicopter crashed. Mountain West argues that the crash resulted in substantial damage to their helicopter.  The logging companies allege that the replacement clutches caused the crashes.

There is a dispute as to whether contractual provisions barring the recovery of consequential damages applied to the replacement clutches.  Kaman argues that the 1999 parts catalog provisions barring the recovery of consequential damages are "applicable to the replacement clutch[es]."  In response, the logging companies argue that "whether the warranty provisions applicable to the replacement clutches mirrored those contained in the helicopter purchase agreement[] involves questions of fact that cannot be decided on summary judgment."

Prior to the crashes, Heli-Air and Helog had taken out a hull insurance policy with Polygon Insurance Company ("Polygon Insurance").  Similarly, Mountain West had taken out a hull insurance policy with Global Aerospace Underwriting Managers, Ltd. ("Global Insurance").

After Heli-Air's helicopter crashed, Heli-Air and Helog settled their insurance claim with Polygon Insurance for

$2,591,908.00.[2]  On November 15, 1999, Heli-Air, Helog, and

Polygon Insurance executed an "Interim Hull Release and

Discharge" that provided, in part, that Heli-Air and Helog

> . . . agree to assign, transfer and subrogate to
> insurers, all right, interest, or causes of action
> against any third party, who may be liable for this
> loss, so that any such action, right or interest may be
> exerted by the said company [Polygon Insurance] in lieu
> of the undersigned [Heli-Air and Helog], [to] the
> extent of the payment aforesaid.

Exhibit D, Kaman's Supplemental Local Rule 56(a)(1)

statement (document no. 50).

Approximately a year later, on October 10, 2000, Mountain

West likewise settled its hull insurance claim with Global

Insurance for $1,030,000.00.[3]  As part of the settlement, one

Bryan J. Burr signed a "Sworn Statement of Proof of Loss" as

president of Mountain West.  The statement provides, in relevant

part, that Mountain West

> hereby release[s] and subrogate[s] to the said Interested
> Underwriters [Global Insurance] all of the rights that I
> (we) have or which I (we) hereafter may have against anyone
> whomsoever, with respect to the said loss and damage.

Exhibit B, Kaman's Supplemental Local Rule 56(a)(1) statement

(document no. 50).

---

[2] In their Local Rule 56(c)(2) statement, the plaintiffs "reserve[] the
right to correct the actual amount for which they settled if the evidence
herein establishes a variation in that number."

[3] In their Local Rule 56(c)(2) statement, the plaintiffs "reserve[] the
right to correct the actual amount for which they settled if the evidence
herein establishes a variation in that number."

After the logging companies' respective insurance settlements, Global Insurance and Polygon Insurance brought subrogation actions against Kaman in state court.  Specifically, on September 11, 2001, Polygon Insurance brought an action against Kaman in Connecticut superior court on three grounds: 1) products liability, 2) breach of warranty, and 3) unfair trade practices.  In the complaint, Polygon Insurance stated that it brought the action "as subrogees of Helog."  Furthermore, the complaint stated that "Helog executed a Release and Discharge and Subrogation Receipt vesting Polygon [with] all rights of subrogation. . . to pursue repayment of the outlay from other parties as the Underwriters saw fit."

The next month, on October 26, 2001, Global Insurance brought an action against Kaman in Connecticut superior court on three grounds: 1) products liability, 2) breach of warranty, and 3) unfair trade practices.  In the complaint, Global Insurance stated that it brought the action as a "subrogee of Mountain West Helicopters."  Specifically, the complaint stated,

> Mountain West executed a Release and Discharge and
> Subrogation vesting Global rights of subrogation
> and recovery . . . to pursue repayment of the
> outlay from other parties as Underwriters saw fit.

Exhibit E, Kaman's Supplemental Local Rule 56(a)(1) statement (document no. 50).

Kaman and/or its insurance carrier subsequently settled Global Insurance and Polygon Insurance's state court actions. Specifically, on November 5, 2002, Kaman entered into a settlement agreement with Global Insurance in which Kaman agreed to pay Global Insurance $285,000.00.  In the agreement, Global stated that it was the "subrogee of Mountain West."  Furthermore, Global "represents and warrants" to Kaman "that it has full authority to act on their [Mountain West's] behalf in executing this settlement and release."  Similarly, on June 24, 2003, Kaman entered into a settlement agreement with Polygon Insurance in which Kaman agreed to pay Polygon $1,030,000.00.  In the agreement, Polygon stated that it was the "subrogee[] of Helog."

