**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT, HARTFORD**

| | |
|---|---|
| MOUNTAIN WEST HELICOPTERS, LLC, a Utah Limited Liability Company; LONG-LINE LEASING, LLC, a Utah Limited Liability Company; HELOG AG, a Foreign Corporation; and HELI-AIR ZAGEL LUFTTRANSPORT AG, a foreign corporation,<br><br>Plaintiffs,<br><br>v.<br><br>KAMAN AEROSPACE CORPORATION, a Delaware corporation and JOHN DOES I through V,<br><br>Defendants. | <br><br><br><br><br><br><br><br><br>Case No. 301 CV 1746 (AVC)<br><br>July 30, 2005 |

**PLAINTIFFS' AMENDED MEMORANDUM SUPPORTING THEIR MOTIONS SEEKING, FIRST, CONSOLIDATION, FOR TRIAL, OF THE ISSUES OF LIABILITY AND DAMAGES, SECOND, THEREAFTER, THE SETTING OF AN APPROPRIATE SCHEDULING ORDER AND, THIRD, RECONSIDERATION, AFTER ORAL ARGUMENT, OF THE COURT'S RULING ON THE APPLICATION OF THE COLLATERAL SOURCE RULE TO THESE FACTS**

Plaintiffs, Mountain West Helicopters, LLC ("Mountain West"), Long-Line Leasing, LLC ("Long-Line"), Helog AG ("Helog") and Heli-Air Zagel Lufttransport AG ("Heli-Air"), hereinafter collectively "Plaintiffs" and/or the "Helicopter Logging Companies," through counsel, submit this amended memorandum supporting their Motions Seeking, First, Consolidation, for Trial, of the Issues of Liability and Damages, Second, Thereafter, the Setting of an Appropriate Scheduling Order and, Third, Reconsideration, After Oral Argument, of the Court's Ruling on the Application of the Collateral Source Rule to These Facts.

## I. INTRODUCTION

Following the initial early July filing of this same memorandum, the court by order dated July 8, 2005, noted "Magistrate Judge Martinez has informed the court that the within motion and memorandum refer to statements made during confidential settlement negotiations. Therefore, the court will not review the contents of the within documents. The plaintiff may refile the within motion and memorandum with all inappropriate language excised. SO ORDERED." The court did not elaborate on the "inappropriate language" to be excised.

Plaintiffs respectfully submit it is difficult to demonstrate how bifurcation no longer "encourag[es] settlement," *U.S. v. Alcan Aluminum Corp.*, 990 F.2d 711, 720 (2d Cir. 1993), without some reference to the confidential settlement negotiations that have occurred. Nevertheless, after struggling for several days to comply with the court's order while still demonstrating how bifurcation no longer encourages settlement, plaintiffs' counsel left a voice-mail message for Kaman's counsel requesting identification of the "inappropriate language" to be excised. Counsel did not respond and, thus, plaintiffs submit this amended memorandum.

These motions follow the parties' cross-motions for summary judgment and the court's April 7, 2005-ruling thereon ("Ruling"). The cross-motions for partial summary judgment followed an initial effort to settle the parties' disputes. Those efforts revealed substantial disagreements between plaintiffs and defendants, with respect to the recoverable damages herein, resulting in a joint motion seeking reverse bifurcation in order to obtain the court's perspective on the issues. With the Ruling, the court offered its perspective on the damages' issues. Thereafter, the court ordered the parties to mediate, before Magistrate Judge Donna Martinez, on Wednesday, June 15, 2005. The mediation proved unsuccessful and, in the interests of judicial economy and to further encourage settlement, the Helicopter Logging Companies, respectfully, now seek the court's orders (1) consolidating the issues of liability

and damages for trial, (2) setting a scheduling order to permit the completion of discovery necessary for trial, and (3) reconsidering, after oral argument, the court's Ruling on the application of the collateral source rule to these facts.[1]

