FILED

2005 AUG 26  A 10: 15

DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT, HARTFORD

| | |
|---|---|
| MOUNTAIN WEST HELICOPTERS, LLC, a Utah Limited Liability Company; LONG-LINE LEASING, LLC, a Utah Limited Liability Company; HELOG AG, a Foreign Corporation; and HELI-AIR ZAGEL LUFTTRANSPORT AG, a foreign corporation,<br><br>        Plaintiffs,<br><br>v.<br><br>KAMAN AEROSPACE CORPORATION, a Delaware corporation and JOHN DOES I through V,<br><br>        Defendants. | Case No. 301 CV 1746 (AVC)<br><br>August 24, 2005 |

**PLAINTIFFS' REPLY MEMORANDUM SUPPORTING THEIR MOTIONS SEEKING, FIRST, CONSOLIDATION, FOR TRIAL, OF THE ISSUES OF LIABILITY AND DAMAGES, SECOND, THEREAFTER, THE SETTING OF AN APPROPRIATE SCHEDULING ORDER AND, THIRD, RECONSIDERATION, AFTER ORAL ARGUMENT, OF THE COURT'S RULING ON THE APPLICATION OF THE COLLATERAL SOURCE RULE TO THESE FACTS**

Plaintiffs, Mountain West Helicopters, LLC ("Mountain West"), Long-Line

Leasing, LLC ("Long-Line"), Helog AG ("Helog") and Heli-Air Zagel Lufttransport AG

("Heli-Air"), hereinafter collectively "Plaintiffs" and/or the "Helicopter Logging Companies,"

through counsel, submit this reply memorandum supporting their Motions Seeking, First,

Consolidation, for Trial, of the Issues of Liability and Damages, Second, Thereafter, the

Setting of an Appropriate Scheduling Order and, Third, Reconsideration, After Oral Argument,

of the Court's Ruling on the Application of the Collateral Source Rule to These Facts.

## I.  INTRODUCTION

As noted in plaintiffs' July 30, 2005-Initial Memorandum ("Initial Memo"), these motions follow the parties' cross-motions for summary judgment and the court's April 7, 2005-ruling thereon ("Ruling").  The cross-motions for partial summary judgment followed an initial effort to settle these disputes.  Those efforts revealed substantial disagreements with respect to the recoverable damages herein, resulting in a joint motion seeking reverse bifurcation in order to obtain the court's perspective on the issues.  With the Ruling, the court offered its perspective on the damages' issues.  Thereafter, the court ordered the parties to mediate, before Magistrate Judge Donna Martinez, on Wednesday, June 15, 2005.  The mediation proved unsuccessful and, in the interests of judicial economy and to further encourage settlement, the Helicopter Logging Companies, respectfully, now seek the court's orders (1) consolidating the issues of liability and damages for trial, (2) setting a scheduling order to permit the completion of discovery necessary for a consolidated trial, and (3) reconsidering, after oral argument, the court's Ruling on the application of the collateral source rule to these facts.[1]

## II. TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

II. TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

III. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    a.    Bifurcation and Summary Judgment Have Served Their Purpose; Plaintiffs Agreed to Reverse Bifurcation to Obtain the Court's View on Damages via Summary Judgment Not a Bifurcated Damages Trial; and Kaman's Opposing Memorandum Fails to Identify Any Judicial Economy or Other Factor That Would Encourage Settlement, Thus, Justifying Continued Bifurcation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    b.    The Court's Ruling, on the Collateral Source Rule, Is Subject to Reconsideration and Contrary to the Law . . . . . . . . . . . . . . . . . . . . . . . 4

---

[1] Again, plaintiffs respectfully submit there is no rush to schedule the oral argument and it may be most appropriate to schedule it for the first day of the consolidated trial.

