# EXHIBIT 1

**Westlaw.**

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1778862 (D.Md.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Maryland.
THE CLARK CONSTRUCTION GROUP INC.
v.
ALLGLASS SYSTEMS, INC., et al.
No. Civ.A. DKC2002-1590.

Aug. 6, 2004.

Timothy F. Brown, J. Marcus Meeks, Arent Fox Kintner Plotkin and Kahn PLLC, Washington, DC, for Plaintiff.
Leonard Arthur Sacks, Leonard A. Sacks & Associates, P.C., Rockville, MD, David D. Gilliss, Bambi W. Stevens, Melody Ellison McGrath, Niles Barton and Wilmer LLP, Baltimore, MD, for Defendant.

MEMORANDUM OPINION
CHASANOW, J.

*1 Presently pending and ready for resolution in this breach of contract case are the motions by: (1) Plaintiff The Clark Construction Group, Inc. for partial summary judgment; (2) Defendant (and Third-Party Plaintiff) Allglass Systems, Inc. for summary judgment and to strike; (3) Defendant Colonial Surety Company for summary judgment; and (4) Third-Party Defendant Kawneer Company, Inc. for summary judgment. The issues have been fully briefed and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the reasons that follow, the court will grant the motions by Clark and Kawneer and will deny the motions by Allglass and Colonial.

I. Background

A. Factual Background

Unless otherwise stated, the following facts are uncontroverted. This case arises out of two construction projects: (1) an office building in Washington, DC (1201 Eye Street Project) and (2) the Chevy Chase Bank headquarters building in Bethesda, Maryland (Chevy Chase Bank Project). On these projects, Plaintiff The Clark Construction Group, Inc. (Clark) was the general contractor, Defendant Allglass Systems, Inc. (Allglass) was a subcontractor, and Defendant Colonial Surety Company (Colonial) was Allglass' surety. On the 1201 Eye Street Project, Third-Party Defendant Kawneer Company, Inc. (Kawneer) designed and manufactured the window systems installed by Allglass there.

*1. 1201 Eye Street Project*

On April 22, 2000, Clark contracted with the Owner, 1215 Eye Street, N.W., Associates, L.P., to construct an office building located at 1201/1215 Eye Street, in accordance with the drawings and specifications provided, for a guaranteed maximum price of $24.5 million (Contract). The Owner's representative for purposes of providing any required direction to Clark was The John Akridge Companies (Akridge). Clark and Allglass executed a subcontract agreement for the 1201 Eye Street Project (Subcontract) on July 7, 2000, at a price of $2,367,000.00. Under the Subcontract, Allglass was to perform specified portions of Clark's Contract with the Owner-in particular, the installation of windows and related panels, glazed curtainwall, aluminum curtainwall, and, as applicable, caulking and sealing. The Contract specifications that governed Allglass' work required that the windows be leak-free. The Subcontract further required that Allglass complete installation of the window system within 20 weeks. Allglass began work in or about May 2001 or early June 2001.

Pursuant to the Subcontract, Allglass selected for the project, and Akridge ultimately approved, windows manufactured by Kawneer, which had passed certain quality control tests. Allglass executed a purchase order with Kawneer to provide shop drawings, test information, installation, fabrication instructions, and to supply the extrusions necessary for fabrication of the window systems. Akridge hired Architectural Testing, Inc. (ATI) to perform water penetration tests on the windows installed by Allglass to determine if they were leak-free. ATI performed three rounds of water penetration tests in September and October 2001. Allglass failed all three tests. Kawneer, the window manufacturer, attended the third round of testing and subsequently issued a report detailing the results of its own investigation of the Allglass

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1778862 (D.Md.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

installation. In its report summary, Kawneer concluded that the installation contained "numerous deficiencies" and recommended that Allglass "undertake remedial inspection and repair efforts on site." Paper 106, Ex. 17 at Sec. VI.

*2 In late October 2001, Allglass submitted to Clark a Remedial work Action Plan, based on the Kawneer report. Allglass began its remediation of the windows in early December 2001 and, during this time, it also continued to perform initial Subcontract work not yet completed. In February 2002, ATI tested the remediated windows to evaluate the reinstallation; three of the five specimens initially failed the ATI tests. Following these test failures, Kawneer again visited the site to inspect the windows and issued a follow-up letter report detailing its findings, which mirrored those of its initial report.

On February 21, 2002, Clark issued a "Notice of Default/Cure Opportunity" to Allglass, in which it declared Allglass "in default." *Id.*, Ex. 25. Clark ordered Allglass to submit, within three days, a written plan to correct all workmanship and other defects, a written plan for repairing related exterior damage, and a written detailed schedule for completion of all its work. One week later, the Owner sent Clark a letter placing it "in default" for failing "to complete and test the window system on-time," and directed Clark to provide written plans for ensuring completion of the window system. *Id.*, Ex. 27. On March 7, 2002, Clark notified Allglass that, due to its failure to cure the default, it would supplement its work, pursuant to the Subcontract. Clark then hired PCC Component Construction, Inc. (PCC) to supplement the remediation effort.

On March 22, 2002, Allglass announced that it had completed the remediation work. ATI tested the windows for leaks and found that some of them still failed the water penetration tests. As a result, and due to deficiencies with installation of certain "sawtooth" windows, Clark directed PCC to complete remediation of Allglass' remaining work and to repair damage to the exterior of the building allegedly caused by Allglass' attempted remediation. PCC finished the window installation work in October 2002, at which time the Owner accepted the work as complete. In August and September 2002, Clark negotiated the final settlement of the 1201 Eye Street Project with the Owner. Clark claims that it incurred significant costs, as a result of Allglass' allegedly deficient installation work, and now seeks to recover them.

*2. Chevy Chase Bank Project*

On January 9, 1998, Clark contracted with the Owner, Chevy Chase Bank, to construct an office building. Clark and Allglass executed a subcontract agreement for the Chevy Chase Bank Project (Subcontract) on November 18, 1999, at a price of $3,940,000.00. Allglass was to perform specified portions of Clark's Contract with the Owner-in particular, the furnishing and installation of glass and glazing, and, as applicable, caulking and sealing. Clark alleges that Allglass breached its obligations under the Subcontract. In November 2002, Clark negotiated the final settlement of the Chevy Chase Bank Project with the Owner.

*B. Procedural Background*

*3 On May 2, 2002, Clark filed a complaint for breach of contract, stemming from these two projects, against Allglass and Colonial (its surety). On October 30, 2002, Allglass filed a counterclaim against Clark for breach of contract and quantum meruit. On January 22, 2003, Allglass filed a third-party complaint against Kawneer for breach of warranty. Clark filed a motion for partial summary judgment, on February 23, 2004, against Allglass and Colonial. In response, on April 2, 2004, Allglass filed a cross-motion for partial summary judgment and Colonial filed a cross-motion for summary judgment, both against Clark. On March 31, 2004, Kawneer filed a motion for summary judgment against Allglass.

II. Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson,* 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties,* 810 F.2d 1282, 1286 (4th Cir.1987); *Morrison v. Nissan Motor Co.,* 601 F.2d 139, 141 (4th Cir.1987). The moving party bears the burden of showing that there is no

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1778862 (D.Md.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

genuine issue as to any material fact and that he is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Catawba Indian Tribe of South Carolina v. State of S.C., 978 F.2d 1334, 1339 (4th Cir.1992), cert. denied, 507 U.S. 972, 113 S.Ct. 1415, 122 L.Ed.2d 785 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. See U.S. v. Diebold, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Gill v. Rollins Protective Servs. Co., 773 F.2d 592, 595 (4th Cir.1985). A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element ... necessarily renders all other facts immaterial." Celotex Corp., 477 U.S. at 323. Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial. See Anderson, 477 U.S. at 256; Celotex Corp., 477 U.S. at 324. However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." Detrick v. Panalpina, Inc., 108 F.3d 529, 536 (4th Cir.), cert. denied, 522 U.S. 810, 118 S.Ct. 52, 139 L.Ed.2d 17 (1997). There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

*4 The inquiry involved on a summary judgment motion "necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." Anderson, 477 U.S. at 252. Where the movant also bears the burden of proof on the claims at trial, as Plaintiff does in part here, it "must do more than put the issue into genuine doubt; indeed, [it] must remove genuine doubt from the issue altogether." Hoover Color Corp. v. Bayer Corp., 199 F.3d 160, 164 (4th Cir.1999) (internal quotation omitted), cert. denied, 530 U.S. 1204, 120 S.Ct. 2198, 147 L.Ed.2d 234 (2000); see also Proctor v. Prince George's Hosp. Ctr., 32 F.Supp.2d 820, 822 (D.Md.1998) (evidentiary showing by movant "must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party") (internal quotation and italics omitted). Summary judgment will not be appropriate unless the movant's evidence supporting the motion "demonstrate[s] an absence of a genuine dispute as to every fact material to each element of the movant's claim and the non-movant's response fails to raise a genuine issue of material fact as to any one element." McIntyre v. Robinson, 126 F.Supp.2d 394, 400 (D.Md.2000) (internal citations omitted).