On September 11, 2001, the same day Polygon Insurance filed its subrogation action against Kaman in state court, the logging companies filed this action against Kaman in federal court.  The complaint alleges the following causes of action: strict products liability, negligence, breach of warranty, misrepresentation, and unfair trade practices.

With regard to damages, the complaint alleges that, defective replacement clutches caused the "total loss of or substantial damage" to the Heli-Air and Mountain West helicopters.  In addition, the complaint alleges that the crashes caused the logging companies to:

> (1) "lose revenues and profits from their logging
> operations"; (2) "incur ongoing expense in the form of
> excess salaried personnel unable to generate revenue in

the absence of the Helicopters"; (3) "lose the benefit
of pilot training expense paid by plaintiff to Kaman
for pilots trained in the Helicopters and unable to
generate revenue in the absence thereof"; (4) "lose the
benefit of a portion of the annual premium paid to
insure the Helicopters"; (5) "incur increased hull and
liabilities and/or workers compensation insurance
premiums during the years following the crashes"; (6)
"incur the expense of a deductible for the portion of
the insurance risk assumed by plaintiffs"; (7) "incur
the expense of ongoing interest charged, with no
corresponding revenue generated, during the period
between the crashes and settlement of the hull claims";
(8) "incur the expense associated with investigating
the crashes"; and (9) "in the case of Helog and/or
Heli-Air, incur the expense associated with replacing
the Helicopter at the exchange rate that had
significantly worsened and cost Helog and/or Heli-Air
approximately $1,000,000 more than originally paid for
the Heli-Air Helicopter."

On May 30, 2003, Kaman filed a motion to dismiss (document
no. 26) pursuant to Fed. R. Civ. P. 12(b)(6) arguing that the
logging companies had failed to state a claim upon which relief
could be granted.  On March 9, 2004, the court denied Kaman's
motion to dismiss (document no. 31).  Specifically, the court
concluded that "the CPLA governs the CUTPA cause of action and
the strict liability, negligence, breach of warranty, and
misrepresentation causes of action."  The court also noted that
some of the damages that the logging companies seek are "not
permitted under the CPLA."  The court, however, concluded that at
the motion to dismiss stage, it need not "identify which claims
for damages are proper and which are not."

After the March 9, 2004 ruling, the court gave the parties permission to conduct limited discovery on the issue of damages.

On September 10, 2004, Kaman filed the within motion for partial summary judgment (document no. 44). On September 13, 2004, the logging companies filed the within cross-motion for partial summary judgment (document no. 47).

## DISCUSSION

### I. Under the CPLA, the Logging Companies Cannot Recover in Tort for Commercial, or 'Consequential Economic,' Damages

Kaman first argues that the plaintiffs "cannot recover in tort for any of the economic losses they claim to have suffered." Specifically, Kaman argues that "[a]side from the claims for damages to the helicopters themselves, all other damages sought by plaintiffs constitute commercial losses, and are thus precluded by the plain language of the CPLA."

The logging companies respond that the court should not decide whether the CPLA "allows the recovery of such damages" because "Connecticut law expressly recognizes plaintiffs' contract claims for the selfsame 'economic' or 'commercial' damages." The court concludes, however, that it is appropriate to address the issue of whether the CPLA allows the recovery of such damages. For the reasons set forth below, the court agrees with Kaman that some of the damages that the logging companies seek constitute commercial damages which they cannot recover by way of their CPLA cause of action.

10

## A.    CPLA Governs All of the Plaintiffs' Tort Claims

"The CPLA creates a consolidated cause of action for all product liability claims." <u>LaMontage v. E.I. Du Pont de Nemours and Co.</u>, 834 F. Supp. 576, 587 (D. Conn. 1993).[4]  In <u>Winslow v. Lewis-Shepard</u>, 212 Conn. 462 (1989), the Connecticut supreme court held that the CPLA "provides the exclusive remedy for a claim falling within its scope, thereby denying a claimant the option of bringing common law causes of action for the same claim." <u>Id.</u> at 465.  Specifically, section 52-572n(a) provides that the CPLA cause of action "shall be in lieu of all other claims against product sellers, including actions of negligence, strict liability and warranty for harm caused by a product." Conn. Gen. Stat. § 52-572n(a).  Furthermore, section 52-572m(b) provides that a CPLA cause of action

> shall include, but is not limited to the following theories: Strict liability in tort; negligence; breach of warranty, express or implied . . .