## II. TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

II. TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    a.    Bifurcation and Summary Judgment Are Tools Used to Promote Judicial Economy and/or to Encourage Settlement. The Parties Used Both the Reverse Bifurcation and Summary Judgment Tools. Now Reverse Bifurcation Neither Promotes Judicial Economy Nor Encourages Settlement and the Court Should Abandon it . . . . . . . . . . . . 1
        1.    Bifurcation Is the Exception, Not the Rule, and Is Intended to Be Conducive to and Promote Judicial Efficiency and Economy and/or to Encourage Settlement . . . . . . . . . . . . . . . . . . 2
        2.    The Decision to Bifurcate Issues for Trial Lies in the Sound Discretion of the Trial Court . . . . . . . . . . . . . . . . . . . . . . . . . 3
        3.    The Benefit of Reverse Bifurcation, i.e., to Obtain the Court's Perspective on Damages, Is Now Achieved with the Ruling on the Parties' Cross-Motions for Partial Summary Judgment. Separate Trials on Damages and Liability No Longer Promote and a Single Remaining Trial Will Promote Judicial Economy and Convenience and/or Encourage Settlement. Moreover, a Single Trial Will Prejudice Neither Party While Bifurcated Trials Will Prejudice Plaintiffs by Increasing Their Costs . . . . . 3
    b.    The Court's Ruling, with All Due Respect, Stands Alone in Concluding the Collateral Source Rule Should Not or Does Not Apply under These Facts and Circumstances. Accordingly, Plaintiffs, Respectfully, Seek Reconsideration after an Opportunity for Oral Argument on the Issue . . . . 7

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

V. CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

---

[1] Plaintiffs respectfully submit there is no rush to schedule the oral argument and it may be most appropriate to schedule it for the first day of a consolidated trial.

## III. ARGUMENT

a. **Bifurcation and Summary Judgment Are Tools Used to Promote Judicial Economy and/or to Encourage Settlement. The Parties Used Both the Reverse Bifurcation and Summary Judgment Tools. Now Reverse Bifurcation Neither Promotes Judicial Economy Nor Encourages Settlement and the Court Should Abandon it**

"Bifurcation and summary judgment provide powerful legal tools which, by . . . isolating issues to be resolved, avoid lengthy and perhaps needless litigation. The existence of those procedural tools . . . encourag[es] settlement . . . and speed[s] up remedial action." *U.S. v. Alcan Aluminum Corp.*, 990 F.2d 711, 720 (2d Cir. 1993). Here, reverse bifurcation sought the court's perspective on damages via summary judgment. The Ruling achieved that goal. If the court now tries damages only, liability will still follow. Why two trials where one suffices?

The Ruling clarifies: "1) the CPLA bars the [Plaintiffs] from recovering certain damages in tort because the damages constitute commercial damages under Connecticut law[2]; 2) genuine issues of material fact exist as to whether contractual provisions barring the recovery of consequential damages apply to the replacement clutches[3]; [and] 3) the partial subrogation of the [Plaintiffs'] claims against Kaman to their insurers and their insurers subsequent settlement of such claims bar the [Plaintiffs] from recovering property damages to the extent that they received payment from their insurers[4]." Ruling at 3 (footnotes supplied).

---

[2] The Ruling did not determine the viability of plaintiffs' proof or the amount of those "certain damages." It only decided the question of law whether such damages are recoverable in tort. The viability of Plaintiffs' proof and/or the amount of those "certain damages" are matters reserved for trial.

[3] Again, the court did not determine the viability of plaintiffs' proof or the amount of those "consequential damages." It only decided whether questions of fact remained for trial. The outcome of those questions and plaintiffs' proof or the amount of "consequential damages" are reserved for trial.

[4] And finally, the court did not determine the viability of plaintiffs' proof or the amount of those "property damages." It only decided the question of law whether the collateral source rule should or

1

1. **Bifurcation Is the Exception, Not the Rule, and Is Intended to Be Conducive to and Promote Judicial Efficiency and Economy and/or to Encourage Settlement**

"Federal Rule of Civil Procedure 42(b) enables a court to bifurcate a trial between different claims and issues *if* it is convenient, does not prejudice either party, and it promotes judicial efficiency." *ABB Indus. Systems, Inc. v. Prime Technology, Inc.*, 32 F.Supp.2d 38, 43 (D.Conn. 1998)(emphasis supplied). Specifically, rule "42(b) provides that '[t]he court, in furtherance of convenience or to avoid prejudice, or when separate trial will be conducive to expedition and economy, may order a separate trial of any claim'. 'Bifurcation, however, is a procedural device to be employed only in exceptional circumstances.'" *U.S. v. 43.47 Acres of Land*, 45 F.Supp.2d 187, 190 (D.Conn. 1999), citing *Marisol A. v. Giuliani*, 929 F.Supp. 662, 693 (S.D.N.Y. 1996). And finally, "[b]ifurcation is *only* appropriate where (1) separate trials would promote judicial economy and convenience; or (2) a single trial would prejudice the