IV. CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

V. CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## III. ARGUMENT

a.      **Bifurcation and Summary Judgment Have Served Their Purpose; Plaintiffs Agreed to Reverse Bifurcation to Obtain the Court's View on Damages via Summary Judgment Not a Bifurcated Damages Trial; and Kaman's Opposing Memorandum Fails to Identify Any Judicial Economy or Other Factor That Would Encourage Settlement, Thus, Justifying Continued Bifurcation**

Plaintiffs reiterate that "[b]ifurcation and summary judgment provide powerful legal tools which, by . . . isolating issues to be resolved, avoid lengthy and perhaps needless litigation. The existence of those procedural tools . . . encourag[es] settlement . . . and speed[s] up remedial action." *U.S. v. Alcan Aluminum Corp.*, 990 F.2d 711, 720 (2d Cir. 1993). Here, reverse bifurcation sought the court's perspective on damages via summary judgment. Kaman's August 12, 2005-Opposing Memorandum ("Opposition") does not challenge that fact and it is, thus, undisputed the Ruling achieved that goal.

Kaman now argues, however, that "[r]esolution of the damages case will determine whether plaintiffs' maximum potential recovery is the insurance deductibles (a few hundred thousand dollars) or millions in economic damages.[2] If as Kaman believes, plaintiffs' maximum recovery is limited to the insurance deductibles, both parties should know this now."[3] Opposition at 3. The fact of the matter is Kaman's position for settlement has always

_____

[2] As noted in footnote 6 of plaintiffs' Initial memo, with continued bifurcation the only way two trials could be avoided is if "the damages issues render moot the issue of liability with a finding that the plaintiffs are entitled to no damages under any set of circumstances." Kaman's statement confirms this is not that case and, thus, the parties will still face a second trial on liability.

[3] Kaman further claims that "for plaintiffs to potentially recover anything more than their insurance deductibles, they must prove that Kaman's limited warranties *do not apply* to the replacement

1

been that "plaintiffs' maximum recovery is limited to the insurance deductibles." Plaintiffs

agreed to reverse bifurcation to persuade Kaman (with the assistance of the Ruling) that there is

additional exposure due to the collateral source rule (approximately $ 2,900,000 - $ 3,900,000

in additional "property damages" (see footnote 8 of plaintiffs' Initial Memo and page 9 herein))

and Kaman's apparent failure to obtain plaintiffs' agreements to exclude or limit Kaman's

liability for consequential or economic losses arising out of Kaman's breach of warranty

(approximately $ 4,500,000 - $ 5,000,000 in additional "consequential" or "economic"

damages (see footnote 9 of plaintiffs' Initial Memo)). The Ruling rejected plaintiffs' position

on the collateral source rule issue, but accepted their position on the "consequential" loss issue.

Kaman's position for settlement is, nevertheless, reduced from where it stood one year ago!

Kaman further argues "Plaintiffs should want to know whether it is worth investing

the time, effort and resources in prosecuting a case . . . if the potential payout is small."

Opposition at 4. Plaintiffs already know this Court's answer to that question. The Ruling

reveals, among other things: (1) plaintiffs can recover, in tort or in contract, their "property

losses" but only to the extent of their insurance deductibles or uninsured losses; (2) the

collateral source rule does not apply and, thus, Kaman's liability for plaintiffs' "property

losses" is limited to less than $ 2,000,000 (despite the fact Kaman caused plaintiffs to suffer

more than double that amount in "property losses") because plaintiffs' insurers made up the

difference and Kaman "settled" the insurers' subrogation claims; and (3) as a matter of law, the

---

clutches." Opposition at 3 (emphasis supplied). Kaman should check the rules regarding the burden of
proof. The rules do not require plaintiffs to prove a negative, i.e., that the limited warranties do not
apply. Rather, since Kaman alleges the existence of an agreement limiting its liability for consequential
damages, it is axiomatic that "the party claiming the existence of such an agreement . . . shall have the
burden of proving it." *American Banana v. Republic Nat. Bank*, 362 F.3d 33, 42 (2d Cir. 2004).

2

court cannot conclude Kaman limited its liability for "consequential" or "economic" losses caused by its breach of warranty.