When faced with cross-motions for summary judgment, as in this case, the court must consider "each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir.2003) (internal quotation omitted). See also havePower, LLC v. Gen. Electric Co., 256 F.Supp.2d 402, 406 (D.Md.2003) (citing 10A Charles A. Wright and Arthur R. Miller, Federal Practice & Procedure § 2720 (3d ed.1983)). The court reviews each motion under the familiar standard for summary judgment, supra. The court must deny both motions if it finds there is a genuine issue of material fact, "[b]ut if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Federal Practice & Procedure § 2720.

III. Analysis

A. Choice of Law

The claims arising out of each Subcontract between Clark and Allglass are governed by "the laws of the jurisdiction where the project is located." Paper 106, Ex. 5 at ¶ 22.d., Ex. 6 at ¶ 22.d. Thus, District of Columbia law shall apply to claims for the 1201 Eye Street Project, while Maryland law shall apply to claims for the Chevy Chase Bank Project.[FN1]

> FN1. Allglass argues that the clause in the Subcontracts, which provides the Courts of Maryland with "sole and exclusive jurisdiction" over such claims, "does not require that the Maryland court shall apply D.C. law." Paper 106, Ex. 5 at ¶ 11.c., Ex. 6 at ¶ 11.c.; Paper 130 at 16. However, Allglass ignores the operative choice of law provision in the Subcontracts, which does impose such a requirement.

B. Clark's Motion for Partial Summary Judgment (against Allglass and Colonial)

Clark seeks summary judgment affirmatively against

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Allglass and Colonial, on their liability to Clark for certain increased costs and other damages incurred by Clark due to Allglass' failure to install leak-free windows, and to do so in a timely manner, as required by the 1201 Eye Street Project Subcontract. Clark further seeks partial summary judgment dismissing all but five of Allglass' counterclaims for breach of contract, as well as summary judgment on Allglass' quantum meruit claims, for both the 1201 Eye Street and Chevy Chase Bank Projects.

*1. Clark's Affirmative Summary Judgment Motion (1201 Eye Street)*

*(a) Liability of Allglass*

**\*5** Under District of Columbia law, a breach of contract is "an unjustified failure to perform all or any part of what is promised in a contract entitling the injured party to damages." <u>Bembery v. District of Columbia, 758 A.2d 518, 520 (D.C.2000)</u> (quoting <u>Fowler v. A & A Co., 262 A.2d 344, 347 (D.C.1970)</u>). Therefore, to prove that Allglass breached the Subcontract, Clark must show that Allglass "failed to perform as required by the agreement." <u>Bldg. Servs. Co. v. Nat'l R.R. Passenger Corp., 305 F.Supp.2d 85, 92 (D.D.C.2004)</u> (citing <u>Dist. Cablevision Ltd. P'ship v. Bassin, 828 A.2d 714, 729 (D.C.2003)</u>). Clark contends that Allglass breached its obligations under the Subcontract in two material ways, by failing to: (1) install leak-free windows and (2) complete the installation work within 20 weeks.

The "Performance Criteria" of the Subcontract required Allglass to "[d]esign, fabricate, and install each type of curtain wall, including joints between window walls and other work, to effectively prevent leakage of either water or air into the building." Paper 106, Ex. 8 at ¶ 1.3.C.8. Clark argues that Allglass clearly breached the Subcontract by not installing leak-free windows. As evidence, Clark provides, *inter alia*, a series of reports, conducted by various experts, which document the failed tests performed on the windows installed by Allglass. In October 2001, Kawneer reported that it found "numerous deficiencies" with the installed windows and made clear to Allglass that the remediation "will certainly require a comprehensive effort on your firm's part to exhaustively review, inspect, and repair the work as necessary." *Id.*, Ex. 17 at Sec. VI. A separate field observation report by Curtain Wall Design and Consulting, Inc. (CDC) confirmed "similar deficiencies to those mentioned in the Kawneer October 25, 2001 report" and recommended implementation of a "quality control program." *Id.*, Ex. 21. [FN2] That same month, ATI tested the windows and also found that "all specimens failed to meet the requirements for water penetration." *Id.*, Ex. 18. [FN3] Later, in February 2002, ATI tested the remediated windows to evaluate the reinstallation, concluding that three of the five specimens initially failed the water penetration tests. *See id.*, Ex. 30. Finally, ATI reported that of tests performed on 11 specimens in March 2002, five "failed to meet the requirements for water penetration." *Id.*, Ex. 35.

FN2. CDC is a window expert employed by Allglass.

FN3. Another test performed by ATI at this time revealed that the windows "failed to meet the performance requirements," due to water leakage. *Id.*, Ex. 19.

Allglass does not challenge the substantive findings of these expert reports. Instead, Allglass argues that the windows leaked because Clark performed an improper and "more stringent" test (a "chamber test") on the windows, rather than "a hose test as required by the specifications." Paper 111 at 25. As Clark correctly notes, however, the Owner had the contractual right to order whatever testing it deemed appropriate. The "General Conditions," as prescribed by the American Institute of Architects (AIA), provide in pertinent part: If the Owner determines that "portions of the Work require additional testing, inspection or approval ... the [Owner] will ... instruct the Contractor to make arrangements for such additional testing, inspection or approval." Paper 106, Ex. 4 at ¶ 13.5.2. (as modified by Contract (Ex. 3), sub-Ex. D at 23). [FN4] This contractual interpretation is unambiguous and unrefuted by Allglass. [FN5]

FN4. The Contract between Clark and the Owner had expressly "incorporated herein by reference ... the text and contents" of these "General Conditions." *Id.*, Ex. 3 at Art. VI.C. *See* <u>U.S. on Behalf of Dep't of Labor v. Ins. Co. of North America, 131 F.3d 1037, 1042 (D.C.Cir.1997)</u> ("When a contract incorporates a regulation by reference, that regulation becomes a part of the contract for the indicated purposes as if the words of that regulation were set out in full in the contract"). The Subcontract between Clark

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and Allglass, in turn, incorporated the Contract-as one of the "Contract Documents," under whose terms Allglass was to perform "in strict accordance and full compliance." Paper 106, Ex. 5 at ¶ 1.a., sub-Ex. A at 4.

> FN5. In light of this discussion, the court need not address Allglass' bald assertion that "[b]oth the change in testing method and the demand to meet more stringent testing requirements were constructive changes to the Subcontract." Paper 130 at 8.

*6 Allglass also contends that the windows failed the water penetration tests because the sealant was not given proper time to cure. Again, Allglass' unsupported argument unravels in the face of the documentary evidence and its own admissions. Any possible issue with curing of the sealant was relevant only to the first test, conducted in September 2001. As Clark correctly argues, and as discussed *supra,* various "subsequent tests were performed over the following seven months where caulk had been given ample time to cure, and those tests still failed." Paper 124 at 8. Indeed, the Kawneer report notes that its experts performed the test, in mid-October 2001, "[a]fter the reworked area was left for a period of one week to allow the sealant to cure." Paper 106, Ex. 17 at Sec. 5. FN6 None of the other subsequent reports mention lack of cured sealant as a factor in the failed tests, nor does Allglass offer any evidence that this condition was at issue.

> FN6. Glen Christie, director of operations for Allglass, even wrote to a Clark official, at this time, that the one-week "delay in performing the [Kawneer] test is per ... recommended curing time for the perimeter seal." Paper 110, Ex. 16.

Moreover, Allglass stated in its remedial work action plan, dated October 23, 2001, that "several deficiencies have been observed ... of the existing installation ... and are direct contributing factors to the results of field water testing as performed by ATI. All the deficiencies are items that are not installed as per Kawneer Company installation and assembly instructions." *Id.,* Ex. 16. Even as late as April 2002, Allglass acknowledged that the tests performed on the windows revealed "many deficiencies due to the lack of proper sealant in the locations where they were required, consequently, resulting in test failure and water coming into the building. Unfortunately this was not just at one window locations [sic], it was many." Paper 124, Ex. 90.