---

[4]  "The purpose of the [CPLA] was to merge the numerous causes of action that have been asserted in common law product liability actions and to create one statutory cause of action, embracing the various theories of liability." <u>Londrini v. Brito Enter.</u>, 1993 WL 328573, at *4 (Conn. Super. Ct. 1993)(quoted in <u>LaMontage v. E.I. Du Pont de Nemours and Co.</u>, 834 F. Supp. 576, 587 (D. Conn. 1993)).  Although the CPLA brought the separate common law causes of action together into one products liability cause of action, "there was no intention on the part of the framers to eliminate the various theories of liability under the common law."  <u>Skerritt v. Sandoz Nutrition Corp.</u>, 1991 WL 60423, at *1 (Conn. Super. Ct. 1991)(quoted in <u>LaMontage v. E.I. Du Pont de Nemours and Co.</u>, 834 F. Supp. 576, 587 (D. Conn. 1993)).  The CPLA therefore does not change the elements that a plaintiff must prove to make out a prima facie case of negligence, strict liability, or breach of warranty.  Rather, "the CPLA preserves the common law theories of product liability that were available before its passage." <u>LaMontage v. E.I. Du Pont de Nemours and Co.</u>, 834 F. Supp. 576, 588 (D. Conn. 1993).  Importantly for purposes of the within motions, however, the CPLA does place uniform limits on the types of damages available in products liability actions.

> misrepresentation or nondisclosure, whether
> negligent or innocent.

Conn. Gen. Stat. § 52-572m(b).

As the court stated in its ruling on Kaman's motion to dismiss, to the extent that the causes of action sound in tort, the CPLA governs the logging companies' "CUTPA, strict liability, negligence, breach of warranty, and misrepresentation claims."

**B.    The CPLA Bars Recovery of Commercial Loss Between Commercial Parties**

The CPLA limits the type of damages that a commercial party may recover in a products liability action. LaMontage v. E.I. Du Pont de Nemours and Co., 834 F. Supp. 576, 587(D. Conn. 1993)(noting "[t]he consolidated cause of action created by the CPLA means that all product liability claims are governed by . . . a *uniform set of remedies*")(emphasis added).  Specifically, section 52-420n(c) of the CPLA provides, "between commercial parties, commercial loss caused by a product . . . may not be recovered by a commercial claimant in a product liability claim." Conn. Gen. Stat. § 52-420(c).  It is undisputed that all parties to this action are commercial parties within the meaning of the CPLA.  Therefore the only issue before the court is whether any of the logging companies' claimed damages constitute commercial losses.

12

Although neither the Connecticut supreme court nor the
Connecticut appellate courts have set forth a comprehensive
definition of commercial loss, Connecticut courts "have generally
agreed that commercial loss includes 'consequential economic
losses.'"[5] American Nat'l Fire Ins. v. A. Secondino & Sons, 1995
WL 253085, at *4 (D. Conn. 1995).  For example, a Connecticut
district court held that section 52-420n(c) of the CPLA bars the
recovery of damages for "diminished proceeds upon resale and loss
of income during downtime." McKernan v. United Technologies
Corp., et al., 717 F. Supp. 60, 66 (D. Conn. 1989).  Similarly,
another Connecticut district court held that lost salaries,
overtime pay, additional taxes, rent, and lost sales because such
losses constitute "consequential economic damages." Connecticut
Gen. Life Ins. Co. v. Grodsky Serv., Inc. 781 F. Supp. 897, 901

---

[5] The Restatement (Second) of Contracts, § 351 cmt. b, recognizes that
the terms consequential damages and special damages "are often misleading."
Id.  Similarly, in Applied Data Processing, Inc. V. Burroughs Corp., 394 F.
Supp. 504, 509 (D. Conn. 1975), the court recognized the confusion over the
definition of consequential damages.  In Applied Data, the court defined
consequential and special damages by contrasting them with general damages.
General damages are damages that "naturally and ordinarily follow the breach."
Id.  In contrast, consequential and special damages are damages that "ensue,
not necessarily or ordinarily, but because of special circumstances." Id.
Similarly, the Restatement (Second) of Contracts, § 351 cmt. b, defines
consequential damages as "damages recoverable for loss that results other than
in the ordinary course of events."
    Connecticut's UCC provides a definition of consequential damages.
Specifically, Conn. Gen. Stat. § 42a-2-751(2) states that consequential
damages "include:"
        (a) any loss resulting from general or particular requirements and
        needs of which the seller at the time of contracting had reason to
        know and which could not reasonably be prevented by cover or
        otherwise; and (b) injury to person or property proximately
        resulting from any breach of warranty.
Conn. Gen. Stat. § 42a-2-751(2)(quoted in Gaynor Elec. Co., Inc. v. Hollander,
29 Conn. App. 865, 869 n.2 (Conn. App. Ct. 1993)).