---

should not apply to plaintiffs' property damages claims. The viability of Plaintiffs' proof and/or the amount of those "property damages" are issues reserved for trial. Furthermore, with respect to these "property damages" the court specifically noted "plaintiffs 'reserve the right to correct the actual amount . . . if the evidence herein [at trial, of course,] establishes a variation. . . .'" Ruling at 6, n. 3. And, responding to Kaman's interrogatory number 7, reading "Please indicate the fair market value of the helicopter on the day of the accident and describe how the fair market value calculation was determined," Helog/Heli-Air stated "Helog objects to interrogatory number 7 as the fair market value of the helicopter on the day of the accident is undoubtedly the subject of expert testimony in addition to whatever opinions Helog or Kaman may have regarding the issue. At this stage of the litigation, Helog has not yet retained an expert to offer an opinion." Notwithstanding the objection, Helog/Heli-Air offered an opinion as to the fair market value (which sufficed for purposes of obtaining the court's perspective on the cross-motions for summary judgment), but, in the motion for summary judgment memoranda, also argued their measure of "property damages" could well be the replacement, rather than the fair market, value of the Helog/Heli-Air helicopter. The court did not decide whether "replacement value" rather than "fair market value" represented plaintiffs' correct measure of damages, thus leaving that issue for trial as well. Accordingly, Plaintiffs respectfully submit, despite the "reverse bifurcation" procedure targeting the court's perspective on damages via summary judgment, the understanding was, and always has been, the issues of the viability of the evidence and amounts of "damages" were, and always have been, for trial, not the cross-motions for summary judgment.

2

interests of a party." *Id.* at 190-191 (emphasis supplied), citing *Katsaros v. Cody*, 744 F.2d 270, 278 (2d Cir. 1984).

For the reasons more fully articulated in section 3 below, plaintiffs now submit bifurcation (and, particularly, reverse bifurcation) is no longer appropriate because (1) the parties obtained the benefit of bifurcation with the court's Ruling on the cross-motions for summary judgment; (2) separate trials, at this stage, neither promote judicial economy and convenience nor encourage settlement; and (3) a single trial will not prejudice the interests of either party and bifurcated trials will require plaintiffs to travel twice from Europe and Utah. Moreover, Rule 42(a) Fed.R.Civ.P. allows the court to enter consolidation "orders . . . as may tend to avoid unnecessary costs and delay."

    **2.**    **The Decision to Bifurcate Issues for Trial Lies in the Sound Discretion of the Trial Court**

"Bifurcation is within the discretion of a trial judge. . . ." *ABB Indus. Systems, Inc. v. Prime Technology, Inc.*, 32 F.Supp.2d 38, 43 (D.Conn. 1998). Compare *U.S. v. 43.47 Acres of Land*, 45 F.Supp.2d 187, 191 (D.Conn. 1999)("it is in the court's discretion [whether] to order a separate trial. . . ."). Therefore, "[b]ifurcation orders are rarely appealed. They will only be reversed for a clear abuse of discretion or a strong showing of prejudice." *In re Simon II Litigation*, 211 F.R.D. 86, 188 (E.D.N.Y. 2002), citing *United States v. Garber*, 413 F.2d 284, 285 (2d Cir. 1969); *Garber v. Randell*, 477 F.2d 711, 714 (2d Cir. 1973).

    **3.**    **The Benefit of Reverse Bifurcation, i.e., to Obtain the Court's Perspective on Damages, Is Now Achieved with the Ruling on the Parties' Cross-Motions for Partial Summary Judgment. Separate Trials on Damages and Liability No Longer Promote and a Single Remaining Trial Will Promote Judicial Economy and Convenience and/or Encourage Settlement. Moreover, a Single Trial Will Prejudice Neither Party While Bifurcated Trials Will Prejudice Plaintiffs by Increasing Their Costs**

3

As previously noted, the parties, with the court's consent and approval, employed both the reverse bifurcation and summary judgment tools to obtain the court's perspective on damages issues significantly more complicated and contentious than the issue of liability.[5] Upon obtaining the Court's perspective on damages, reverse bifurcation had served its purpose. It now neither promotes judicial economy nor encourages settlement.

Reverse bifurcation no longer promotes judicial economy and convenience because here, irrespective of the outcome of a damages trial, a liability trial will follow nevertheless. Traditional bifurcation, i.e., where the issue of liability is tried before damages, can often "increase trial efficiency. There may be no need to hold the second [i.e., the damages] proceeding. Even if there is a second proceeding the number of issues involved may be reduced by the outcome of the first [i.e., the liability] proceeding." *SCFC ILC, Inc. v. Visa U.S.A. Inc.*, 801 F.Supp. 517, 528 (D.Utah 1992). But, even traditional bifurcation "is a procedural device to be employed only in exceptional circumstances." *U.S. v. 43.47 Acres of Land*, 45 F.Supp.2d at 190.