With Kaman's acknowledgment that "millions in economic damages" are at stake and the understanding that additional millions hinge (for purposes of appeal) on the question of law whether the collateral source rule applies here, it should be apparent that until Kaman offers to settle for some amount that accurately reflects the risk of having the outcome of those two issues go against Kaman, plaintiffs will have no logical choice but to "incur the expense of retaining experts, taking numerous depositions here and in Europe, and reviewing and analyzing thousands of pages of technical data related to the clutches. . . ." Opposition at 4. Indeed, the only real issue is whether, in the interest of judicial economy and/or to encourage settlement, plaintiffs should engage in the foregoing efforts now, in anticipation of one trial, or later, in anticipation of two.[4]

Finally, Kaman argues "[t]he reason for trying the damages phase of this case before addressing liability remains as strong today as when the parties jointly proposed reverse bifurcation a year ago." Opposition at 4. A year ago, the court had not yet issued its Ruling! As noted above, plaintiffs agreed to and jointly proposed reverse bifurcation to obtain the court's assistance, via summary judgment, to persuade Kaman that these cases were worth more than "a few hundred thousand dollars" in insurance deductibles. As is often the case, with the Ruling, plaintiffs won some and lost some. Despite admitting that "millions in

---

[4] Two trials not only increase plaintiffs trial travel expenses, but also their discovery travel expenses. The Court may recall that on June 14, 2005, the parties telephoned seeking assistance with respect to Kaman's decision not to produce, for depositions, Kaman witnesses Roger Wassmuth, Robert Garneau, Alton M. "Mitch" Boggan and a witness identified under Rule 30(b)(6) Fed.R.Civ.P. Plaintiffs will take the depositions of these individuals on issues pertaining both to liability and damages. With bifurcation, plaintiffs will necessarily have to depose each of the foregoing individuals on two separate occasions, necessitating two trips, whereas with consolidation one trip will suffice.

3

economic damages" remain at stake, Kaman offers nothing to settle the risk of losing those millions. Moreover, it offers nothing to settle the risk that the Ruling may have incorrectly concluded the collateral source rule does not apply here and the Court could reverse itself or find itself reversed by the Second Circuit Court of Appeals. Subsection "b" outlines precisely why plaintiffs submit the Ruling was incorrect with respect to the collateral source rule.

> b.    **The Court's Ruling, on the Collateral Source Rule, Is Subject to Reconsideration and Contrary to the Law**

Kaman argues, under "Local Rule 7(c), motions to reconsider must be made within *ten days* of the ruling" and "[p]laintiffs' request for reconsideration – filed many months after the Court's April 7 Ruling – should be rejected on this basis alone." Opposition at 6 (emphasis in original). Plaintiffs acknowledge they do, indeed, ask the court to reconsider the April 7-Ruling. They further acknowledge, regardless of whether their request for reconsideration is timely under applicable local rules, "motions for reconsideration are not . . . called for in the Federal Rules of Civil Procedure. . . ." *McDowell v. Dynamics Corp. of America*, 931 F.2d 380, 382 (6th Cir. 1991). While courts occasionally treat motions for reconsideration as "motions to alter or amend a judgment under Rule 59(e)," *id.*, here there is no judgment to alter or amend and, thus, a motion for reconsideration is entirely inappropriate. Nevertheless, under Rule 4(a) Fed.R.App.P. an appeal in a civil case may be "filed with the district court within 30 days after the date of entry of the judgment. . . ." Thus, whether this Court reconsiders its ruling on the collateral source rule or the Second Circuit does, after entry of a judgment herein and plaintiffs' filing of a notice of appeal, it really does not matter. The fact of the matter is there is still time for reconsideration.

Turning then to the merits of reconsidering the collateral source rule controversy, Kaman argues, in its Ruling, "[t]he Court concluded that plaintiffs' *assignment* of their hull

4

claims to their insurers and bedrock principles of subrogation law barred plaintiffs' from

seeking this double recovery." Opposition at 6 (emphasis supplied). Plaintiffs' Initial Memo,

in contrast, asserts "the court's Ruling took great pains <u>not</u> to conclude, as a matter of law, that

plaintiffs' insurers obtained their rights by 'assignment' rather than by 'subrogation.'" Initial

Memo at 11. Whether plaintiffs' insurers obtained their rights by "assignment" or by

"subrogation" goes to the very heart of this controversy! The "distinction between assignment

and subrogation is that subrogation presupposes actual payment and satisfaction of a debt or

claim to which the payor is subrogated, whereas under an assignment of a right or claim, the

whole of the right or claim is assigned. In essence, *while subrogation is a designation of*

*proceeds recovered from a wrongdoer*, an *assignment transfers the entire cause of action to the*

*insurer*." 16 *Couch on Insurance 3d*, § 222:53 at pages 222-91 and 222-92 (emphasis

supplied).[5] Accordingly, "an insurer's recovery on a subrogated claim may not exceed the

amount paid under the policy. . . . *Nevertheless, the underlying claim is still that of the*

*insured*." *Seguros Banvenez, S.A. v. S/S Oliver Drescher*, 761 F.2d 855, 861 (2d Cir.