Under the Subcontract, Allglass was required to complete all of its work on the 1201 Eye Street Project within 20 weeks. *See* Paper 106, Ex. 5, sub-Ex. B at ¶ 24. Indeed, the Subcontract made clear that "[t]ime is of the essence in the execution of the work of this Agreement." *Id.* and Ex. 5 at ¶ 8.a. Assuming that Allglass began work on June 1, 2001, as it asserts, the work should have been completed by November 1, 2001. Clark argues that Allglass plainly failed to meet this deadline. As an initial matter, the subsequent ATI reports concluding that Allglass had not installed leak-free windows were based upon failed water penetration tests conducted in February and March of 2002-months after the stated deadline. Moreover, the words of Allglass undermine its assertion that it completed the installation in a timely fashion. In January 2002, Rein Clabbers, president of Allglass, told Clark that "our primary focus is to complete this job." Paper 124, Ex. 71. In February 2002, Clabbers informed Colonial, Allglass' surety, that he had just met with Clark and the Owner "to discuss the remedial work that is being performed and what ASI's timeframe is for completion." *Id.,* Ex. 82. FN7 Finally, in March 2002, Clabbers stated that "[w]e are extremely close to completing this project." *Id.,* Ex. 88.

> FN7. ASI stands for Allglass Systems, Inc.

*7 Once again, Allglass fails to rebut this evidence with any of its own. To support its assertion that it completed installation by November 1, 2001, Allglass relies solely on a "core and shell" certificate issued by the District of Columbia on that date. However, the letter certifies only that the core area and shell of the building were in compliance with various applicable codes. Indeed, the certificate makes clear: "This letter does not indicate that all of the construction at the premises have been completed." *Id.,* Ex. 59. The court is at a loss to understand how Allglass, without any apparent trace of irony, can ignore the plain language of this two-paragraph letter, while simultaneously citing to it, and ask: "How can Clark blatantly ignore its own Exhibit?" Paper 130 at 6. FN8

> FN8. In addition, Allglass argues that it began work on June 1, 2001, because of a precast concrete delay. As Clark correctly notes, however, this delay "occurred before

Allglass ever started work on the Project." Paper 124 at 21. Allglass still was obligated to complete the work within 20 weeks of when it began work-*i.e.*, November 1, 2001. Thus, any suggestion by Allglass that it did not adhere to the deadline due to a "concurrent delay" with the precast concrete must fail. The uncontroverted evidence demonstrates that any delays in the precast concrete "had no impact on the beginning or performance" by Allglass of installing the windows-and, therefore, "there was no 'concurrent' delay in this period." *Williams Enters., Inc. v. Strait Mfg. & Welding, Inc., 728 F.Supp. 12, 16 (D.D.C.1990), aff'd, 938 F.2d 230 (D.C.Cir.1991).*

(b) *Liability of Colonial* [FN9]

FN9. Clark's motion for partial summary judgment pertains to Colonial only with regard to the 1201 Eye Street Project.

Suretyship creates a "tripartite relationship," whereby the surety "guarantees and assumes joint and several responsibility ... for the performance of a promise" made by the principal. 4 Bruner & O'Connor, Construction Law § 12:2 (2004); *see also Goldberg, Marchesano, Kohlman, Inc. v. Old Republic Sur. Co., 727 A.2d 858, 860 (D.C.1999)* ("A surety bond is a contract whereby one party, the surety, agrees to answer for the debts of another, the principal"). Allglass, as principal, and Colonial, as its surety, executed a payment bond, on August 1, 2000, under which they both "are held and firmly bound unto The Clark Construction Group, Inc." (the obligee), in the amount of the Subcontract ($2,367,000.00). Paper 106, Ex. 47. That is, Colonial guaranteed to Clark that Allglass would "perform a construction contract and pay those who contribute labor and material to the bonded project." 4 Bruner & O'Connor § 12:2. Under District of Columbia law, "a surety's obligation must be measured by the conditions stated in the bond." *Goldberg, 727 A.2d at 861* (quoting *Bevard v. New Amsterdam Cas. Co., 132 A.2d 157, 159 (D.C.1957))*; *see also U.S. for Use of Modern Elec., Inc. v. Ideal Elec. Sec. Co., Inc., 868 F.Supp. 10, 13 n. 3 (D.D.C.1994)* (court should construe the language of a surety bond "in connection with the contract with which it was executed") (internal quotation omitted).

In the instant case, the performance bond clearly binds Colonial, jointly and severally, for any liability incurred by Allglass for failing to "well and truly perform" its Subcontract obligations. Paper 106, Ex. 47. It is well established in the construction suretyship relationship that "the surety's bond obligation is co-extensive with that of the contractor under the bonded contract and is conditioned upon and triggered by the bonded contractor's material default of its performance or payment obligations under the bonded contract." 4 Bruner & O'Connor § 12:2. Indeed, as the Supreme Court has long held, "nothing is plainer than the rule that a surety in a bond is liable to the same extent to which his principal is liable, by force of the bond." *Gaussen v. U.S., 97 U.S. 584, 590, 24 L.Ed. 1009 (1878).* Therefore, Colonial bears the same liability as Allglass, arising from Allglass' breaches of the Subcontract.

*8 Colonial argues that Clark breached the Subcontract, thereby precluding recovery for damages, because it failed to provide a proper cure notice to Allglass. [FN10] Under the Subcontract, after serving three days' written notice, if the deficiency specified in the notice remains:

FN10. Allglass discusses the cure notice issue fleetingly in its summary judgment papers. Nevertheless, any arguments by Allglass that the cure notice was insufficient fail for the same reasons as do those of Colonial.

Clark, at its option, ... may (i) take such steps as are necessary to overcome the condition, in which case the Subcontractor shall be liable to Clark for the cost thereof, (ii) terminate for default Subcontractor's performance of all or a part of the Subcontract work. Paper 106, Ex. 5 at ¶ 10.a. In a letter to Allglass dated February 21, 2002, Clark stated: "Allglass Systems, Inc. is in default of its obligations under its Subcontract on this project." *Id.*, Ex. 25. Specifically, Clark informed Allglass it was in default because (a) it had failed to pay its subcontractors and (b) completion of its work was "over five (5) months late and the recent window tests ... failed again." *Id.* Clark ordered Allglass to submit, within three days, various written plans and schedules for repairing and completing its work (*see supra* ); Allglass also was "required to begin corrective actions within three days." *Id.* Failure to do so, Clark warned, "is extremely serious" and any damages it incurred as a result of Allglass' deficient performance "are your responsibility, and that of your surety." *Id.* Allglass did not comply with the notice, and Clark was

compelled to hire PCC, at an additional cost, to complete the work. PCC completed the remedial work in October 2002. *See id.,* Ex. 49.

A legally sufficient cure notice "must fairly apprise the contractor and surety of the specific defaults which the obligee regards as sufficiently material to future contract performance to warrant termination of the contract if the defaults are not cured." 5 Bruner & O'Connor, Construction Law § 12:41 (2004). Clark met this requirement because its cure notice "plainly declared [Allglass] in default on the [Subcontract]." *U.S. Fid. and Guar. Co. v. Braspetro Oil Servs. Co., 369 F.3d 34, 57 (2d Cir.2004)*; *see also Summitt Investigative Serv., Inc. v. Herman, 34 F.Supp.2d 16, 18 (D.D.C.1998)* ("cure notice ... warned [party] that it risked incurring an immediate default on the contract"). The letter from Clark-even titled "Re: Notice of Default/Cure Opportunity"-and explanation therein, together with the "plethora of correspondence" between Clark and Allglass about Allglass' deficient performance, provided adequate notice to Allglass and Colonial of the basis for declaring Allglass in default. Paper 106, Ex. 25; Paper 124 at 25. *Cf. L & A Contracting Co. v. Southern Concrete Servs., Inc., 17 F.3d 106, 111 (5th Cir.1994)* (purported notice insufficient where no correspondence from contractor to subcontractor "even contained the word 'default', [or] ... an unequivocal declaration of default"). For these reasons, any arguments by Colonial to the contrary are simply unavailing.