(D. Conn. 1991).

Applying the law to this case, the court concludes that the following damages are commercial losses, and therefore, the plaintiffs may not recover such damages in a tort action brought pursuant to the CPLA:

> (1) lost "revenues and profits from their logging operations"; (2) "ongoing expense in the form of excess salaried personnel unable to generate revenue in the absence of the Helicopters"; (3) lost "benefit of pilot training expense paid by plaintiff to Kaman for pilots trained in the Helicopters and unable to generate revenue in the absence thereof"; (4) lost "benefit of a portion of the annual premium paid to insure the Helicopters"; (5) "increased hull and liabilities and/or workers compensation insurance premiums during the years following the crashes;" (6) "the expense of ongoing interest charged, with no corresponding revenue generated, during the period between the crashes and settlement of the hull claims";(7) "the expense associated with investigating the crashes."

In contrast, the CPLA does not bar the plaintiffs from recovering tort damages to compensate them for the "total loss of or substantial damage to their helicopters."[6]

---

[6] The court previously held in its ruling on the motion to dismiss, that the term "commercial loss" does not include damage to the defective product itself or other damage to property.  Here, the plaintiffs seek, in part, compensation for the "total loss or substantial damage" to the helicopters. The damage to the helicopters is property damage, not commercial loss, and thus the CPLA does not bar such recovery.

**II.  Breach of Warranty in Contract and Consequential Damages**

Kaman next argues that "warranty provisions governing the helicopter and replacement [clutches]. . . unequivocally bar the recovery of consequential damages" in contract based on breach of warranty.  The logging companies respond that "fact issues remain[] regarding the contracts that governed the sales of the clutches" and that they can recover "commercial losses."

The CPLA provides that plaintiffs can only bring causes of action for commercial loss pursuant to Connecticut's version of the UCC.  Specifically the CPLA, Conn. Gen. Stat. § 52-430(c), provides, in part: "An action for commercial loss caused by a product may be brought *only* under, and shall be governed by, title 42a, the Uniform Commercial Code ["UCC"]."  Conn. Gen. Stat. § 52-420(c)(emphasis added). <u>See also</u>, <u>McKernan v. United Technologies Corp., et al.</u>, 717 F. Supp. 60, 66 (D. Conn. 1989)(noting "a legal action for recovery of commercial losses may be brought only under Connecticut's version of the Uniform Commercial Code").[7]

Pursuant to Connecticut's version of the UCC, parties can contractually agree to exclude recovery of consequential damages. Specifically, Conn. Gen. Stat. § 42a-2-719, provides, in part:

> Consequential damages may be limited or excluded unless the
> limitation or exclusion is unconscionable . . . . limitation

---

[7] The plaintiffs do not specifically state the basis for their breach of warranty claim under the Connecticut's version of the UCC.

of damages where the loss is commercial is not [prima facie
unconscionable].

Conn. Gen. Stat. § 42a-2-719.[8]

It is undisputed that the original helicopter purchase
agreements between the logging companies and Kaman disclaim
liability for "any indirect, incidental, [or] consequential"
damages.  Similarly, Kaman's 1999 parts catalog disclaims
liability for consequential damages.  Exhibit F, Defendants Local
Rule 56(A)(1) Statement.  The parties disagree, however, on
whether the purchase agreement or 1999 parts catalog clauses
excluding recovery of consequential damages govern the
replacement clutches.  The parties have presented the court with
conflicting affidavits in this respect.