Here, in contrast, sorting out damages issues in a bifurcated trial (that were already addressed, at least in part, on summary judgment) is not only somewhat redundant but also has no potential for resolving the liability issues. Judicial economy does not lie in scheduling two trials for that which can be accomplished in one. Further, plaintiffs see no prejudice to either

---

[5] Plaintiffs suggest there really is no liability issue when three clutches, bearing the same part number, cause three helicopter crashes -- each within weeks of the respective clutch's first installation. (A National Transportation Safety Board ("NTSB") record of the third crash, i.e., the crash not a part of this lawsuit, is attached as exhibit A). Moreover, written reports from the NTSB, in the two U.S. crashes, and the Austrian Federal Ministry of Transportation, in the Austrian crash, conclude clutch failures caused each crash. Finally, the FAA recognized the clutches that caused the helicopter crashes failed to match a "standard of safety." The clutches caused an "unsafe condition that is likely to exist or develop on other Kaman Model K-1200 helicopters. . . ," see exhibit B attached hereto at 1, and, thus, "Sprag Clutch, P/N [part number] K974110-005, is considered unairworthy." See exhibit B at 2.

4

party in having one trial rather than two.[6] Indeed, if there is prejudice, it lies in requiring plaintiffs to incur the costs of traveling twice from Europe and Utah when one trip will suffice.

In addition to its present failure to promote judicial economy and efficiency, reverse bifurcation now no longer encourages settlement. Acknowledging the general impropriety of discussing settlement with the court, plaintiffs, nevertheless, respectfully submit a recitation of confidential settlement efforts (without specifying the amounts of the offers or demands) is critical to understanding why reverse bifurcation no longer encourages settlement and, in fact, as plaintiffs now contend, actually discourages settlement.

At the mediation, the parties discussed the issue of whether a discovery cutoff existed. Plaintiffs' counsel stated (in view of the fact that discovery on liability had not yet even commenced) there was no court-ordered discovery cutoff. Counsel for Kaman then asserted the court had ordered an "all damages discovery" cutoff prior to the September 2004 filing of the cross-motions for summary judgment[7] and further asserted it was now "too late" for plaintiffs to employ expert witnesses to testify regarding helicopter values. These statements, combined with Kaman's persistent unwillingness to agree to reschedule the dates set in a scheduling conference that plaintiffs' counsel was unable to attend (in fact, knew nothing about), due to a medical emergency, made it apparent to plaintiffs (or, at least, to their counsel) that Kaman, on the advice of counsel or otherwise, believed it had plaintiffs on a procedural "railroad" that would prevent them from proving their damages at a bifurcated damages' trial.

---

[6] Unless, of course, the damages issues render moot the issue of liability with a finding that the plaintiffs are entitled to no damages under any set of circumstances. That, of course, is not this case and, thus, irrespective of the damages trial outcome, the parties will still face a second trial on liability.

[7] This was an interesting position for Kaman's counsel to take since on June 13 and 14, 2005, the two days before he made the statement, he had requested and taken the depositions of Helog representative, Beat Ruckli, and Mountain West representative, Bryan Burr, on damages issues.

The evidence of Kaman's belief that it had plaintiffs on this procedural "railroad" became apparent at the mediation where Kaman, among other things: (1) reduced its offer to settle, made one year ago, by nearly 50%; (2) made a mediation-best-offer to settle all claims for less than one-hundred percent of what plaintiffs calculate to be the "undisputed property damages," i.e., the amount Kaman would be required to pay after giving it full credit for the amounts plaintiffs' received from their own helicopter hull insurance providers; (3) offered nothing to settle the risk that this court or the Second Circuit might reverse the current Ruling on the collateral source rule issue[8]; and (4) offered nothing to settle the risk that trial could establish Kaman's failure to obtain plaintiffs' agreements to limit Kaman's liability for defective parts, thus, permitting plaintiffs' recovery of their commercial or consequential losses.[9]  In summary, as articulated above, plaintiffs viewed the mediation as an utter waste of time and now find themselves embarrassed (or at least their counsel does) because, during the mediation, they twice reduced their demand for settlement, ultimately offering to accept, as full settlement, approximately 40% of the amount demanded one year ago.  Plaintiffs now submit worthwhile settlement discussions will not occur until this court's order establishes that plaintiffs are not on what Kaman perceives to be a procedural "railroad" and will have an opportunity to prove their damages (and Kaman's liability therefor) at trial.