1985)(emphasis supplied).[6]

---

[5] The *Appleman* treatise recognizes "subrogation and assignment are distinct legal concepts. Assignment has been defined as 'a transfer or making over to another of *the whole* of any property, real or personal, in possession or in action, or of any estate or right therein.' Assignment occurs after the loss, in a transaction in which the assignee, a volunteer, pays the damaged party and receives, in return, an assignment of the damaged party's rights. Subrogation, on the other hand, involves a pre-existing contractual relationship (the insurance policy), under which the subrogee (insurer) pays the subrogor (injured party) and is, by operation of law, entitled to subrogation." 22 Eric Mills Holmes, *Appleman on Insurance* § 141.1[B](2d ed. 2003)(emphasis supplied). Volume 22 of *Appleman on Insurance* (2d ed. 2003), which was "missing" from the University of Utah law library at the time of plaintiffs' initial memorandum had resurfaced by the time of preparing this reply memorandum.

[6] Compare Lee R. Russ and Thomas F. Segalla - Volume16 *Couch on Insurance 3d*, § 222:2 at page 222-11 (2000) noting "Subrogation, which technically applies only to the insurer's right to proceed against a third party responsible for a loss which the insurer has compensated pursuant to its contractual

5

In their Initial Memo, Plaintiffs noted the court cited no authority, and invited Kaman to cite any authority, standing for the proposition that the collateral source rule does not apply when a plaintiff's insurer, <u>by virtue of a right of subrogation rather than an assignment</u>, settles its subrogation claim for less than full value, i.e., for about forty cents on the dollar as occurred here. Initial Memo at 7-8. In other words, should the difference between the full value of the subrogation claim and the less than full value paid by the tortfeasor, Kaman, inure to the benefit of the tortfeasor, who contributed nothing for the insurance obtained by the tort victim, rather than to the tort victim, who paid the premium and obtained the benefit of the very insurance the court now relies upon to justify its order limiting Kaman's liability to less than forty percent of the property damages it caused!

Responding to plaintiffs' invitation, Kaman cited, without quoting from, only one case; *Wasko v. Manella*, 269 Conn. 527, 535 (2004). Opposition at 6-7. A quick review of page 535 of the *Wasko* decision reveals the phrase "collateral source rule" is to be found nowhere therein! Indeed, the phrase "collateral source rule" is missing not only from page 535, but can be found nowhere in the *Wasko v. Manella* decision! Without, at least, mentioning the "collateral source rule," it is difficult to understand how *Wasko v. Manella* could stand for the proposition that the collateral source rule does not apply when a plaintiff's insurer, <u>by virtue of a right of subrogation rather than an assignment</u>, settles its subrogation claim for less than full value.

---

obligation under a policy. . . , depends . . . on the existence of the insured's right to proceed against that entity." See also *Kroeker v. State Farm Mutual Automobile Ins. Co.*, 466 S.W.2d 105, 110 (Mo. App. 1971) (". . . [A]ssignment . . . vests *legal* title in the assignee, together with the right to maintain an action in his own name as the real party in interest. . . . In the case of subrogation, however, only an equitable right passes to the subrogee and the legal title to the claim is never removed from the subrogor, but remains with him throughout.")