*9 In sum, Clark has demonstrated that Allglass and Colonial are liable, as a matter of law, for Allglass' breaches of the Subcontract by failing to install leak-free windows and to comply with the 20-week deadline. Accordingly, Clark's motion for partial summary judgment, as to the liability of Allglass and Colonial, will be granted. [FN11]

FN11. Both Allglass and Colonial argue that Clark breached the 1201 Eye Street Subcontract by improperly withholding "approximately $240,000.00" in funds due to Allglass on another project, for 799 Ninth Street. Paper 111 at ¶ 44. The Subcontract provides, in pertinent part:
Clark may withhold amounts otherwise due under this Subcontract to cover Clark's reasonable estimate of any costs or liability Clark has incurred or may incur for which [Allglass] may be responsible under this Subcontract.

Paper 106, Ex. 5 at ¶ 4.g. (as modified by sub-Ex. F). However, the record demonstrates that Clark withheld monies on the 1201 Eye Street Project solely on the basis of Allglass' deficient work and failure to pay its subcontractors; neither Allglass nor Colonial offer any evidence in opposition. To the contrary, in a letter titled "Re: 779[sic] 9th St. payment," Rein Clabbers, president of Allglass, wrote to Brian Abt, executive vice president of Clark: "It is my understanding that you have placed a hold on the payment of $24,5839 [sic], *which is for monies that are owed for a requisition on 799 9th St."* Paper 111, Ex. 18 (emphasis added). Therefore, any sums withheld by Clark on the 799 Ninth Street Project-and any arguments by Allglass and Colonial on the issue-are irrelevant in this case.

*(c) Damages*

The inquiry now shifts to the damages Clark may recover as a result of the breaches. The Subcontract provides that Allglass "shall be liable to Clark for all costs Clark incurs as a result of [Allglass'] failure to perform this Subcontract in accordance with its terms." Paper 106, Ex. 5 at ¶ 6.b. Clark seeks recovery of the following costs and damages, as set forth in its statement of damages (Paper 106, Ex. 43) and the declaration of its executive vice president, Brian Abt (Paper 106, Ex. 1):(1) costs incurred to complete Allglass' work and repair damaged work, *i.e.,* the retention and payment of PCC for window installation, under ¶ 6.b. of the Subcontract; (2) payments to Allglass' subcontractors, under ¶ 4.d. of the Subcontract; (3) Clark's increased "General Conditions," *i.e.,* supervision and time-related costs, under ¶ 6.b. of the Subcontract; (3) a reduction in the final payment to Clark from the Owner, via settlement, under ¶ 6.b. of the Subcontract; and (4) attorney's fees, under ¶ 6.b. of the Subcontract. [FN12] In total, Clark claims increased costs and damages in the amount of $3,142,036.00, exclusive of attorney's fees.

FN12. Clark initially had sought "a 10% mark-up on Clark's increased costs," based on ¶ 6.f. of the Subcontract. Paper 106 at 3, 25. However, an addendum to the Subcontract specifically deleted this provision "in its entirety." *Id.,* Ex. 5, ¶ 33, sub-Ex. F at ¶ 4. Therefore, Clark has

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-01746-AVC    Document 105-3    Filed 03/24/2006    Page 9 of 19

Not Reported in F.Supp.2d                                                                                              Page 8
Not Reported in F.Supp.2d, 2004 WL 1778862 (D.Md.)
(Cite as: Not Reported in F.Supp.2d)

withdrawn this claim. *See* Paper 124 at 2, n. 1.

Because the court has found that Allglass breached the Subcontract, Allglass is therefore liable to Clark for each category of damages. Clark may recover damages, the amount of which to be proven at trial, from either Allglass or Colonial, or both. The amount of costs recoverable presents genuine issues of material fact and therefore is a matter for trial, where the each party may make its case.

*2. Clark's Defenses Against Allglass' Counterclaims (1201 Eye Street and Chevy Chase Bank)*

*(a) Subcontract Damages*

Allglass filed a counterclaim against Clark, alleging that Clark breached the 1201 Eye Street Project Subcontract by, *inter alia,* failing "to schedule the Project and coordinate the work of the subcontractors [and] ... to coordinate the work of the trades and schedule the work." Paper 18 at ¶¶ 29-30. Allglass also claimed that "Clark directed changes in sequence of construction and additional work for which it failed and refused to compensate Allglass." *Id.* at ¶ 31. As relief, Allglass seeks recovery for a host of damages, approximately $2.5 million, it allegedly incurred as a result-both for initial work and remediation efforts. *See* Paper 106, Ex. 45 (1201 Eye Street Summary of Damages).

Clark argues that all but five of Allglass' claims on the 1201 Eye Street Project must fail because Allglass failed to provide a timely notice and submission of claims for increased costs due to purported extra work performed, as required by the Subcontracts. On the Chevy Chase Bank Project, Clark contends that all such claims by Allglass must fail for this reason. Each Subcontract requires that, in order to recover "equitable adjustment in the Subcontract Price" for extra "changes" ordered by Clark, Allglass must "notify Clark within three (3) days ... and seek a confirmation from Clark." *Id.,* Ex. 5 at ¶ 9.d., Ex. 6 at ¶ 9.d. Failure by Allglass to comply with this requirement, however, "shall constitute a waiver of the right to compensation." *Id.* Furthermore, Allglass also must submit an additional notification "in writing not later than ten (10) days after [its] knowledge of the claim." *Id.* at ¶ 11.a.

*10 The notice requirements and a period of time, for changes and claims clauses, "typically are defined by contract"-as in the Subcontracts here. 1 Bruner & O'Connor, Construction Law § 4:35 (2004). For these Subcontracts, "[t]imely notice of claims is a matter of fundamental fairness" for Clark, as the recipient of the notice, to afford it the opportunity to present such claims to the Owner for final settlement. *Id.* [FN13] The 10-day claim submission requirement imposes an additional barrier to recovery; however, "[w]here clear and unambiguous, and not waived by agreement or conduct, such requirements are enforced." 1 Bruner & O'Connor, Construction Law § 4:36 (2004). The language of the Subcontracts, *supra,* is unquestionably clear and unambiguous, with regard to the claim notice and claim submission requirements.

FN13. As explained in a treatise on the subject matter:
Fairness inherent in timely notice permits the recipient of the notice to: (1) assess the implications and potential liability that may be created; (2) investigate whether the claimed item truly is "extra" to the original contractual undertaking; (3) document costs incurred in performance of the extra work; and (4) fairly adjust the contract price before memories fade, documents are lost and the facts recede into the "construction haze."
1 Bruner & O'Connor, Construction Law § 4:35 (2004).

Clark contends that of the 21 items of damages listed on the 1201 Eye Street Project, Allglass failed to file a mandatory written claim for 15 items. [FN14] Allglass does not maintain, or even suggest, that it filed these claims. In fact, Richard Metzler, whom Allglass designated as its Rule 30(b)(6) corporate representative on damages, confirmed in his deposition testimony that Allglass did not submit any written claims for items 6-22. *See* Paper 106, Ex. 39 at 179-233. Instead, Allglass asserts that it was excused from the written claim requirement because "Clark actually was provided with notice of the claims by Allglass throughout the Project." Paper 130 at 17. Allglass cites to three letters written by Clabbers to Clark as evidence of "[c]lear notices regarding Allglass' claims." *Id.* at 16-17. These letters, even in their most liberal interpretation, fall well short of the Subcontract requirements for recovery of change claims. Moreover, Allglass provides no properly supported evidence that Clark had actual knowledge of these claims, much less that "Clark admitted having notice." Paper 111 at 36. A purported "claim for additional compensation" is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1778862 (D.Md.)
(Cite as: Not Reported in F.Supp.2d)

Page 9

insufficient where, as with that of Allglass here, "[i]t is devoid of specific figures and supporting documentation." *Vermont Marble Co. v. Baltimore Contractors, Inc.,* 520 F.Supp. 922, 928 and at n. 8 (D.D.C.1981).

> FN14. These consist of items 6 through 22, as Allglass had withdrawn the damages previously claimed as item 21. See Paper 106, Ex. 45.

In sum, the failure to submit items 6-22 as claims to Clark, as required by the Subcontract, operates as a waiver [FN15] and precludes Allglass' recovery of these damages in connection with the 1201 Eye Street Project. *See U.S. for Use and Benefit of Chase Somerset Corp. v. Becon Servs. Corp.,* 837 F.Supp. 461, 465 (D.D.C.1993) (subcontractor denied recovery where "plain, unambiguous language" of subcontract provided "in no uncertain terms ... that no claim for additional compensation would be considered unless itemized and presented within 10 days"). Accordingly, Clark's motion for partial summary judgment, as to damages items 6-22, will be granted. Disputed issues of material fact remain regarding recovery of items 1-5.