The affidavits of logging company executives, Wolfgang Zagel
and Bryan J. Burr, state that neither has "present recollection
of agreeing to the warranty provisions, exclusions and/or
limitations contained in the 1999 Kaman parts catalog, as a

---

[8] The court notes that a plaintiff's recovery of consequential damages
for breach of warranty "is permitted only if, at the time of contracting,
seller *had reason to foresee* that buyer" would probably incur the
consequential damages "as a result of breach of warranty." Omega Eng., Inc. v.
Eastman Kodak Co., 908 F. Supp. 1084, 1092 (D. Conn. 1995)(emphasis added).
See also Neiditz v. Morton S. Fine and Assoc., Inc., 199 Conn. 683, 689 n.3
(Conn. 1986)(noting recovery of consequential damages is "limited to those
damages the defendant had reason to foresee as the probable result of the
breach at the time when the contract was made"); Restatement (Second) of
Contracts, § 351 cmt. b.  Kaman has not raised the issue of whether the
logging companies have raised a genuine issue of material fact as to if, at
the time of contracting, Kaman had reason to foresee that the logging
companies would probably incur the specified consequential damages as a result
of breach of warranty.  The court, therefore, will not address this issue it
at this time.

16

condition of purchasing the clutch from Kaman." Exhibit E, Exhibit G, Defendant's Local 56(A)(1) Statement. In contrast, the affidavit of G. Roger Wassmuth, Kaman's director of business development, states that in a June 21, 1999 letter, Helog "acknowledged that the replacement transmission assembly [clutch] was subject to Kaman's 'terms and conditions of sale, a copy of which [Helog] received as part of the Kaman 1999 Commercial Price List.'" Similarly, the Wassmuth affidavit states that a "pick ticket" documenting the "sale of the clutch to Mountain West . . . states that the transaction is subject to Kaman's standard 'terms and conditions of sale' which Mountain West received as part of the '1999 Commercial Price List.'"

        As a result of this conflicting evidence, a genuine issue of material fact exists as to the parties' intent to contractually bar the recovery of consequential damages with regard to the replacement clutches. Therefore, the court cannot conclude as a matter of law that the logging companies are barred from recovering consequential damages for breach of warranty. See International Connectors Indus., Ltd. v. Litton Sys., 1995 WL 253089, at *7 (D. Conn. 1995)(denying summary judgment after concluding "there is at least a genuine issue of material fact regarding the parties' intent concerning the applicability" of a contractual provision excluding recovery of consequential damages).

### III. Insurance Subrogation

Kaman next argues that the logging companies "subrogated" and "assigned" their "claims [against Kaman] for damage to the helicopters to their insurers, and cannot recover a second time for these losses." In other words, Polygon Insurance gained subrogation rights against Kaman as a result of its $2,591,908.00 insurance payment to Helog and Heli-Air. Polygon Insurance then exercised its subrogation rights by bringing a subrogation action against Kaman and settling with Kaman for $1,120,000.00. As a result of this subrogation and settlement, Kaman argues, Helog and Heli-Air are barred from now recovering $2,591,908.00 from Kaman. Similarly, Global Insurance gained subrogation rights as a result of their $1,030,000.00 insurance payment to Mountain West and Long-Line. Global Insurance then exercised its subrogation rights by bringing a subrogation action against Kaman and settling with Kaman for $285,000.00. As a result of the subrogation and settlement, Kaman argues, Mountain West and Long-Line are barred from now recovering $1,030,000.00 from Kaman.

The logging companies respond that "[t]he insurers payment of a claim does nothing more than satisfy the insurer's contractual obligation . . . . [it] does not serve as . . . an assignment" of their causes of action against Kaman. Accordingly, the logging companies argue, the logging companies are entitled to seek full property damages from Kaman less "the

18

amount paid by Kaman (and/or its insurance carrier)" to Polygon Insurance and Global Insurance in settlement of their subrogation actions.  Specifically, Kaman paid Polygon Insurance $1,120,000.00 in settlement of Polygon's subrogation action. Similarly, Kaman paid Global Insurance $285,000.00 in settlement of Global's subrogation action.  Therefore, the logging companies argue, Kaman should only receive a $1,120,000.00 and $285,000.00 credit against any property damages they may owe the logging companies.

For the reasons set forth below, the court concludes that the logging companies' application of subrogation law is flawed. The court agrees with Kaman.

A.    **Subrogation and its Purpose**

Subrogation is "the right one party has against a third party following payment, in whole or in part, of a legal obligation that ought to have been met by the third party." Allstate Ins. Co. v. Mazzola, 175 F.3d 255, 258 (2d Cir. 1999). Through subrogation, insurers "'stand in the shoes' of their insured" and may "seek indemnification by pursuing any claims that the insured may have had against third parties legally responsible for the loss." Id.