---

[8] Plaintiffs' calculate the court's collateral source rule decision eliminated about $2,000,000 - $3,000,000 from their "property damages," the amount at stake if reversed.

[9] Responding to Kaman's interrogatory number 2, asking Plaintiffs' to identify their "consequential" or "commercial" losses, Helog/Heli-Air stated "approximately" $ 4,295,033.00 and Mountain West stated "approximately" $ 478,200.00.  The fact that plaintiffs "approximated" or "estimated" their damages is further evidence of the understanding that this was not the time to prove their damages but only the time to provide information sufficient to permit the court to rule, via summary judgment, on the questions of law presented by the damages controversy.

      **b.**      **The Court's Ruling, with All Due Respect, Stands Alone in Concluding the Collateral Source Rule Should Not or Does Not Apply under These Facts and Circumstances. Accordingly, Plaintiffs, Respectfully, Seek Reconsideration after an Opportunity for Oral Argument on the Issue**

The court's Ruling, in favor of Kaman on the collateral source rule issue, recognizes "[plaintiffs] cite numerous cases adopting the collateral source rule." Ruling at 26. But, plaintiffs "cite no cases applying the collateral source rule when an insurance company has already brought a subrogation action and settled its subrogation claims." *Id.* Therefore, and although it cites no concurring authority (see Ruling at 25-26), the court ultimately concludes "[a]pplication of the collateral source rule here might lead to Kaman paying the [plaintiffs] for a claim Kaman has already settled with the [plaintiffs'] insurance companies" and "the principles underlying the . . . rule preclude its application to this action." Ruling at 26.[10]

Plaintiffs, again with all due respect, beg to differ and, respectfully, suggest the court cited no concurring authority because it simply does not exist. If it does exist, Plaintiffs hasten to invite Kaman to cite the case so stating, i.e., the case stating that when a plaintiff's insurer, <u>by virtue of a right of subrogation rather than an assignment</u>, purports to give away the claim of its insured for about 40 cents on the dollar, the 60 cents on the dollar give away inures

---

[10] Kaman also, apparently, persuaded the court with an argument that the collateral source "rule is inapplicable because 'there is no conceivable way Kaman will reap a windfall from plaintiffs' insurance recoveries. . . .'" Ruling at 25. Thus, plaintiffs take this opportunity to describe the windfall to Kaman. The defective clutches caused Helog/Heli-Air to lose a helicopter worth approximately $3,000,000 (which they replaced for approximately $4,000,000) and required Mountain West to pay to Kaman approximately $1,200,000 for repairs. The defective clutches, therefore, caused total property damages of approximately $4,200,000 or, if the replacement value applies, approximately $5,200,000. Kaman, or its liability insurance carrier, has paid, to date, approximately $1,300,000. See Ruling at 8. At the mediation, plaintiffs calculated the "undisputed property damages," i.e., the amount remaining after giving Kaman full credit for what plaintiffs received from their own insurance carriers, at approximately $430,000. Thus, if Kaman, or its insurance carrier, pays maximum property damages of $1,730,000 (i.e., $1,300,000 + $430,000), after causing damages between $4,200,000 and $5,200,000, Kaman reaps a $2-3,000,000 windfall because plaintiffs' insurers paid them the difference!

to the benefit of the tortfeasor, who contributed nothing for the insurance obtained by the tort victim, rather than to the tort victim, who obtained the insurance and paid the premium!

Due to plaintiffs respectful disagreement with the court's Ruling, insofar as it concludes the collateral source should not apply here, they seek an opportunity for oral argument on these issues, in the context of a motion for reconsideration. In support of this last aspect of their motions, plaintiffs note, since the court's Ruling, they have submitted the following Westlaw inquiry under the "allfeds" database: "Has any Court concluded the collateral source rule should not apply when a plaintiff's insurer brings its own subrogation action and then settles that subrogation action for less than full value?" Following that search, plaintiffs represent to the court that they found no such decision.[11] In other words, this court stands alone in reaching that conclusion. Moreover, the cases appearing and/or cited in that search included the following statements of the law pertaining to the specific issue whether the collateral source rule applies in circumstances where a plaintiff's insurance company has already brought a subrogation action and settled its claims for less than full value.