The reality is *Wasko v. Manella* supports plaintiffs' position that they have not "assigned" their claims against Kaman to their helicopter hull insurers. Rather, plaintiffs' helicopter hull insurers have, by operation of law, a right of legal or equitable subrogation, i.e., a designation of entitlement to proceeds derived from plaintiffs' underlying claims against Kaman. In *Wasko v. Manella* the Connecticut Supreme Court held: (1) "the Appellate Court properly concluded that [the insurer's] right of subrogation was equitable, and not statutory, in nature"; and (2) "the Appellate Court improperly extended the analytical framework of *DiLullo* [*v. Joseph*, 259 Conn. 847, 848, 792 A.2d 819 (2002)] to the facts of the present case." *Wasko v. Manella*, 269 Conn. 527, 532, 849 A.2d 777, 781 (2004). In reaching these two conclusions, the Connecticut court explained, among other things: (1) "The law has recognized two types of subrogation: conventional; and legal or equitable"; (2) "Conventional subrogation can take effect only by agreement and has been said to be synonymous with assignment. It occurs where one having no interest or any relation to the matter pays the debt of another, and by agreement is entitled to the rights and securities of the creditor so paid"; and (3) "By contrast . . . [t]he object of [legal or equitable] subrogation . . . is the prevention of injustice. It is designed to promote and to accomplish justice and is the mode which equity adopts to compel the ultimate payment of a debt by one who, in justice, equity and good conscience should pay it." *Id.*, 269 Conn. at 532 and 849 A.2d at 781. And finally, "insurers that are obligated by a preexisting contract to pay the losses of an insured proceed in a subsequent action against the responsible party under the theory of equitable subrogation, and not conventional subrogation." *Id.*, 269 Conn. at 533 and 849 A.2d at 781-782.

Here then, for the reasons cited above, among others, there is no conventional subrogation, i.e., no legally recognizable "agreement," synonymous with assignment, by which plaintiffs transferred their rights to their helicopter hull insurers. Rather, these

7

circumstances give rise to legal or equitable subrogation the goal of which is, among other things, "to compel the ultimate payment of a debt by one who, in justice, equity and good conscience should pay it," i.e., Kaman, the tortfeasor!

The Couch treatise notes the goals (or purposes) of legal or equitable subrogation are, actually, threefold: (1) "securing the ultimate discharge of a debt by the person who in good conscience ought to pay it," i.e., "a wrongdoer who is legally responsible for the harm should not receive the windfall of being absolved from liability because the insured had the foresight to obtain, and had paid the expense of procuring, insurance for his or her protection"; (2) "preventing the insured from recovering twice for one harm"; and (3) "reimbursing the insurer for the payment which it has made." 16 *Couch on Insurance 3d*, § 222:8 at pages 222-30 through 222-32 (2000). The Ruling, concluding that the collateral source rule should not apply here, sacrifices goals one and three on the altar of goal two, i.e., the Ruling prevents "the insured from recovering twice for one harm" by (1) excusing Kaman's liability for causing, approximately, $ 2,900,000 - $3,900,000 in property damages and (2) precluding the plaintiffs/insureds/subrogors from recovering the amount necessary to reimburse "the insurer for the payment which it has made." The table on the following page demonstrates how applying the collateral source rule is the only method by which the three goals or purposes of legal or equitable subrogation can be met. Each of the following events is the result of the defective clutches.

**** The remainder of page 8 intentionally left blank ****

| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| | Description of Event | Plaintiffs/Tort Victims/Subrogors | Kaman/Tortfeasor | Insurers/Subrogees |
| A | Property Losses Caused/Suffered[7] | $-5,200,000.00 | $5,200,000.00 | $0.00 |
| B | Hull Insurance Claims Paid or Received to Date[8] | $ 3,621,908.00 | $ 0.00 | $-3,621,908.00 |
| C | Amounts Paid By or Received From Kaman/Tortfeasor[9] | $ 0.00 | $-1,315,000.00 | $1,315,000.00 |
| D | Amounts Remaining Payable By or Receivable From Kaman/Tortfeasor[10] | $ 3,885,000.00 | $-3,885,000.00 | $ 0.00 |
| E | Amounts Remaining Subject to the Right of Subrogation[11] | $-2,306,908.00 | $ 0.00 | $2,306,908.00 |
| F | Net Amounts Remaining Payable or Receivable[12] | $0.00 | $0.00 | $0.00 |

---

[7] Helog/Heli-Air lost a helicopter worth approximately $3,000,000 (replaced for approximately $4,000,000) and Mountain West/Long-Line paid approximately $1,200,000 for repairs, i.e., total property damages of about $4,200,000 or, if the replacement value applies, about $5,200,000.