> FN15. As explained in a treatise on construction law:
> It is a relatively common occurrence that participants to a construction project will act or fail to act in such a manner so as to lose the ability to enforce a right or claim.... Waiver is a sole or unilateral act. A party to a construction contract can waive a right merely by acting or failing to act in a certain way.
> 2 Bruner & O'Connor, Construction Law § 7:148 (2004). The failure of Allglass to comply with the pertinent provision of the Subcontracts is a classic illustration of waiver.

*11 Clark seeks summary judgment against Allglass for all of its counterclaims on the Chevy Chase Bank Project. Clark states that Allglass failed to file written claims for any alleged extra damages, as provided in the sworn declaration by Richard Rizzo, vice president of Clark who supervised Allglass' performance on the Chevy Chase Bank Project. *See* Paper 106, Ex. 2 at ¶ ¶ 2, 6-7. In an affidavit, Clabbers asserts that "Allglass provided notice and submitted supporting information in support of its claims" on the Chevy Chase Bank Project. Paper 111, Ex. 41 at ¶ 52. However, no evidence of the requisite notice to Clark or other such "supporting information" appears in the record.

It is well established that "a [counterclaim] plaintiff must 'set forth' by affidavit or other evidence 'specific facts' to survive a motion for summary judgment." *Bennett v. Spear,* 520 U.S. 154, 168, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (quoting Fed.R.Civ.P. 56(e)). [FN16] The Clabbers affidavit, the only "evidence" relied on by Allglass (aside from unsupported assertions in its papers), references no documentation of any purported notices in the record; nor does Clabbers provide dates for these notices or any other such basic details. Accordingly, Clark's motion for summary judgment, as to these Chevy Chase Bank counterclaims, will be granted. [FN17]

> FN16. Rule 56(e) provides, in pertinent part: When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.
> Fed.R.Civ.P. 56(e).

> FN17. Clark also correctly points out that Allglass "has never specified the damages it seeks to recover" on the Chevy Chase Bank Project. Paper 106 at 32.

*(b) Quantum Meruit*

Allglass included claims for quantum meruit on both Projects in its counterclaim. Quantum meruit is a theory of recovery that "rests on a contract implied in fact, that is, a contract inferred from the conduct of the parties." *U.S. ex rel. Modern Elec., Inc. v. Ideal Elec. Sec. Co., Inc.,* 81 F.3d 240, 246 (D.C.Cir.1996). For this reason, neither the District of Columbia nor Maryland permits quantum meruit claims when an express written contract exists between the parties. *See, e.g., Albrecht v. Comm. on Employee Benefits of Fed. Reserve Employee Benefits Sys.,* 357 F.3d 62, 69 (D.C.Cir.2004) ("there can be no claim for unjust enrichment when an express contract exists between the parties") (quoting *Schiff v. Am. Ass'n of Retired*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-01746-AVC    Document 105-3    Filed 03/24/2006    Page 11 of 19

Not Reported in F.Supp.2d                                                                Page 10
Not Reported in F.Supp.2d, 2004 WL 1778862 (D.Md.)
(Cite as: Not Reported in F.Supp.2d)

*Persons*, 697 A.2d 1193, 1194 (D.C.1997)); *Chancellor v. L.J. Hooker Commercial Real Estate, Inc.*, 690 F.Supp. 35, 39 (D.D.C.1988) ("In this jurisdiction, one cannot recover under quantum meruit when compensation of the parties is covered by a written contract"); *Dale Denton Real Estate, Inc. v. Fitzgerald*, 635 A.2d 925, 928 (D.C.1993) ("There is no need to resort to a quasi-contract claim based on *quantum meruit* if a true contract was in existence at the time the services were performed"); *Kwang Dong Pharm. Co. v. Han*, 205 F.Supp.2d 489, 497 (D.Md.2002) (absent evidence of fraud or bad faith, "unjust enrichment claims are barred where an express contract exists"); *Abt Assoc., Inc. v. JHPIEGO Corp.*, 104 F.Supp.2d 523, 534 (D.Md.2000) ("when there is an express contract dealing specifically with the services rendered, quantum meruit is unavailable") (quoting *First Nat'l Bank v. Burton, Parsons & Co.*, 57 Md.App. 437, 451, 470 A.2d 822, 829 (1984)), *aff'd*, 9 Fed.Appx. 172 (4th Cir.2001) (unpublished disposition).

*12 It is uncontroverted that the Subcontracts, executed between Clark and Allglass, governed the terms, scope and compensation (and all other relevant aspects) of the 1201 Eye Street and Chevy Chase Bank Projects throughout their relationship. Allglass cannot recover under quantum meruit in the face of such express, properly enforceable contracts. Accordingly, Clark's motion for summary judgment, as to Allglass' quantum meruit claims on both Projects, will be granted.

*C. Allglass' Motion for Summary Judgment (against Clark)*

Based on the foregoing discussion granting Clark's motion for partial summary judgment, it follows that Allglass' motion for summary judgment must be denied. Allglass has not shown that it is entitled to judgment as a matter of law.

*D. Colonial's Motion for Summary Judgment (against Clark)*

Likewise, based on the foregoing discussion granting Clark's motion for partial summary judgment, it follows that Colonial's motion for summary judgment must be denied. Colonial has not shown that it is entitled to judgment as a matter of law.

*E. Kawneer's Motion for Summary Judgment (against Allglass)*

Allglass filed a third-party complaint against Kawneer, the window manufacturer which sold Allglass the components it used for installation on the 1201 Eye Street Project, for "Kawneer's failure to properly design the corner windows." Paper 23 at ¶ 31. [FN18] Allglass alleges that these corner windows leaked and thus Kawneer should bear liability for the claims Clark filed against Allglass. As relief, Allglass seeks recovery in the amount of $700,000.00 and indemnification for Clark's claims against Allglass. In its summary judgment motion, Kawneer argues, *inter alia*, that Allglass is precluded from recovery of these damages under Kawneer's (i) Limited Warranty and Remedy, and (ii) Terms and Conditions of Sale.

   FN18. All claims by Allglass against Kawneer pertain only to the 1201 Eye Street Project.

*1. Damages*

The Limited Warranty and Remedy, submitted by Kawneer to Allglass, provides, in pertinent part:
KAWNEER'S AGGREGATE TOTAL CUMULATIVE LIABILITY UNDER THIS LIMITED WARRANTY IS LIMITED TO THE DOLLAR AMOUNT OF THE PURCHASER'S ORIGINAL PAYMENT MADE TO KAWNEER FOR MATERIAL FURNISHED BY KAWNEER ONLY. IN CONSIDERATION OF THIS WARRANTY, KAWNEER SHALL NOT BE LIABLE FOR SPECIAL, DIRECT, INDIRECT, OR CONSEQUENTIAL DAMAGES OF ANY KIND, INCLUDING BUT NOT LIMITED TO LOSS OF USE, LOSS OF PROFITS OR GOODWILL, DAMAGES FOR NEGLIGENCE IN THE MANUFACTURE, DESIGN, OR INSTALLATION OF THE PRODUCTS, OR OTHER COMMERCIAL LOSS OR INJURY.

Paper 110, Ex. 8 (all caps in original). The Warranty further states that the Warranty "does not cover, and Kawneer hereby disclaims all liability for, the installation of Kawneer products." *Id.* Finally, the Warranty makes clear that the "sole and exclusive remedy" for any claims regarding Kawneer products "is limited to, at Kawneer's option, repair or replacement of such products or repayment by Kawneer of the purchase price paid for it." *Id.* [FN19] The final Kawneer Material Proposal, sent to and received by Allglass, incorporates "acceptance of Kawneer's Standard Warranty and Terms and

Case 3:01-cv-01746-AVC   Document 105-3   Filed 03/24/2006   Page 12 of 19

Not Reported in F.Supp.2d                                                                                  Page 11
Not Reported in F.Supp.2d, 2004 WL 1778862 (D.Md.)
(Cite as: Not Reported in F.Supp.2d)

Conditions of Sale included in Kawneer's current product and price catalogs." *Id.,* Ex. 10 at ¶ 5. Kawneer sent the installation instructions for the window components to Allglass on April 5, 2001 (*see id.,* Ex. 5) and the Warranty on June 25, 2002 (*see id.,* Ex. 13).