Specifically, subrogation allows "the insurer to succeed to its insured's rights in relation to the insured event and allow the insurer to recoup its payment from the tortfeasor" in either

19

of two ways. 22 Eric Mills Holmes, <u>Appleman on Insurance</u> §
141.1[B][3] (2d ed. 2003).  The insurance company may itself sue
the party responsible for the loss, or the insurance company may
wait for the insured to sue the tortfeasor and then seek
reimbursement from the insured.[9]  Here, Polygon Insurance and
Global Insurance chose the first method to exercise their
subrogation rights.  The insurance companies brought an action
against Kaman instead of waiting to seek reimbursement after the
logging companies sued Kaman.

One purpose of both methods of subrogation is to
"eliminate[] the possibility that the insured might obtain a
duplicate recovery and prevent[] unjust enrichment" by
"prevent[ing] an unwarranted windfall to the insured." 22 Eric
Mills Holmes, <u>Appleman on Insurance</u> § 141.1[D][2] (2d ed. 2003).

_____

[9] The Fifth Circuit Court of Appeals has provided a useful description
of the two ways insurance companies can exercise their subrogation rights:

> The right of subrogation is ordinarily exercised in one of two
> ways. If the insurer pays benefits that partially compensate the
> insured and the tortfeasor subsequently pays the insured an amount
> that makes the total received by the insured greater than its
> actual loss, the insurer may recover the benefits paid by claiming
> the surplus amount. In this way, subrogation prevents a double
> recovery--unjust enrichment--by the insured.  Alternatively, after
> an insurer has fully compensated the insured, it may sue the
> tortfeasor directly to recover its outlay. The tortfeasor, then,
> does not become the unintended beneficiary of the insurance
> contract.

<u>Oss v. United Services Auto. Ass'n</u>, 807 F.2d 457, 458-59 (5th Cir.
1987). The court notes, however, that pursuant to Connecticut law, the
insurer need not fully compensate the insured before it can sue the
wrongdoer.  An insurer may sue a wrongdoer even if the insurer has only
partially compensated the insured.  <u>See e.g.</u> <u>Hartford Accident and
Indemn. Co. v. Chung</u>, 37 Conn. Supp. 587, 590-91 (Conn. Super. Ct. (App.
Sess.) 1981).

pulls

As the Second Circuit recognizes, subrogation "seeks, first, to
prevent the insured from recovering twice for one harm, as it
might if it could recover from both the insurer and from the
third person who caused the harm . . ." <u>Allstate Ins. Co. v.
Mazzola</u>, 175 F.3d 255, 258 (2d Cir. 1999).

Furthermore, the United States Supreme Court recognized over
a century ago that, "The right of subrogation . . . . is a
creature of equity; is enforced solely for the purpose of
accomplishing the ends of substantial justice." <u>Memphis & L.R.R.
Co. v. Dow</u>, 120 U.S. 287, 301-02 (1887).  <u>See also</u> <u>Gibbs v.
Hawaiian Eugenia Corp</u>., 966 F.2d 101, 105-06 (1992)(quoting in
part 16 George J. Couch, et al., <u>Couch on Insurance</u> 2d § 61:18,
at 93 (2d rev. ed. 1983)); <u>Hartford Accident and Indem. Co. v.
Chung</u>, 37 Conn. Supp. 587, 592 (Conn. Super. Ct. (App. Sess.)
1981).  Overall, "as an equitable doctrine" subrogation "invokes
matters of policy and fairness." <u>DiLullo v. Joseph</u>, 259 Conn.
847, 854 (2002).[10]

---

[10] Connecticut law recognizes two types of subrogation: 1) conventional
subrogation and 2) equitable subrogation. <u>Westchester Fire Ins. Co. v.
Allstate Ins. Co.</u>, 236 Conn. 362 (1996).  The first, conventional subrogation,
is product of a contract that the parties form after the loss.  It applies
only when "one having no interest or any relation in the matter pays the debt
of another, and *by agreement* is entitled to the rights . . . of the creditor
so paid." <u>Id.</u> at 371 (quoting <u>Security Ins. Co. of New Haven v. Mangan</u>, 242
A.2d 482 (1968))(emphasis added).  The second, equitable subrogation, in
contrast, "is not a matter of contract; it does not arise from any contractual
relationship between the parties, but takes place as a matter of equity, with
or without an agreement to that effect." <u>Westchester Fire Ins. Co. v. Allstate
Ins. Co.</u>, 236 Conn. 362, 371 (1996)(quoting <u>Hartford Accident & Indemn. Co. v.
Chung</u>, 429 A.3d 158 (1981)).
    Connecticut courts recognize that when, as here, an insurance company
pays an insured for an injury caused by a third party, the payment gives rise
to a right of equitable rather than conventional subrogation. <u>See</u> <u>Westchester