"The recovery of damages from a tortfeasor by the owner of damaged or destroyed property is <u>unaffected</u> by the fact that the owner may have already received full or partial payment for the loss by his or her own insurance" and this collateral source "rule is <u>not</u> affected by the insurer's subrogation rights, which are a matter between the insurer and the insured." 22 Am Jur 2d Damages, § 410 at 368-369 (emphasis supplied).[12]

---

[11] The April 7-Ruling did not appear, apparently because it is not a reported decision.

[12] The Am Jur language cites *Rexroad v. Kansas Power and Light Company*, 388 P.2d 832 (Kansas 1964) for the proposition. "It is well settled that the damages recoverable for a wrong are not diminished by the fact that the party injured has been wholly or partly indemnified for his loss by insurance effected by him, and to the procurement of which the wrongdoer did not contribute. *This rule is not affected by the fact that the insurer is entitled to be subrogated to the rights of the insured, as*

8

In *Texport Oil Co. v. M/V Amolyntos*, 816 F.Supp. 825 (E.D.N.Y. 1993), plaintiff, Texport, an oil and gas trader based in Houston, Texas, asserted claims against defendant, the M/V Amolyntos, an ore/bulk/oiler oceangoing vessel, for the alleged contamination, during shipping by the Amolyntos, of "Rumanian Unleaded Gasoline." The Amolyntos, argued, as Kaman does here, that "[a]s a result of the insurance payment to Texport [from Texport's own insurer] in the sum of $650,000 and . . . [Texport's insurance] carrier's waiver of its subrogation rights[13] . . . 'Texport can not recover twice'" by keeping the $650,000 payment from its carrier and still pursuing the full value of its claims. *Id.* at 843 (footnote supplied).

The Eastern District of New York rejected the Amolyntos' defense with the following three legal conclusions, among others. (A) "In tort cases, where the plaintiff receives benefits from a third party who is not connected with the defendant, these benefits are from a source 'collateral' to the defendant, hence the name of the rule. These collateral source benefits, of course, reduce the financial loss to the plaintiff. Notwithstanding the fact that these collateral source payments decrease the damages and, if not credited, would result in a 'windfall' or a double recovery, they are generally *not admissible [evidence]* to mitigate the plaintiff's damages." *Id.* at 843 (emphasis supplied). (B) "The rule that collateral benefits are not deducted from the plaintiff's recovery against the tortfeasor applies to insurance policies,

---

*against the tortfeasor*, or to recover back from him the amount he recovers. . . . The reasons generally given for the rule are that the contract of insurance and the subsequent conduct of the insurer and the insured in relation thereto are matters with which the wrongdoer has no concern and which do not affect the measure of his liability. . . . [If] the plaintiff is a real party in interest, *the defendant has no further right to bring [plaintiff's] insurance into the case.*" *Id.* at 841-842 (emphasis supplied).

[13] Plaintiffs, of course, would also assert that their insurers "waived" 60 cents on the dollar of their subrogation rights, by settling those claims for 40 cents on the dollar.

9

whether maintained by the plaintiff or by a third party, *with or without the right of subrogation.*" *Id.* at 843-844 (emphasis supplied). And finally, (C) "This rule also applies to property damage claims." *Id.* at 844. Plaintiffs acknowledge this court is not bound by decisions from the Eastern District of New York, however, the Amolyntos appealed and, on appeal, the Second Circuit affirmed with binding authority that recognized:

> . . . [T]he fact that Texport entered into an independent contract with a third-party insurer to indemnify any loss does not insulate the *Amolyntos* from full liability. Restatement (Second) of Torts § 920(A)(2) (1989); *William Z. Salcer, Etc. v. Envicon Equities,* 744 F.2d 935, 941 (2 Cir.1984) ("The essence of the collateral source rule is the independence of the transaction giving rise to the collateral source, such as the insurance policy."). The proper question to ask in these circumstances is who should receive the windfall . . . the wronged or the wrongdoer? Clearly, Texport, as the wronged party, should benefit from the insurance for which it paid when purchasing the gasoline C.I.F. Furthermore, by assigning that right to Texport, we do not impose a double burden on the *Amolyntos* since the *Amolyntos* did not pay for the insurance. *Gypsum Carrier, Inc. v. Handelsman,* 307 F.2d 525, 534 (9 Cir.1962) (a tortfeasor bears only the single burden imposed by society "not only to make the plaintiff whole, but also to deter negligence and encourage due care"). As to this, we affirm.

*Texport Oil Co. v. M/V AMOLYNTOS,* 11 F.3d 361, 367 (2d Cir. 1993).