[8] See Opposition at 6, i.e., $2,591,908 + $1,030,000 = $3,621,908.

[9] See Ruling at 8, i.e., $285,000 + $1,030,000 = $1,315,000.

[10] Derived by subtracting row C, column 4, what Kaman or its insurer has paid, from row A, column 4, the total "property losses" Kaman caused, i.e., $5,200,000 - $1,315,000 = $3,885,000.

[11] Derived by subtracting row C, column 5, what Plaintiffs' insurers paid, from row B, column 5, what Plaintiffs' insurers have recovered to date, i.e., $3,621,908.00 - $1,315,000.00 = $2,306,908.

[12] The addition and/or subtraction, as applicable, of each number in the respective column.

9

"The theory behind this [subrogation] principle is that absent repayment of the insurer the insured would be unjustly enriched by virtue of a recovery from both the insurer and the wrongdoer, or in absence of such double recovery by the insured , the third party [wrongdoer] would go free despite his legal obligation in connection with the loss." *Skauge v. Mountain States Tel. & Tel. Co.*, 565 P.2d 628, 630 (Mon. 1977). In contravention of the theory, the April 2005-Ruling allows Kaman to "go free" of approximately $2.9 - $3.9 million (depending upon whether fair market value or replacement value applies) of its "legal obligation in connection with the loss" when the principle of subrogation contemplates plaintiffs "double recovery," subject to their insurer's equitable right of subrogation, in order to keep Kaman from "going free" of its "legal obligation in connection with the loss."[13]

Kaman also misrepresents that this "Court correctly held that plaintiffs cannot now 'take back' the claims the insurers already asserted (and settled) against Kaman." Opposition at 7. There is nothing to "take back" when "the underlying claim is still that of the insured" and "legal title to the claim is never removed from the subrogor, but remains with him throughout." Subrogation does not transfer plaintiffs' causes of action to their insurers! "[S]ubrogation is a designation of proceeds recovered from a wrongdoer" whether those proceeds are recovered by the subrogor, i.e., plaintiffs, or the subrogee, i.e., plaintiffs' insurers. 16 *Couch on Insurance 3d*, § 222:53 at pages 222-91 and 222-92. Moreover, "[i]f the insurer pays only a part of the insured's damages, it receives only a partial, subordinate

---

[13] ". . . [S]ubrogation often is appropriately viewed as an important technique for serving the ends of justice by placing the economic responsibility for injuries on the party whose fault caused the loss without also allowing a recovery by the injured person from both an insurer and the tortfeasor that would violate the principle of indemnification." 1 Eric Mills Holmes, *Appleman on Insurance* § 3.1 at 335 (2d ed. 1996)

subrogation." 22 Eric Mills Holmes, *Appleman on Insurance* § 141.2[A](2d ed. 2003).[14] And finally, "[s]ubrogation ensures that the tortfeasor is held accountable for wrongful acts. It also ensures that the person who in good conscience ought to pay a loss (the tortfeasor) does in fact pay the loss." 22 Eric Mills Holmes, *Appleman on Insurance* § 141.1[D][3](2d ed. 2003).

Notably, in view of the court's prior reliance on the *Appleman* treatise, "[u]nder the 'collateral source' rule, a defendant is not relieved of damages if the plaintiff is made whole from a source wholly independent of the defendant." 12 Eric Mills Holmes, *Appleman on Insurance* § 89.5(2d ed. 1999).[15] Even more notable, perhaps, is the *Appleman* treatise cites a decision from the Connecticut Supreme Court as authority for the foregoing proposition, i.e., *Rametta v. Stella*, 19 Conn. App. 223, 228, 562 A.2d 67, 70 (1989), affirmed in *Rametta v. Stella*, 214 Conn. 484, 489-490, 572 A.2d 978, 981-982 (Conn. 1990). In *Rametta v. Stella*, both the court of appeals and the supreme court of Connecticut recognized "[u]nder the collateral source rule, 'a defendant is not entitled to be relieved from paying **_any part_** of the compensation due for injuries proximately resulting from his act where payment [for such injuries or damages] comes from a collateral source, wholly independent of him.' (Citations omitted). 'The basis of our well-established collateral source rule is that a wrongdoer shall not benefit from a windfall from an outside source. That rule is applicable . . . in any tort case.'" *See* 19 Conn. App. at 228, 562 A.2d at 70, and 214 Conn. at 489-490, 572 A.2d at 981-982.