> FN19. Similarly, the Terms and Conditions of Sales provides, in pertinent part:
> Kawneer Company, Inc. hereby disclaims all liability for, and is not responsible or liable for, any damages or costs that may result from improper installation of its products. It is the responsibility of the dealer purchasing a Kawneer product to ensure that the Kawneer product is installed properly and in accordance with Kawneer's printed instructions.
> Paper 113, Ex. 7.

*13 It is well established that "Virginia law permits a manufacturer to tailor both the warranty protection offered with a product and the remedies available for breach of warranty." *Redman v. John D. Brush and Co.,* 111 F.3d 1174, 1182 (4th Cir.1997). [FN20] Disclaimers of contractual liability, as by Kawneer in its Warranty, "preserve the ability of parties to negotiate and enforce contracts which distribute the risks of certain kinds of liability between them." *Reibold v. Simon Aerials, Inc.,* 859 F.Supp. 193, 199 (E.D.Va.1994). In Virginia, when "experienced parties agree to allocate unknown or undeterminable risks, they should be held to their bargain; courts, or juries, should not be permitted to rewrite the agreement." *Envirotech Corp. v. Halco Eng'g, Inc.,* 234 Va. 583, 593, 364 S.E.2d 215, 220 (Va.1988). Allglass and Kawneer are both commercially sophisticated parties, particularly in the construction industry, and they have had a commercial relationship spanning 25 years and thousands of products. *See* Paper 110, Ex. 9 at ¶ 6, Ex. 11 at 203-04.

> FN20. In a federal diversity case, as the instant case, the court must apply the choice of law rules of the forum state, Maryland. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Absent a choice-of-law provision in the contract, as here between Allglass and Kawneer, "Maryland applies the law of the jurisdiction where the contract was made to matters regarding the validity and interpretation of contract provisions, and a contract is made where the last act necessary to make the contract binding occurs." *Riesett v. W.B. Doner & Co.,* 293 F.3d 164, 173 n. 5 (4th Cir.2002) (internal citations omitted). Kawneer contends that Virginia law applies because "the last operative act to make the contract binding" occurred in Virginia, from where Scott Pence, a project manager for Kawneer, sent the warranties for the Project directly to Dick Metzler of Allglass. Paper 110 at 11 n. 3. Kawneer provides evidence to support this assertion. Although it claims that "Kawneer's reliance on Virginia law is misplaced," Allglass stated that it "will respond to Kawneer's citation to Virginia law." Paper 123 at 5-6 n. 1. Allglass suggests that District of Columbia law is the appropriate applicable law, as Allglass received the warranties there, but it does not offer any evidence or supporting case law. Accordingly, because both parties have briefed the underlying substantive issues under Virginia law, the court will apply Virginia law in this case.

Therefore, the Virginia courts will enforce such disclaimers of contractual liability as valid, unless they are unconscionable. *See Reibold,* 859 F.Supp. at 199 ("the only substantive limit on parties wishing to disclaim any contractual liability ... is unconscionability"); *Blevins v. New Holland North America, Inc.,* 97 F.Supp.2d 747, 749 (W.D.Va.2000) ("A seller may by contract limit the remedies for breach of warranty, and ... may exclude consequential damages, unless the exclusion is unconscionable"). Unconscionability is "a narrow doctrine" which may invalidate the contract at issue, upon a showing that the contract is "one which no reasonable person would enter into, and the inequality must be so gross as to shock the conscience." *Sydnor v. Conseco Fin. Servicing Corp.,* 252 F.3d 302, 305 (4th Cir.2001) (internal quotations omitted). Indeed, unconscionability focuses on "a grossly unequal bargaining power at the time the contract is formed." *Envirotech Corp.,* 234 Va. at 593, 364 S.E.2d 215. The party challenging the provisions regarding disclaimer of liability and exclusive remedies, as Allglass here, bears the burden of proving that the disclaimer is unconscionable. *See Blevins,* 97 F.Supp.2d at 750; *Reibold,* 859 F.Supp. at 197. [FN21] Allglass must show that it "was compelled to accept [the provisions] by lack of meaningful choice." *Blevins,* 97 F.Supp.2d at 751.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1778862 (D.Md.)
(Cite as: Not Reported in F.Supp.2d)

Page 12

FN21. Unconscionability is a matter of law for determination by the court. See Blevins, 97 F.Supp.2d at 750 n. 5.

The disclaimer of liability and exclusive remedy provisions appear standard and appropriate for a contract between two sophisticated parties, as Allglass and Kawneer. In fact, Allglass does not contend that the provisions are unconscionable, much less submit any evidence that it was forced to accept them against its will. Allglass states that its "claims arise out of Kawneer's alleged failure to properly *design* the window system for the 1201 Eye Street Project." Paper 123 at 8 (emphasis added). However, the clear language of the Warranty bars such a claim: "KAWNEER SHALL NOT BE LIABLE ... FOR NEGLIGENCE IN THE MANUFACTURE, *DESIGN*, OR INSTALLATION OF THE PRODUCTS." Paper 110, Ex. 8 (emphasis added). Under the express provisions of the Warranty, Allglass may recover against Kawneer, if at all, only for the repair or replacement of the window components or repayment of the purchase price. See Redman, 111 F.3d at 1182-83 (enforcing disclaimer where plaintiff's remedy "is defined by [defendant's] warranty" and extent of defendant's liability "is controlled by [ ] warranty"). FN22 Accordingly, Kawneer's motion for summary judgment, as to Allglass' counterclaim for damages, will be granted.

FN22. Allglass argues that it should not be **bound** by the liability disclaimer because it did not sign the **Warranty** and therefore did not **accept** that provision. Kawneer had sent the **Warranty** to Allglass in June 2002. However, Kawneer had sent Material Proposals-all of which expressly incorporated "Kawneer's Standard **Warranty** and Terms and Conditions of Sale included in Kawneer's current product and price **catalogs**"-in February 2000, May 2000 and June 2001 (the final one). Paper 110, Ex. 10 at ¶ 5. Therefore, Allglass had sufficient notice of the liability disclaimer provision-based on the Material Proposals and the parties' extensive previous course of dealing-when it sent purchase orders to Kawneer on various dates in September 2000, January 2001, April-August 2001, and October 2001-March 2002. See id., Ex. 12. Allglass did not object to the provision in writing within 10 days of becoming aware of the **Warranty** (incorporated into the Material Proposals), as required by the Virginia Statute of Frauds (Va.Code Ann. § 8.2-201(2)). Therefore, absent a timely written objection by Allglass, these "purchase order[s] [were] a confirmatory writing effective against the sender under § 8.2-201(2)." Howard P. Foley Co. v. Phoenix Eng'g & Supply Co., 819 F.2d 60, 64 (4th Cir.1987); see also Armco, Inc. v. New Horizon Dev. Co. of Virginia, Inc., 229 Va. 561, 566, 331 S.E.2d 456, 459 (1985).

*2. Indemnification*

*14 Allglass also seeks indemnification from Kawneer, for Clark's "claims for the damages resulting from the design of the windows." Paper 23 at 6. The contract between the parties does not mention indemnity. Although an implied right to indemnity may arise from a contract, "only unique factors or a special relationship between the parties give rise to such a right." TransDulles Ctr., Inc. v. USX Corp., 976 F.2d 219, 228 (4th Cir.1992). Courts often do not recognize an implied indemnity right "because if the parties desired to create an indemnitor-indemnitee relationship, they could have done so expressly in the contract." Hanover Ins. Co. v. Corrpro Companies, Inc., 312 F.Supp.2d 816, 821 (E.D.Va.2004). As to Allglass and Kawneer, "no unique relationship existed beyond the fact of the contract itself." Dacotah Mktg. and Research, L.L.C. v. Versatility, Inc., 21 F.Supp.2d 570, 580 (E.D.Va.1998). Indeed, the ordinary commercial contract between the parties here "supplies no basis to find an implied contract for indemnification." TransDulles Ctr., 976 F.2d at 228.

Even if Allglass' claims against Kawneer sound in tort, a dubious proposition at best, Allglass still may not recover indemnification because it is not an innocent party. Under Virginia law, a party is entitled to equitable, implied indemnification in tort only if that party is "without personal fault, [but] nevertheless legally liable for damages caused by the negligence of another." Carr v. Home Ins. Co., 250 Va. 427, 429, 463 S.E.2d 457, 458 (1995); see also Hanover Ins. Co., 312 F.Supp.2d at 821. FN23

FN23. The Fourth Circuit, in an unpublished opinion, has stated that "in order to receive indemnity under Virginia law, a party seeking the award must be an innocent party." Gross v. Shearson Lehman Bros. Holdings, Inc., 43 Fed.Appx. 672, 678 (4th

Cir.2002) (unpublished disposition).