**B.    An Insurance Company Obtains Rights Against an Alleged Wrongdoer Immediately Upon Payment to the Insured**

An insurance company need not obtain a contractual assignment of the insured's cause of action against the wrongdoer to acquire the right to proceed against the wrongdoer. Connecticut courts recognize that "upon paying to the insured the amount of a loss, total or partial," the insurance company automatically "becomes, *without any formal assignment or any express stipulation* to that effect in the policy, subrogated in a corresponding amount to the insured's right of action against the person responsible for the loss." <u>Hartford Accident and Indemn. Co. v. Chung</u>, 37 Conn. Supp. 587, 590-91 (Conn. Super. Ct. (App. Sess.) 1981).  <u>See also</u> <u>Gibbs v. Hawaiian Eugenia Corp.</u>, 966 F.2d 101, 106 (2d Cir. 1992)(recognizing "[t]he general rule is that an insurer's right to subrogation attaches, by operation of law, on paying an insured's loss"); <u>Old Repub. Nat. Title. Ins. Co. v. Garrell</u>, 2004 WL 3105938, at *3 (Conn. Super. Ct. 2004)(noting

---

<u>Fire Ins. Co. v. Allstate Ins. Co.</u>, 236 Conn. 362, 372 (1996)(holding insurance relationship gave rise to equitable subrogation; noting an insurer is "not acting as a mere volunteer; rather it was obligated by preexisting contract of insurance to pay the losses of the insured").

The logging companies argue that because the subrogation here constitutes equitable subrogation, there was not a contractual "assignment" of their cause of action against Kaman to the insurance companies, and therefore the logging companies may seek full recovery from Kaman. As explained below, Connecticut case law does not support this argument. To the contrary, Connecticut courts have consistently held that in cases of equitable subrogation, as here, insurance companies immediately obtain rights against the party responsible for the loss even without a formal contractual assignment.  <u>See e.g.</u> <u>Old Repub. Nat. Title. Ins. Co. v. Garrell</u>, 2004 WL 3105938, at *3 (Conn. Super. Ct. 2004); <u>Fidelity and Deposit Co. of Md. v. Bradley</u>, 1997 WL 804898, at *3 (Conn. Super. Ct. 1997).

with equitable subrogation, the insurer need not allege that the insured "granted it rights to bring" the action against the tortfeasor because the insurer "can bring the action independently, as subrogee"); Fidelity and Deposit Co. of Md. v. Bradley, 1997 WL 804898, at *3 (Conn. Super. Ct. 1997); 6A John Alan Appleman & Jean Appleman, Appleman on Insurance § 4053, at 139 (1st ed. 1972)(noting "By far the majority of cases have held that an insurer may be subrogated to the insured's rights against a tort-feasor, although no formal assignment has been executed").

### C.    Application to this Action

After the 1999 helicopter crashes, the logging companies submitted claims to their respective insurance companies. Polygon Insurance subsequently paid Helog and Heli-Air $2,591,908.00; Global Insurance, likewise paid Mountain West and Long-Line $1,030,000.00.  The moment the insurance companies paid these amounts they automatically obtained subrogation rights in a corresponding amount against Kaman. Gibbs v. Hawaiian Eugenia Corp., 966 F.2d 101, 106 (2d Cir. 1992).  Specifically, the insurance companies succeeded pro tanto "to all the procedural rights and remedies" that the logging companies possessed against Kaman. See 6A John Alan Appleman & Jean Appleman, Appleman on Insurance § 4051 (1st ed. 1972).

The logging companies argue because they never contracted to "assign" their rights against Kaman to the insurance companies, they are entitled to full property damages from Kaman.  The

logging companies, however, ignore the automatic nature of
subrogation upon the insurer's payment to the insured.  The
insurance companies did not need a "formal assignment or any
express stipulation . . . . in the policy" to obtain rights
against Kaman. <u>Hartford Accident and Indemn. Co. v. Chung</u>, 37
Conn. Supp. 587, 590-91 (Conn. Super. Ct. (App. Sess.) 1981).