The Second Circuit also recognizes "the amount paid by an insurer under an insurance policy acts as a limit on the insurer's [subrogation] recovery. *Nevertheless, the underlying claim is still that of the insured.*" *Seguros Banvenez, S.A. v. S/S Oliver Drescher,*

761 F.2d 855, 861 (2d Cir. 1985)(emphasis supplied).[14]  Plaintiffs submit the court's Ruling took great pains not to conclude, as a matter of law, that plaintiffs' insurers obtained their rights by "assignment" rather than by "subrogation."  Had they obtained their rights by assignment, the underlying claim would be that of the insurer rather than the insured.[15]

Finally, and, again, with the utmost respect, plaintiffs note "[f]or those who do not often visit the filed of subrogation, the basic terminology can easily complicate the case to the point of frustration."  See 16 *Couch on Insurance 3d*, § 222:2 at page 222-10 (2000).  Moreover, "[i]t is not rare for judges to decry the ever-growing tangle of terms used to describe very similar legal theories, nor to find opinions that employ several of these [subrogation] terms in describing a single circumstance."  *Id*. at 222-12.  That said, plaintiffs note the Ruling in favor of Kaman, on the collateral source rule issue, occurred, at least in part, because the court recognized "[o]ne purpose . . . of subrogation is to 'eliminate[] the possibility that the insured might obtain a duplicate [or, as Kaman complains, a double]

---

[14] Compare Lee R. Russ and Thomas F. Segalla - Volume 16 *Couch on Insurance 3d*, § 222:2 at page 222-11 (2000) noting "Subrogation, which technically applies only to the insurer's right to proceed against a third party responsible for a loss which the insurer has compensated pursuant to its contractual obligation under a policy. . . , depends . . . on the existence of the insured's right to proceed against that entity."

[15] The "distinction between assignment and subrogation is that subrogation presupposes actual payment and satisfaction of a debt or claim to which the payor is subrogated, whereas under an assignment of a right or claim, the whole of the right or claim is assigned.  In essence, while subrogation is a designation of proceeds recovered from a wrongdoer, an assignment transfers the entire cause of action to the insurer."  See 16 *Couch on Insurance 3d*, § 222:53 at pages 222-91 and 222-92.

recovery. . . .'" Ruling at 20, citing 22 Eric Mills Holmes, *Appleman on Insurance* § 141.1[D][2] (2d ed. 2003)(emphasis supplied).[16]

Another equally, if not more, compelling purpose of subrogation is to "compel the ultimate discharge of an obligation by one who in good conscience ought to pay it," i.e., the tortfeasor, Kaman! See 16 *Couch on Insurance 3d*, § 222:6 at page 222-27.[17] In other words, Kaman, who, tortiously or in breach of contract, caused plaintiffs to suffer between $4,000,000 and $5,000,000 in property damages, is the one who in good conscience ought to pay those losses. Yet, as explained in footnote 10 above, the court has now entered an order limiting Kaman's liability to less than $2,000,000, for causing between $4,000,000 and $5,000,000 in property damages! The court does so, of course, without plaintiffs' consent or approval and without any offer to compensate plaintiffs for the increased insurance premiums they have paid, since the accidents, because their own insurers paid claims under plaintiffs' aircraft hull

---

[16] Plaintiffs had every intention of presenting this argument using the same treatise, i.e., 22 Eric Mills Holmes, *Appleman on Insurance* (2d ed. 2003), however, volume 22 was "missing" from the University of Utah law library. Therefore, they have done their best to present the argument using another well-accepted treatise, i.e., *Couch on Insurance 3d*, and other appropriate authority.

[17] Compare *Westchester Fire Ins. Co. v. Allstate Ins. Co.*, 236 Conn. 362, 371, 672 A.2d 939, 944 (1996) (Subrogation "is designed to promote and to accomplish justice, and is the mode which equity adopts to compel the ultimate payment of a debt by one who, in justice, equity, and good conscience, should pay it"). The purposes of subrogation (listed, in the *Couch* treatise, in the same order listed here) are, at least, threefold: (1) "securing the ultimate discharge of a debt by the person who in good conscience ought to pay it," i.e., "a wrongdoer who is legally responsible for the harm should not receive the windfall of being absolved from liability because the insured had the foresight to obtain, and had paid the expense of procuring, insurance for his or her protection"; (2) "preventing the insured from recovering twice for one harm"; and (3) "reimbursing the insurer for the payment which it has made." 16 *Couch on Insurance 3d*, § 222:8 at pages 222-30 through 222-32 (2000).

policies that should have been paid, in good conscience, under Kaman's product liability insurance policy! This is not the "justice" contemplated by equitable subrogation.