---

[14] The *Appleman* treatise also recognizes "[a]n insurer may not assert a subrogation right unless the insured is made 'whole' by the insurer's payment." 22 Eric Mills Holmes, *Appleman on Insurance* § 141.2[B][1](2d ed. 2003). In other words if the insurer pays only a part of the insured's damages, as occurred here, the subrogation right is "subordinate" to the insured's right first to be made whole.

[15] Moreover, the collateral source rule is not contingent upon first making the plaintiff(s) whole. "Ordinarily, a tortfeasor is not entitled to credit in a suit brought against the tortfeasor for injuries which the tortfeasor has inflicted for *any sums* to which the insured may be entitled from a[n insurance] policy." 22 Eric Mills Holmes, *Appleman on Insurance* § 131.4 (2d ed. 2002) (emphasis supplied).

The real issue here is who has the right to release Kaman from liability for less than full value? Should it be (1) plaintiffs' insurers who can recoup their losses via subrogation and by increasing plaintiffs insurance premiums; or (2) plaintiffs who can recoup their losses only by asserting claims against the tortfeasor, Kaman? Plaintiffs respectfully submit the answer to the question is clear and the equitable concept of subrogation requires that only plaintiffs, who retain legal title to the claim against Kaman, should have the right to release Kaman from liability for less than the full value of the "property losses" Kaman caused. To preserve that right, Kaman has "no . . . right to bring [plaintiffs'] insurance into the case." See *Rexroad v. Kansas Power and Light Company*, 388 P.2d at 842.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs seek the court's orders (1) consolidating the issues of liability and damages for trial; (2) setting a scheduling order permitting completion of discovery necessary for trial; and (3) reconsidering the court's Ruling, after an opportunity for oral argument, on the issue of the application of the collateral source rule to these facts (unless, of course, the court is inclined to reverse itself on the issue without oral argument).

DATED: August 24, 2005.

The Law Offices of Robert S. Young, L.C.

Robert S. Young (ct 21985)
800 McIntyre Building
68 South Main Street
Salt Lake City, UT 84101
Tel. (801) 531-8300
Fax (801) 359-7233
rsyav8rlaw@hotmail.com

12

## V. CERTIFICATE OF SERVICE

I certify that on August 24, 2005, I caused to be filed with the court and served upon the individuals identified below, in the manner stated, the foregoing PLAINTIFFS' REPLY MEMORANDUM SUPPORTING THEIR MOTIONS SEEKING, FIRST, CONSOLIDATION, FOR TRIAL, OF THE ISSUES OF LIABILITY AND DAMAGES, SECOND, THEREAFTER, THE SETTING OF AN APPROPRIATE SCHEDULING ORDER AND, THIRD, RECONSIDERATION, AFTER ORAL ARGUMENT, OF THE COURT'S RULING ON THE APPLICATION OF THE COLLATERAL SOURCE RULE TO THESE FACTS.  The original, via overnight courier, shipping prepaid, to "be filed with the court within a reasonable time after service," as contemplated by Rule 5(d) Fed.R.Civ.P., and a courtesy copy addressed to:

Original to:

Clerk of the Court
c/o Nola Droney
450 Main Street
Hartford, CT  06103

Courtesy copy to:

Judge Alfred V. Covello
c/o Nola Droney
450 Main Street
Hartford, CT  06103

And one copy each, via first class mail, postage prepaid, addressed to:

Tim Bishop, Esq.
Michael R. Casey, Esq.
BISHOP & JACKSON
80 Ferry Blvd.
Stratford, CT  06615

Timothy A. Diemand, Esq.
Aaron Singer, Esq.
WIGGIN & DANA
One City Place
185 Asylum Street
Hartford, CT  06103-3402

C:\Documents and Settings\Robert S. Young\My Files\Mt. West v. Kaman\Motion to Consolidate Liability and Damages (Reply memo).824.wpd

13