In the instant case, Allglass has acknowledged repeatedly that it failed to install the windows properly. For instance, Allglass wrote in its Remedial Work Action Plan, in October 2001, that "[a]ll the deficiencies are items that are not installed as per Kawneer Company installation and assembly instructions." Paper 110, Ex. 15. Glenn Christie, director of operations for Allglass, stated in his deposition that "[t]here were instances where some of these instructions initially were not done." *Id.*, Ex. 3 at 346 (lines 15-16). Furthermore, as discussed *supra,* Kawneer was brought in to conduct an investigation of the Project and prepare a report only after-and precisely because of-Allglass' deficient installation of the windows. There is no dispute that, as a matter of law, Allglass is at least partially, if not entirely, responsible for the faulty installation. Accordingly, Kawneer's motion for summary judgment, as to Allglass' indemnification claim, will be granted. [FN24]

> FN24. Notably, the Kawneer Warranty makes clear that it will apply "only if Kawneer's products are installed and maintained according to Kawneer's recommended practices and installation instructions." Paper 110, Ex. 8.

*F. Allglass' Motion to Strike*

Allglass had filed a motion to strike portions of Kawneer's reply or, in the alternative, for leave to file a surreply. Allglass claimed that Kawneer had raised a new argument for the first time in its reply. The court denied the motion to file a surreply as moot, but it deferred a determination on the motion to strike. The purported new argument claimed by Allglass was not considered by the court in its disposition of the instant motion. Based on the foregoing discussion granting Kawneer's motion for summary judgment, Allglass' motion to strike will now be denied as moot.

IV. Conclusion

*15 For the foregoing reasons, the court will grant the motion for partial summary judgment by Clark and the motion for summary judgment by Kawneer. The court will deny the motion for summary judgment and motion to strike by Allglass, and the motion for summary judgment by Colonial. A separate Order will follow.

ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is this 6th day of August, 2004, by the United States District Court for the District of Maryland, ORDERED that:

1. The motion by Plaintiff The Clark Construction Group, Inc. for partial summary judgment (Paper 106) BE, and the same hereby IS, GRANTED;

2. Judgment BE, and the same hereby IS, ENTERED in favor of Clark and against Defendants Allglass Systems, Inc. and Colonial Surety Company, as to liability;

3. The motion by Allglass for summary judgment (Paper 111) BE, and the same hereby IS, DENIED;

4. The motion by Colonial for summary judgment (Paper 112) BE, and the same hereby IS, DENIED;

5. The motion by Third-Party Defendant Kawneer for summary judgment (Paper 110) BE, and the same hereby IS, GRANTED;

6. Judgment BE, and the same hereby IS, ENTERED in favor of Kawneer and against Allglass on the Third-Party Claim;

7. The motion by Allglass to strike (Paper 128) BE, and the same hereby IS, DENIED; and

8. The Clerk will transmit copies of this Memorandum Opinion and this Order to counsel for the parties.

D.Md.,2004.
Clark Const. Group Inc. v. Allglass Systems, Inc.
Not Reported in F.Supp.2d, 2004 WL 1778862 (D.Md.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2096661 (Trial Motion, Memorandum and Affidavit) Allglass Systems, Inc.'s Opposition to Kawneer's Motion to Tax Bill of Costs (Jul. 25, 2005)
• 8:02cv01590 (Docket) (May. 02, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 2

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1983 WL 141711 (N.D.Ga.)
(Cite as: Not Reported in F.Supp.)

Page 1

Only the Westlaw citation is currently available.
United States District Court, N.D. Georgia, Atlanta Division.
ATLANTA SPECIALITY FOOD DISTRIBUTORS, INC., Plaintiff,
v.
WATKINS LEASING, INC., Defendant and Third-Party Plaintiff,
v.
CARRIER CORPORATION, Third-Party Defendant.
**Civ. A. No. C81-1341A.**

April 11, 1983.

ORDER

ROBERT H. HALL, Senior District Judge.

*1 This case is presently before the court pursuant to the court's order of January 28, 1983, directing the parties to submit additional briefs. The underlying lawsuit involves air conditioning units used to cool storage compartments in three refrigerated trucks. The units were manufactured by defendant Carrier Corporation (Carrier) and sold to Watkins Leasing, Inc. (Watkins). The units were then installed on trucks which Watkins leased to Atlanta Specialty Food Distributors, Inc. (Atlanta Specialty).

The present aspect of the case concerns the question of which of the two defendants will have to pay Atlanta Specialty for damages it allegedly incurred due to malfunction of the air conditioning units. Watkins contends that if it is liable to Atlanta Specialty, then Carrier is liable to Watkins for breach of warranty. Carrier, however, moved for partial summary judgment, contending that its warranty expressly excludes liability for special, incidental, and consequential damages.

This court held on November 8, 1982 that a disclaimer of incidental and consequential damages is effective even when an exclusive remedy fails of its essential purpose, as long as the disclaimer is not unconscionable. After thus granting partial summary judgment, the court became concerned whether the damage limitation had become part of the contract. Since the court's order directing the parties to further brief this question, the Georgia Court of Appeals handed down a decision which answers the question in favor of Carrier.

The circumstances in the two cases are virtually identical. In the instant case, Watkin's representatives attending a product presentation received promotional literature from Carrier which Watkins states that it "reviewed and relied on." (Watkins' Statement of Facts, ¶ 7). This "specifications sheet" for the Silver Hawk units in question contains the following printed statement:
Warranty: Complete unit warranted for 1 year parts and labor; see warranty details and limitations listed in Form No. M-4330 (7-78).

Shortly after the presentation, a seller of Carrier products submitted a written offer to sell three Carrier Silver Hawk Plus units to Watkins. Watkins verbally ordered the units and confirmed the order in writing. Watkins contends, and Carrier appears not to dispute, that the exclusion of damages was never verbally mentioned before the sale, and that Watkins did not receive the actual written warranty excluding damages until the units were delivered, about a year after they were ordered.

In *A-larms, Inc. v. Alarms Device Manufacturing Co.,* No. 65314 (Ga.App. Jan. 28, 1983), *cert. denied,* No. 39729 (Ga.S.C. March 16, 1983), the buyer had ordered goods described in the manufacturer's catalog. The catalog stated that an "18 months warranty (limited) is in effect on date stamped products. One year on most other products. Write for full warranty information." There, as here, the goods ordered were defective and could not be repaired by the manufacturer. Only then did the buyer discover that the written, limited warranty excluded incidental and consequential damages.

*2 The court of appeals held that the **warranty** effectively barred recovery of incidental and consequential damages. The court stated:
We note that the officers of A-larms emphasized that they had never requested or seen a copy of [the manufacturer's] written **warranty**. In view of the fact that the order catalog stated that the written, limited **warranty** was available upon request, A-larms may not avoid the terms of the written **warranty** by asserting reliance upon its understanding of the extent of the **warranty** based upon verbal communications by various [manufacturer] personnel. A party may not so benefit from its failure to exercise common prudence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1983 WL 141711 (N.D.Ga.)
**(Cite as: Not Reported in F.Supp.)**

Page 2

and diligence. See *Wilkinson v. Walker*, 143 Ga.App. 838 (240 S.E.2d 210) (1977).

*Id.* at 12-13.
*Id.* Court must agree with Carrier that the instant case is indistinguishable from *A-larms*. Here, Watkins ordered the units after receiving a specifications sheet stating that the **warranty** was subject to limitations. Like A-larms, however, Watkins, although admitting it reviewed this sheet, made no attempt to discover the substance of these limitations. It is irrelevant under *A-larms* that Watkins may not have had a copy of the **warranty** until after the sale. The notice provided by the specifications sheet was sufficient to alert Watkins, and its failure to act to learn the limitations on the **warranty** bars its present challenge to the damage exclusion. [FN1] Whether the court feels that *A-larms* was decided rightly or wrongly does not matter. This court is **bound** to follow it. *Gooding v. Wilson*, 405 U.S. 518, 525-26 n. 3 (1972).