Subrogation is an equitable doctrine, therefore, the court
must fashion an outcome which serves the "ends of substantial
justice," <u>Memphis & L.R.R. Co. v. Dow</u>, 120 U.S. 287, 301-02
(1887), and leads to "fairness." <u>DiLullo v. Joseph</u>, 259 Conn.
847, 854 (2002).  The logging companies have already received
$2,591,908.00 and $1,030,000.00 from their insurance companies.
Polygon Insurance and Global Insurance, in turn, have exercised
and settled their respective $2,591,908.00 and $1,030,000.00
subrogation claims against Kaman.  To now allow the logging
companies to recover the same amount from Kaman would allow the
insured to recover "twice for one harm."  In essence, it would
allow the logging companies to "recover from both the insurer and
from the third person who caused the harm . . ." <u>Allstate Ins.
Co. v. Mazzola</u>, 175 F.3d 255, 258 (2d Cir. 1999).  It would also
force Kaman to pay the logging companies for a claim that Kaman
has already settled with their insurance companies.

Accordingly, because the insurance companies have already
settled their subrogation claims against Kaman, the logging
companies are barred from recovering property damages to the

24

extent that they received reimbursement from their insurance companies. Specifically, Heli-Air and Helog may not recover up to $2,591,908.00 of property damages from Kaman. Mountain West and Long-Line may not recover up to $1,030,000.00 of property damages from Kaman. The logging companies may still seek property damages to the extent that such damages exceed these amounts.

### D. Collateral Source Rule is Inapplicable

The logging companies nonetheless argue that pursuant to the collateral source rule "Kaman's liability is <u>not</u> reduced by amounts Plaintiffs received" from their insurers. Kaman responds that such "reliance on the collateral source rule is misplaced." Specifically, Kaman argues that the rule is inapplicable because "there is no conceivable way Kaman will . . . reap a windfall from plaintiffs' insurance recoveries, because the insurers have already asserted and settled plaintiffs' hull claims against Kaman." For the reasons set forth below, the court agrees with Kaman.

The collateral source rule provides that a "defendant is not entitled to be relieved from paying any part of the compensation due for injuries proximately resulting from his act where payment [for such damages] comes from a collateral source, wholly independent of him." <u>Haynes v. Yale-New Haven Hosp.</u>, 243 Conn. 17, 23 (1997)(quoting <u>Gurliacci v. Mayer</u>, 218 Conn. 531, 556-57, 590 A.2d 914 (1991)). When a plaintiff has insurance, however,

courts base the application of the collateral source rule on an understanding that "the insurance company is subrogated to the plaintiff's rights" and will subsequently recover the funds by seeking reimbursement from the plaintiff. Restatement(Second) Torts § 920A cmt. b. (1979).  Here, however, the insurance companies have chosen to settle their subrogation rights in an independent action rather than waiting to seek reimbursement after the logging companies sue Kaman.

Although the logging companies cite numerous cases adopting the collateral source rule, they cite no cases applying the collateral source rule when an insurance company has already brought a subrogation action and settled its subrogation claims. Application of the collateral source rule here might lead to Kaman paying the logging companies for a claim Kaman has already settled with the logging companies' insurance companies.  The court concludes that in light of the insurance companies' having already exercised and settled their subrogation claims, the principles underlying the collateral source rule preclude its application to this action.

**CONCLUSION**

For the reasons set forth above, Kaman's motion for summary judgment (document no. 44) is GRANTED in part and DENIED in part. The logging companies' motion for summary judgment (document no. 47) is GRANTED in part and DENIED in part.

Specifically, the court concludes: 1) the CPLA bars the logging companies from recovering in tort for the consequential damages specified above; 2) genuine issues of material fact exist as to whether the parties intended contractual provisions to bar recovery of consequential damages in contract for breach of warranty; 3) the logging companies are barred from recovering property damages from Kaman to the extent that the logging companies' insurers have already reimbursed the logging companies for those property losses. The logging companies may still seek property damages to the extent that such damages exceed the amounts they received from their insurers.

It is so ordered this 7th day of April, 2005 at Hartford, Connecticut.

_____/s/_____
Alfred V. Covello
United States District Judge

27