Plaintiffs' insurers will never have the same incentive plaintiffs have to recover from the tortfeasor, Kaman. Plaintiffs' insurers have not only a right of subrogation but also the ability to increase plaintiffs' premiums to compensate for their losses. Plaintiffs' remedies, in contrast, are limited to the causes of action against Kaman and Kaman has no right to expect plaintiffs to insure themselves (1) against losses caused by Kaman or (2) so as to reduce the exposure for Kaman's conduct, whether committed tortiously or in breach of contract. Plaintiffs' surrendered no right of recovery against Kaman (although they acknowledge Kaman is entitled to credit for what it or its insurer has paid) and have every right, in justice, equity and good conscience, to compel payment, by Kaman, of all property damages it has caused.

If, indeed, (1) the collateral source "rule is <u>not</u> affected by the insurer's subrogation rights. . . , 22 Am Jur 2d Damages, § 410 at 369 (emphasis supplied), (2) "collateral source payments . . . are generally *not admissible [evidence]* to mitigate the plaintiff's damages. . . ," *Texport Oil Co. v. M/V Amolyntos*, 816 F.Supp. at 843 (emphasis supplied), (3) the collateral source rule "applies to insurance policies . . . *with or without the right of subrogation*. . . ," *Id*. at 844 (emphasis supplied), and (4) plaintiffs' "independent contract[s] with a third-party insurer to indemnify any loss do[] not insulate [Kaman] from full liability. . . , *Texport Oil Co. v. M/V Amolyntos*, 11 F.3d at 367, then why would the collateral source rule not apply here?

The fact of the matter is, Kaman simply has "no . . . right to bring [plaintiffs'] insurance into the case." See *Rexroad v. Kansas Power and Light Company*, 388 P.2d at 842.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs seek the court's orders (1) consolidating the issues of liability and damages for trial; (2) setting a scheduling order permitting completion of discovery necessary for trial; and (3) reconsidering the court's Ruling, after an opportunity for oral argument, on the issue of the application of the collateral source rule to these facts (unless, of course, the court is inclined to reverse itself on the issue without oral argument).

DATED: July 30, 2005.

                               The Law Offices of Robert S. Young, L.C.

                               _____
                               Robert S. Young (ct 21935)
                               800 McIntyre Building
                               68 South Main Street
                               Salt Lake City, UT 84101
                               Tel. (801) 531-8300
                               Fax (801) 359-7233
                               rsyavrlaw@hotmail.com

## V. CERTIFICATE OF SERVICE

I certify that on July 30, 2005, I caused to be filed with the court and served upon the individuals identified below, in the manner stated, the foregoing PLAINTIFFS' AMENDED MEMORANDUM SUPPORTING THEIR MOTIONS SEEKING, FIRST, CONSOLIDATION, FOR TRIAL, OF THE ISSUES OF LIABILITY AND DAMAGES, SECOND, THEREAFTER, THE SETTING OF AN APPROPRIATE SCHEDULING ORDER AND, THIRD, RECONSIDERATION, AFTER ORAL ARGUMENT, OF THE COURT'S RULING ON THE APPLICATION OF THE COLLATERAL SOURCE RULE TO THESE FACTS. The original, via first-class mail postage prepaid, to "be filed with the court within a reasonable time after service," as contemplated by Rule 5(d) Fed.R.Civ.P., and addressed to:

>     Clerk of the Court
>     450 Main Street
>     Hartford, CT 06103

And one copy each, via first class mail, postage prepaid, addressed to:

| | | |
|---|---|---|
| Judge Alfred V. Covello | Tim Bishop, Esq. | Timothy A. Diemand, Esq. |
| c/o Nola Droney | Michael R. Casey, Esq. | Aaron Singer, Esq. |
| 450 Main Street | BISHOP & JACKSON | WIGGIN & DANA |
| Hartford, CT 06103 | 80 Ferry Blvd. | One City Place |
| (860) 240-2694 | Stratford, CT 06615 | 185 Asylum Street |
| | (Via First-Class Mail Only) | Hartford, CT 06103-3402 |
| | | (860) 525-9380 |

_/s/ Robert S. Young_

C:\Documents and Settings\Robert S. Young\My Files\Mt. West v. Kaman\Motion (Amended) to Consolidate Liability and Damages (memo).730.wpd