Watkins argues that despite *A-larms,* the damage exclusion is not effective because the limitation language on the specification sheet was not conspicuous. Apparently, Watkins argues that the language was neither physically conspicuous nor sufficiently obvious in its meaning to be conspicuous. Carrier responds that although disclaimers of warranties must be conspicuous under O.C. G.A. § 11-2-316(2), the requirement does not apply to damage limitations. While this argument appears to have merit, the court need not decide that question because it finds that the language was sufficiently conspicuous. The language is large enough and placed so that a "reasonable person against whom it is to operate ought to have noticed it." O.C.G.A. § 11-1-201(10). This is especially true of someone who has reviewed the document, as Watkins admitted it did. The type used for the language in question is larger than a great portion of the type on the page on which it appears, and is separated from the other information. It is not buried within a mass of fine print. Rather, the language is placed so as to call attention to it.

Nor is the meaning of "limitations" so obscure as to render the language inconspicuous. Despite Watkins' argument that the most reasonable construction of "limitations" is that it refers to time, the court finds that it should be obvious to a commercial entity that "limitations" could also refer to damages. Moreover, in *A-larms,* the language revealed no more than that the warranty was "limited." The court there did not find such language inconspicuous, and this court must reach the same result.

*3 Watkins argues that even if the court finds that the damage exclusion was part of the sales contract under *A-larms,* it is nevertheless void because it is unconscionable. Watkins argues that the *A-larms* court did not consider procedural unconscionability and argues that the inconspicuous nature of the disclaimer and Carrier's failure to disclose it to Watkins at the time of the sale render the disclaimer unconscionable.

However, the *A-larms* court appeared to consider unconscionability to some extent for it stated that the "limitations and exclusions were certainly conspicuous on the written warranty, and we are unable to find, in this case, any of the exclusions unreasonable or unconscionable." *A-larms* at 12. Moreover, Watkins' conspicuousness and disclosure arguments were rejected in the above discussion of whether the disclaimer was part of the contract. They have no more force here in the context of unconscionability. In view of the notice provided Watkins by the specifications sheet that the warranty was subject to limitations and the not inconspicuous nature of the language in question, the court finds that the disclaimer is not unconscionable.

For the first time in its supplemental brief in response to the court's order of January 28, Watkins makes waiver and estoppel arguments against Carrier's assertion of the damage limitation. These arguments come too late and in any event, are without merit. As Carrier points out, estoppel requires some intended deception in the form of false representation or concealment of material facts by the party to be estopped. *Bell v. Studdard*, 220 Ga. 756, 760 (1965). Watkins does not state clearly what the intended deception by Carrier was. However, Carrier cannot be estopped from relying on the damage limitation because under *A-larms,* Watkins is deemed to have had notice of the exclusion from the time it received the specification sheet.

Nor can Carrier be said to have waived its right to assert the damage limitation. If Carrier requested that Atlanta Specialty submit a statement of losses, this cannot be viewed as a waiver to assert its right to limit those losses when later sued by Watkins. Nor can Carrier's refusal to repurchase the units and its attempts to repair the units be viewed as a waiver of the damage exclusion by Carrier when later sued by Watkins. The *A-larms* decision forecloses Watkins' attempts to escape the damage exclusion on these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 3:01-cv-01746-AVC    Document 105-3    Filed 03/24/2006    Page 18 of 19

Not Reported in F.Supp.
Not Reported in F.Supp., 1983 WL 141711 (N.D.Ga.)
(Cite as: Not Reported in F.Supp.)

Page 3

facts by attributing knowledge of the disclaimer to Watkins.

Resolution of the question whether the disclaimer of damages was part of the contract of sale in favor of Carrier requires the court to examine Watkins' motion for reconsideration. [FN2] Watkins has pointed out a recent decision from the Fifth Circuit which appears to align itself with the courts that hold that once it is determined that a limited warranty fails of its essential purposes, then the limitations upon the recovery of consequential and incidental damages are to be disregarded. See *Delhomme Industries, Inc. v. Houston Beechcraft, Inc.,* 669 F.2d 1049, 1062 (5th Cir.1982). Carrier argues vigorously that *Delhomme* cannot be so interpreted, but the court need not determine the meaning of the admittedly vague language in question. *Delhomme,* not decided prior to October 1, 1981, nor by Unit B of the Fifth Circuit, is not binding on this court. See *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981). Moreover, the court believes that the view adopted in the November 8, 1982 order is the better reasoned one.

*4 Watkins also seeks reconsideration of the court's decision that incidental, as well as consequential, damages are not recoverable even though a limited remedy fails of its essential purpose. Watkins points out that O.C.G.A. § 11-2-719(3) does not refer to incidental damages. [FN3] Watkins also argues that not a single case following the view that a damage disclaimer is effective even when an exclusive remedy fails of its essential purpose excludes incidental as well as consequential damages.

In most of the cases, incidental damages were not involved. They were involved, however, in a recent case, *Office Supply Co. v. Basic/Four Corp.,* 530 F.Supp. 776 (E.D.Wis.1982). The contract in that case excluded incidental and consequential damages. The court held that the damage limitation was effective to exclude incidental *and* consequential damages even if the limited remedy failed of its essential purpose, as long as the exclusion was not unconscionable. See *id.* at 787-88.

Unfortunately, the Uniform Commercial Code has ambiguities and gaps, requiring interpretation by the courts. While O.C.G.A. § 11-2-719(3) does not mention incidental damages, this court agrees with the *Office Supply* court that they may be limited too, even though an exclusive remedy fails of its essential purpose, as long as the limitation is not unconscionable. In this connection, Watkins challenges the court's finding that the exclusion was not unconscionable, arguing that the court incorrectly placed the burden of proof on Watkins. Watkins points out that the party moving for summary judgment, Carrier, has the burden of affirmatively demonstrating that there is no question of fact on every relevant issue.

This problem with allocation of the burden of proof appears to be largely irrelevant in view of the court's earlier discussion of unconscionability. To establish unconscionability, Watkins relied heavily on its argument that it never agreed to the damage exclusion nor even knew about it until the units were delivered. The court found above, however, that under *A-larms,* Watkins had constructive notice of the limitation before the contract of sale was made and therefore that the damage exclusion was part of the contract. Further, the court found that due to Watkins' constructive notice the exclusion could not be unconscionable on this ground.

Additionally, the court found that the exclusion was not unconscionable because the language referring to "warranty details and limitations" in Form M-4330 (7-78) was sufficiently conspicuous. Finally, the undisputed evidence shows that the disclaimer itself was conspicuous enough to have put Watkins on notice of its existence. These facts together with the obvious fact that Watkins is a commercial entity sufficiently sophisticated to protect itself in contract negotiations convinces the court that its earlier decision should not be disturbed.

One final matter remains. Watkins argues that the court should certify its November 8, 1982 order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). That section provides in pertinent part:
*5 When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of litigation, he shall so state in writing in such order.

The court of appeals may then permit an appeal from the order in its discretion.

The court is persuaded that interlocutory appeal would not be appropriate in this case for several reasons. First, the order in question involves only the damages that Watkins might recover from Carrier if Watkins is found liable to Atlanta Specialty. Thus, in order for the problem to arise, Atlanta

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1983 WL 141711 (N.D.Ga.)  
**(Cite as: Not Reported in F.Supp.)**

Page 4

Specialty must prove its case against Watkins and Watkins must prove its case against Carrier. Failure of either Atlanta Specialty or Watkins to prove its case would moot the question Watkins seeks to certify for immediate appeal. Thus, an appeal now may very well turn out to be a waste of time.

Additionally, it is clear that an immediate appeal would not materially advance the ultimate termination of the case since the appeal would take a year at the very least, and probably more. This length of time, added to a case already only a little less than two years old, would unacceptably prolong the litigation. A trial appears inevitable, and it should take place as soon as possible. Accordingly, Watkins' motion for interlocutory appeal, as well as its motion for reconsideration, are DENIED.

The parties are directed to submit their proposed pretrial order by April 27, 1983.

So ORDERED this 8 day of April, 1983.

FN1. Because the court finds that under *Alarms*, Watkins is deemed to have had notice that Carrier's warranty would have limitations at the time of the sale and therefore that the damage limitation was part of the contract of sale, the court need not consider Carrier's privity argument.

FN2. In view of the parties' extensive briefs on the various issues and the fact that the issues are legal ones, Watkins' request for oral argument on its motion for reconsideration is denied.

FN3. O.C.G.A. § 11-2-719 provides in pertinent part as follows:
(2) When circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title.
(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not.

N.D.Ga.,1983.  
Atlanta Specialty Food Distributors, Inc. v. Watkins Leasing, Inc.

Not Reported in F.Supp., 1983 WL 141711 (N.D.Ga.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.